**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>**CLARK-CUTLER-MCDERMOTT COMPANY**, *et al.*,[1]<br><br>**Debtors.** | Chapter 11<br><br>Case No. 16-<br><br>**(Joint Administration Requested)** |

**DECLARATION OF JAMES T. MCDERMOTT**
**IN SUPPORT OF CHAPTER 11 PETITIONS**
**AND FIRST DAY MOTIONS AND APPLICATIONS**

I, James T. McDermott, declare as follows:

1. I am the Chief Executive Officer ("CEO") of Clark-Cutler-McDermott Company ("CCM"). I am also a member of CCM's Board of Directors.

2. CCM and CCM Automotive Lafayette LLC ("Lafayette" and collectively with CCM, the "Debtors") are the debtors in the above-captioned cases. CCM is the sole managing member of CCM Automotive LLC, which in turn is the sole member (and manager) of Lafayette. In this capacity, I am familiar with the Debtors' day-to-day operations, business, and financial affairs.

3. In 1983, I obtained a Bachelor of Arts degree in economics from Providence College. In 1985, I obtained an MBA (Finance and International Business) from the University of Notre Dame.

---

[1] The Debtors in these chapter 11 cases are Clark-Cutler-McDermott Company and CCM Automotive Lafayette LLC. CCM's corporate headquarters are located at 5 Fisher Street, Franklin, Massachusetts, 02038. Lafayette, a wholly owned subsidiary of CCM Automotive LLC, has its principal place of business at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia 30728.

4. Prior to joining CCM, I worked as a financial analyst for Ford Motor Company in Dearborn, Michigan. While at Ford, I was responsible for cost and capital investment tracking for future model vehicles, including the 1990 Lincoln Town Car and the 1992 Ford Probe. In that capacity, I developed and tracked budgets and business plans for various product development activities.

5. I joined CCM in 1988 as a controller. Since that time, I have held the following positions: Assistant Treasurer/Chief Financial Officer; Treasurer/Chief Financial Officer; Vice President/Chief Operating Officer; and Chief Executive Officer (2010 – present).

6. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") for the purpose of apprising the Court and other parties in interest of the circumstances leading to the commencement of these Chapter 11 Cases and in support of the First Day Pleadings.

7. Except as otherwise indicated, all statements set forth in this Declaration are based upon (i) my knowledge of CCM and its indirect subsidiary Lafayette, (ii) information supplied to me by other members of the Debtors' board, management, and employees or the Debtors' professionals, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs. If called upon to testify, I could and would competently testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

8. Part I of this Declaration describes the Debtors' business and general background, Part II describes the circumstances giving rise to the commencement of the Chapter 11 Cases, Part III describes the Debtors' organization, their financial results, current assets, and liabilities, Part IV describes the Debtors' proposed course of the Chapter 11 Cases, and Part V sets forth certain facts in support of the individual First Day Pleadings.

## I. Overview of the Debtors' Business

### A. General Background

9. CCM was founded in 1911 by Walter Clark, William Cutler, and my great grandfather, Thomas S. McDermott. CCM's headquarters have remained in Franklin for over a century. A privately held company, CCM has been owned and operated by members of the Clark, Cutler, and McDermott families since its inception. CCM has a long history of developing innovative products for the automotive acoustical industry including: re-claimed cotton acoustical insulation (1971), polypropylene splash shields and fender insulators (1978), and resin-free moldable acoustical insulators (1986).

10. Historically, the Debtors' customer base has been comprised primarily of original equipment manufacturers, parts suppliers, and other suppliers within the automotive industry. The Debtors' non-woven products are also sold to a variety of customers in the transportation, industrial, and textile sectors.

11. Today, CCM is a Tier I and Tier II manufacturer of molded and flat die-cut acoustic insulation and natural fiber-based interior trim products for the automotive industry. CCM also produces a variety of non-woven textile products for the industrial, transportation, and textile industries such as moving pads, grease and oil absorption mats, and other padding. Operating from 300,000 square feet of manufacturing and distribution space located in Franklin,

Massachusetts, CCM produces a full range of products with complete material testing, prototype and production build capabilities.

12. Lafayette is a wholly-owned indirect subsidiary of CCM and produces contoured acoustic insulation and interior trim products for the automotive industry from an 80,000 square-foot manufacturing and warehouse facility in Lafayette, Georgia.

**B. The Debtors' Relationship With General Motors**

13. The Debtors' single largest customer is General Motors LLC ("GM"). Presently, more than 80% of the Debtors' revenues are generated by the sale of automobile parts to GM. CCM manufactures a variety of parts (including floor, dash, and other acoustical insulators) for GM cars and trucks. CCM ships the products primarily from its Franklin campus to GM manufacturing facilities throughout North America, including the Midwest, Mexico, and Canada. Over the past 50 years, the Debtors' relationship with GM has expanded substantially and the Debtors now supply approximately 175 different parts for GM vehicles.

14. For nearly 50 years, CCM has had a very positive relationship with GM. In fact, CCM received the prestigious "Supplier of the Year" award from GM four times in the last seven years (i.e. 2009, 2010, 2012, and 2015). The "Supplier of the Year" award is a very selective honor bestowed upon less than 1% of GM's suppliers worldwide (i.e., approximately 70 out of more than 20,000). In 2012, CCM was also one of only four companies globally to receive GM's "Overdrive" award, which recognizes suppliers that have gone above and beyond in meeting GM's exacting business demands and demonstrating commitment to their communities.

## II. Events Leading to Chapter 11

15. The Debtors' contracts with GM – their single largest customer – are very unprofitable. In fact, as a result of its current pricing arrangements with GM, CCM is operating

4

at a loss of more than $30,000 per day.  The Debtors' supply relationship with GM is memorialized in a series of Purchase Order Contracts, which are supplemented by GM's General Terms and Conditions (collectively, the "GM Contracts").  The GM Contracts require CCM to manufacture products on a fixed price requirements basis.  More specifically, the GM Contracts obligate CCM to produce all of GM's requirements for each component or part, and the price paid by GM for each part usually decreases annually.  As illustrated by its General Terms and Conditions, the GM Contracts are highly favorable for GM and equally unfavorable for the Debtors.

16. Between 2012 and 2015, GM encouraged CCM to open new manufacturing facilities closer to GM's North American Assembly Plants, thereby reducing GM's inbound transportation costs.  CCM responded by opening new manufacturing facilities in Lafayette, Georgia and by establishing a joint venture in Irapuato, Mexico.  GM rewarded CCM's efforts by awarding CCM, Lafayette, and the Mexican joint venture contracts to produce additional parts.  Unfortunately, the price targets provided by GM for numerous parts are significantly below market prices and even below CCM's manufacturing cost.  As the Debtors produced greater quantities of parts for GM, they incurred greater operating losses.  Despite corrective measures by CCM, as further discussed in Part III below, CCM's performance under the GM Contracts has caused the companies to lose more than $12 million since 2013.

17. To assist the Debtors in assessing their business and in assessing their options with GM, in early 2016, CCM engaged a team of consultants from the corporate restructuring group of KPMG LLP ("KPMG").

5

18.     In March of 2016, the Debtors requested price concessions from GM on certain money-losing parts.  CCM explained to GM that without an increase in pricing for its parts, CCM would soon run out of money.

19.     On or about April 1, 2016, CCM and GM entered into an Interim Accommodation Agreement, whereby the parties made various mutual commitments for an initial thirty (30) day period during which time they agreed to negotiate in good faith toward new pricing for certain money-losing parts.  During this thirty day period, GM agreed to provide funding to support CCM's operations.  For every dollar advanced by GM, the Interim Accommodation Agreement provided that $0.50 would take the form of a secured loan, and the remaining $0.50 would be treated as a price adjustment in CCM's favor, although still insufficient to make the contracts profitable.  In other words, CCM was forced to incur additional debt to continue producing parts for GM at a substantial loss.

20.     The Interim Accommodation Agreement was twice extended to give GM additional time to analyze and negotiate CCM's requests for price increases.  During the course of negotiations, GM demanded that CCM engage an investment banker to market the company for sale as a going concern.  CCM interviewed several candidates, engaged Conway MacKenzie Capital Advisors LLC ("Conway MacKenzie") and made plans to begin a marketing process once an agreement on pricing was reached.  CCM made clear to GM that without price increases that would enable the companies to manufacture and sell parts to GM at a profit, there would be no market to sell their businesses as a going concern.

21.     More than three months since the Interim Accommodation Agreement was executed, the parties have been unable to reach an agreement on a revised price structure that would support a sale of the Debtors as a going concern.  Based on advice the Debtors have

received from their financial advisor, KPMG and their investment banker Conway MacKenzie, it is my opinion that because of the current pricing contained within the GM Contracts, more value can be generated through a "turn-key" sale of the Debtors' assets than as a going concern, where a buyer would have to absorb and sustain the same degree of losses that CCM is currently experiencing.

22. As of the Petition Date, CCM has borrowed more than $5 million from GM (together with one-time price increases, a total of more than $10 million has been advanced by GM under the Interim Accommodation Agreement) to sustain its money-losing operations for the past 90 days. Ultimately, GM was unwilling or unable to make price concessions or to otherwise support a sale process that would accomplish anything for anyone other than itself.

23. The term of the Interim Accommodation Agreement (as extended) expired on June 17, 2016. With no hope of a breakthrough in negotiations, following a Board of Directors' meeting on June 16th, CCM reluctantly decided to shut down its Franklin and Lafayette factories and to layoff all of its employees. Operations were discontinued at approximately 4:00 p.m. on Friday, June 17th.

24. During the afternoon of June 17th, GM filed suit against CCM and Lafayette in the United States District Court for the Eastern District of Michigan (the "District Court") in Detroit. GM sought an emergency temporary restraining order ("TRO") and/or the appointment of a receiver. Following an emergency hearing, and based on GM's representation that it would continue to fund the Debtors' operations on the same terms as it had previously, the District Court entered the TRO, forcing the Debtors to continue producing parts under the GM Contracts.

25. Compounding the Debtors' financial difficulties, and despite timely delivery of every part ordered by GM since the TRO, GM has refused to pay CCM's invoices for parts

7

supplied since June 17th.  As of the Petition Date, GM owes CCM approximately $2 million for parts manufactured and delivered since the TRO was entered.

26. In a final attempt to resolve the matter, and to achieve a mutually beneficial outcome, the parties met at CCM's Franklin, Massachusetts facility on June 28th.  Following a meeting that lasted several hours, no new proposals were exchanged and the parties were unable to resolve their differences.

27. CCM's Board of Directors convened another meeting on July 6th.  The Board reviewed the Debtors' efforts to cut costs, improve efficiencies, improve liquidity, and obtain price concessions from GM.  With the assistance of counsel, the Board reviewed all available options.  Regrettably, the Board concluded that it must end, once and for all, its deepening insolvency, and a resolution was passed authorizing the commencement of these Chapter 11 Cases.

28. To ensure that maximum value is achieved for the Debtors' assets, the Board decided to commence these Chapter 11 Cases, to very shortly thereafter discontinue their money-losing operations, and to immediately begin the long anticipated investment banking process, where the Debtors' assets will be offered in a turn-key sale, together with an opportunity to lease the Franklin and Lafayette factories from CCM's non-debtor affiliates.

### III. Corporate Structure, Assets, and Liabilities

**A. Corporate Structure**

29. CCM is a privately-held corporation organized under the laws of the Commonwealth of Massachusetts, with approximately 41 shareholders, all of which are descendants or family members of the founders.  There are two classes of stock: voting and non-voting and there is no liquidation preference between them.

30. The Debtors' equity ownership structure is straightforward. CCM owns the membership interests in Lafayette indirectly through its wholly-owned subsidiary CCM Automotive LLC. CCM has several other direct and indirect subsidiaries and affiliates, including non-debtors CCM Automotive LLC, AirLoc LLC, Duffy's Park LLC, CCMcD Real Estate LLC, CCM Automotive Hildebran LLC, CCM Acoustics Holding, S.A. de C.V., CCM Real Estate Lafayette LLC, Hayward Street LLC, and a minority interest in CCM Acoustics S.A.P.I. de C.V.

31. CCM's executive offices and primary manufacturing facilities are located at 5 Fisher Street, Franklin, Massachusetts. Lafayette also operates an 80,000 square foot manufacturing and warehouse facility located at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia. The real estate from which the Debtors operate is owned by non-debtors, CCMcD Real Estate Lafayette LLC and CCMcD Real Estate LLC (collectively, the "Real Estate Entities").

32. As of the Petition Date, CCM had 229 employees. Of those employees, 16 are salaried and 213 are hourly. In addition, 161 of the employees are members of the New England Joint Board Local 31T of Unite Here ("NEJB").

**B. Assets**

33. The Debtors' assets consist primarily of: (i) cash; (ii) inventory (i.e. raw materials, work in progress, and finished goods); (iii) machinery and equipment; (iv) accounts receivable; and (v) intellectual property. As of the Petition Date, the Debtors had approximately $1,930,973 in cash on hand,[2] $2,910,900.69 of accounts receivable, inventory with a book value of approximately $1,185,748.04, and equipment with an orderly liquidation value of $5,157,400.[3]

---

[2] This amount is subject to the reconciliation of outstanding items.

[3] Prior to the Petition Date, appraiser Koster Industries, Inc. ("Koster") physically viewed and valued the Debtors' machinery and equipment, issuing a written appraisal on May 17, 2016. Koster estimated that the forced liquidation

9

**C. Liabilities**

34. The Debtors' liabilities fall primarily into the following two categories: (a) approximately $6.5 million of secured debt; and (b) approximately $6.8 million in trade debt. In addition, pursuant to its collective bargaining arrangement with the NEJB, CCM is a participant in the National Retirement Fund, a multi-employer defined benefit pension plan (the "Pension Plan"). In the event of its withdrawal from the Pension Plan, CCM would incur so-called "withdrawal liability" to the Pension Plan, the net present value of which is currently projected to be $8.7 million.

*(1) Secured Financing Transactions with Wells Fargo and GM*

35. The Debtors have two secured creditors, Wells Fargo Bank, National Association acting through Wells Fargo Business Credit ("Wells Fargo") and GM. A summary of the Debtors' obligations under its secured loan facilities is attached to the Cash Collateral Motion (described below) as **Exhibit B**.

36. The Debtors' financing relationship with Wells Fargo includes a $9 million revolving credit facility (the "Revolver") and a $3,181,500 term loan (the "Term Loan"). As of the Petition Date, no money was outstanding or owed on the Revolver and approximately $1,486,296.40 was outstanding to Wells Fargo on account of the Term Loan.

37. The outstanding principal balance of the Term Loan is paid in equal monthly installments of $66,276.00 on the first of each month. Obligations under the Revolver and Term Loan are secured by blanket liens against substantially all of the Debtors' assets pursuant to that certain Third Amended and Restated Credit and Security Agreement dated May 23, 2012. Wells

---

value of the Debtors' machinery and equipment would be $3,106,045, while an orderly liquidation would generate $5,157,400.

Fargo also holds mortgages against certain real estate owned by the Real Estate Entities, as security for guarantees given by the Real Estate Entities.

38. The Debtors' financing relationship with GM arose in connection with the Interim Accommodation Agreement and is evidenced by a series of Notes dated March 14, March 15, April 25, May 6, May 13, May 23, May 27, June 10, June 20, June 22, June 24, 2016, June 30, and July 6, 2016 (collectively, the "Junior Notes"), which accrue interest at the rate of 6.94% per annum. The Junior Notes are payable on demand. The Debtors' obligations under the Junior Notes are secured by a blanket lien against substantially all of their assets pursuant to that certain Amended and Restated Security Agreement entered into on March 15, 2016.

39. Beyond the approximately $1,486,296.40 outstanding to Wells Fargo on account of the Term Loan and the approximately $5,047,500 outstanding to GM on the Junior Notes, the Debtors have no other secured debt.

*(2) Trade Debt*

40. In addition to secured debt owed to Wells Fargo and GM, the Debtors owed approximately $6.8 million as of May 31, 2016 in unsecured debt owed to various vendors and service providers in connection with their business operations.

**D. Financial Performance**

41. For the last several years, the Debtors have been operating at a significant loss. For the year ended December 31, 2013, CCM's consolidated net loss totaled $750,270. At year end 2014, its consolidated net loss had increased to $3,676,220. By year end 2015, CCM's consolidated net loss totaled $3,735,568. For the five months of 2016 ended May 31st, CCM suffered consolidated losses totaling $5,227,992, almost doubling its losses for the entire prior year. Currently, CCM is operating at a loss of more than $30,000 per day.

## IV. Proposed Course of Chapter 11 Cases

42. The Debtors cannot continue in business under the GM Contracts. A fundamental goal of the Interim Accommodation Agreement was to achieve permanent price increases that would allow the Debtors to earn a profit, and thereby positioning the companies for sale as a going concern where the buyer would inherit acceptable margins. CCM has been unable to secure those necessary price increases. Instead, through these Chapter 11 Cases, the Debtors seek this Court's approval of the immediate rejection of the GM Contracts. Thereafter, the Debtors intend to conduct an investment banking and auction process to offer their assets for sale, together with the opportunity to lease the Franklin, Massachusetts and Lafayette, Georgia facilities as a turn-key operation. As part of the first-day relief, the Debtors are seeking this Court's approval of their decision to reject the GM Contracts, which have inflicted more than $12 million in losses on the companies since 2013. While the Debtors seek to reject their existing GM Contracts immediately, we intend to work cooperatively with GM to facilitate an orderly transition of the Debtors' assets to the highest bidder, which is likely to be an existing GM supplier.

43. Subject to this Court's approval of the Debtors' decision to reject the GM Contracts, the Debtors will cease operations on July 8, 2016. Thereafter, the Debtors will pursue a turn-key sale of their assets, wherein they will sell substantially all of their assets under a court-approved auction process. In cooperation with the Debtors, the Real Estate Entities have agreed to make available for lease to the highest bidder (at fair market rents) the Franklin and Lafayette facilities. This process will maximize the value of the Debtors' assets by eliminating the burdensome GM Contracts and by enabling the highest bidder to engage the Debtors' highly skilled workforce and to immediately operate the Debtors' assets for a profit.

44. The Debtors have concluded that their assets will be significantly more valuable once the burden of the GM Contracts is lifted.

## V. First Day Relief

45. In connection with their chapter 11 petitions, the Debtors have filed a number of First Day Pleadings seeking various forms of relief. To the extent they were not otherwise addressed above, the facts underlying the First Day Pleadings are stated below.

### A. Motions For Which Approval Will be Sought At The First-Day Hearing

#### *(1) Joint Administration of Cases and Related Relief*

46. The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only. I believe it would be far more practical and efficient for the administration of these two Chapter 11 Cases if the Court were to authorize their joint administration. As explained above, Lafayette is an indirect subsidiary of CCM. Most of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect each of the Debtors. Joint administration should, therefore, reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, hearings, applications, and orders. This would benefit all parties in interest.

47. The Debtors also ask the Court to extend the deadline for the filing of schedules, statements of financial affairs and other statements of financial information required by the Bankruptcy Rules to a date that is thirty (30) days from the Petition Date. I understand that under applicable rules, this would be a sixteen (16) day extension of the deadline to file schedules and statements. Given the effort required to prepare for and conduct these cases on an expedited basis, and the attention paid pre-petition in trying to stave off the filing entirely, the Debtors will not be in a position to accurately complete their schedules and statements within the

deadlines allowed for by the Bankruptcy Rules and Local Rules. Once the Debtors' agreements with GM have been rejected and its manufacturing operations have ceased, the Debtors will retain a skeleton staff to assist in the marketing and sale process. This same staff will need to handle the preparation of the Debtors' schedules and statements. For these reasons, I believe that the requested extension is necessary to ensure that the Debtors can appropriately prioritize tasks in their attempt at an orderly liquidation.

48. By this same motion, the Debtors are also asking the Court to authorize the filing of a consolidated creditor matrix and a consolidated list of their top twenty (20) unsecured creditors. The Debtors' creditors are largely the same. As a result, two separate matrices would repeat much of the same information. As the Debtors are seeking the joint administration of the Chapter 11 Cases, all their creditors will receive the same notices, hearing dates, and so forth, regardless of the creditor matrix on which they would appear. Further, there would be no significant benefit to offset the burden of compiling separate lists. Moreover, a single consolidated list of their combined twenty largest creditors in the Chapter 11 Cases is sufficient to reflect the body of unsecured creditors that have the greatest stake in these cases. Given that the Debtors are affiliates and by nature of their business have some overlapping creditors, the Debtors believe that such relief is appropriate.

*(2) Motion to Use Cash Collateral*

49. For the reasons set forth below, the Court's approval of the Cash Collateral Motion is critical. As of Petition Date, the Debtors had approximately $4,841,873.69 of accounts receivable ($2,910,900.69) and cash on hand ($1,930,973) which is Cash Collateral of Wells Fargo and possibly GM. The Debtors do not have access to unencumbered cash nor could they procure any alternate source of financing. Absent authorization from the Court to use Cash

Collateral, the Debtors will be unable to pay their employees remaining wages or to pay the costs and expenses of administering these Chapter 11 Cases. The use of Cash Collateral will enable the Debtors to preserve the value of their assets while they pursue a turn-key sale. Specifically, through the use of Cash Collateral, the Debtors will pay employees remaining wages and benefits (including for the ongoing skeleton staff), insurance, taxes, and other necessities. Without the ability to use Cash Collateral to pay for such expenses, the Debtors will be forced to liquidate on a fire sale basis, thereby substantially devaluing their assets below what is expected to be generated in a more orderly process.

50. Unless the Court authorizes the use of Cash Collateral, I do not believe that the Debtors will be able to pay for services and expenses necessary to preserve and maximize the value of the Debtors' estates. Moreover, I believe that such relief on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending a final hearing.

*(3) Employee Wage Motion*

51. The Debtors are asking the Court to enter an order authorizing payment of prepetition Employee Wages and Benefits (as defined in the Employee Wage Motion) and to continue to honor the Employee Wages and Benefits until such time as operations are discontinued. Thereafter, the Debtors will continue to provide such wages and benefits to the skeleton staff that remains. Absent the requested relief, many of the employees may be unable to meet personal obligations and may be left without medical insurance.

*(4) Motion to Reject the GM Contracts*

52. Contemporaneously with the filing of the Chapter 11 Cases, the Debtors filed a motion to reject the GM Contracts. After several months of analysis, input from third-party advisors, and negotiations with GM, it is the Debtors' business judgment that their assets will be

more valuable if decoupled from the significant and unsustainable financial burdens imposed by the GM Contracts. Once the GM Contracts are rejected, the Debtors' resources will be liberated, they will be able to maximize the value of their assets through a professionally managed turn-key sale process.

53. As further described above, CCM's performance under the GM Contracts has inflicted losses totaling more than $12 million since 2013. Presently, CCM incurs daily losses of more than $30,000 producing parts for GM under the GM Contracts. The current terms of the GM Contracts are simply not economic and have resulted in a deepening insolvency that GM was unwilling or unable to address. For all of these reasons, it is the Debtors' business judgement that the immediate rejection of the GM Contracts will benefit their estates.

### A. Motion For Which Approval Will Be Sought At the Second-Day Hearing

#### *(1) Application to Employ Conway MacKenzie Capital Advisors LLC*

54. Among their First Day Motions, the Debtors have filed an application to employ Conway MacKenzie as investment banker. Conway MacKenzie is a full-service international investment banking firm with expertise across a wide range of products and services in investment banking, wealth and asset management, and financial restructuring, among others. The Debtors interviewed several candidates and selected Conway MacKenzie because its professionals have extensive experience working with financially distressed auto parts suppliers, both in and out of chapter 11. In addition, since May 2016, Conway MacKenzie has been developing a marketing and sale strategy for the Debtors. With input from GM, Conway MacKenzie has created an executive summary or "teaser" to use for marketing purposes, developed a focused list of strategic and financial targets likely to be interested in purchasing the Debtors' assets, and established an electronic data room to facilitate due diligence by potential

16

bidders. With Conway MacKenzie's assistance, the Debtors can conduct an expeditious sale process that will maximize recoveries for all concerned.

## Declaration

55. Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

## Relief Requested

56. I respectfully request that the Court grant the relief requested in the First Pleadings and such other and further relief as may be just and proper.

Clark-Cutler-McDermott Company

By: _____
James T. McDermott
Chief Executive Officer

Executed on:
July 6, 2016