## **EXHIBIT B**

**Engagement Letter**



1301 McKinney St, Suite 2025
Houston, Texas 77010

April 14, 2016


Mr. Thomas R. McDermott
President
Clark-Cutler-McDermott Company
5 Fisher Street
Franklin, Massachusetts 02038

Dear Mr. McDermott:

This letter (the "Agreement") confirms our understanding that Clark-Cutler-McDermott Company, including its subsidiaries affiliates and any related successor entities resulting from the transactions contemplated herein (the "Company") has engaged Conway MacKenzie Capital Advisors LLC ("CMCA") as exclusive advisor to render investment banking services to the Company in connection with the implementation of strategic advisory alternatives, including a targeted sale process and commercial discussions with the Company's primary customer, General Motors ("GM"). Any terms not defined below will otherwise have the meaning ascribed in Schedule II of this Agreement.

1. **Services**

    A. In connection with its role as advisor and as part of its efforts to help you achieve your objectives, CMCA will be available to, as requested and directed by the Company:

    i. provide support, as requested, to the Company in negotiations with GM pertaining to the interim Access and Accommodation agreement, including request for further pricing, among other potential commercial requests;
    ii. assist the Company in the preparation of an executive summary and electronic data room relating to the proposed Disposition for distribution and presentation to potential strategic buyers or financial sponsors who own a related investment (collectively the "Prospective Buyers") upon the execution of a non-disclosure agreement;
    iii. screening of potentially interested Prospective Buyers together with the Company to develop a target list ("Targets"); in conjunction with the Company, the parties would endeavor to refine the Targets to approximately 20 - 40 Prospective Buyers;
    iv. coordinating, together with involvement from the Company, materials and information to be made available to Prospective Buyers as part of due diligence investigations and as a supplement to the electronic data room;
    v. assist the Company in evaluating indications of interest and/or letters of intent which are received from Prospective Buyers;
    vi. participate in site visits and potential management meetings with Prospective Buyers;
    vii. assist the Company in its negotiation of documents related to the Disposition; and

viii. advise the Company (including, if requested, meetings with its Board of Directors) with respect to the form and structure of, and consideration to be received in, the proposed Disposition.

B. Exclusive Engagement - In order that the Company and CMCA best coordinate their efforts to effect a transaction during the term of this Agreement, the Company and CMCA agree that during the term of this Agreement: (a) CMCA will be the sole and exclusive investment banker to the Company respecting any Disposition; (b) the Company shall furnish to CMCA the names of all parties with which it has had discussions or contact prior to or after the date hereof relating to the Disposition; in the event the Company continues or initiates any discussions relating to the Disposition other than through CMCA, the Company agrees to coordinate these discussions with CMCA; and (c) in the event the Company receives an unsolicited inquiry concerning matters covered by this Agreement, the Company will refer any such inquiry to CMCA.

C. Reliance - The Company recognizes and confirms that, in providing our services pursuant to this Agreement, CMCA will rely upon and assume the accuracy and completeness of all financial and other information furnished by or discussed with the Company and its personnel or available from public sources and CMCA does not assume responsibility for the accuracy or completeness of any such information. CMCA will have no obligation to verify such information or to conduct any independent evaluation of such information.

2. **Fees and Expenses**

   A. In consideration for our role as advisor, the Company agrees to compensate CMCA as follows:

      i. Upfront Fee – A non-refundable upfront fee of $40,000 due upon commencement of the engagement; plus
      ii. Monthly Fee – A non-refundable monthly fee of $40,000, with successive payments due every 30 days after commencement of the engagement and subject to a minimum of three Monthly Fees earned, totaling $120,000. Should the engagement extend beyond the initial three Monthly Fees, additional Monthly Fees shall continue to be earned. One-hundred percent (100%) of Monthly Fees would be credited against the Disposition Fee as set forth below; plus ⟵ the Upfront Fee and
      iii. Disposition Fee – In the event of any Disposition, the Company shall pay a fee ("Disposition Fee") calculated as follows, (i) if the aggregate Enterprise Value is less than or equal to $10.0 million, the Disposition Fee shall be equal to 4.5% of the Enterprise Value, and (ii) for Enterprise Value that is in excess of $10.0 million, the Disposition Fee on those amounts shall be equal to 7.5%. For illustration purposes and avoidance of doubt, assuming a Disposition resulting in $12.0 million in Enterprise Value, the Disposition Fee would equal $600,000 [($10.0 million * 4.5%) + ($2.0 million * 7.5%)]. The Disposition Fee, if earned, will be payable at, and its payment will be a condition precedent, to the closing of a Disposition. The Disposition Fee is subject to a minimum fee of $450,000, inclusive of the aforementioned 100% credit of Monthly Fees paid.

   B. Reimbursement of Expenses - Additionally, CMCA shall be entitled to reimbursement of its reasonable and reasonably documented out-of-pocket expenses incurred from time to time during the term hereof in connection with the services to be provided under this Agreement, payable at invoicing of the Company.

2

   C. Tail Period: CMCA shall be entitled to the fees enumerated in this Agreement if a Disposition is consummated:

      i. during the term of CMCA's engagement under this Agreement;
      ii. during the 12 months following the termination or expiration of CMCA's engagement with any person or entity (or any other person or entity formed by or affiliated with such person or entity) with whom CMCA had a material discussion, who signed a confidentiality agreement during the term of this Agreement, or who received offering materials from CMCA during the term of this Agreement; or
      iii. which results from an agreement in principle or a definitive agreement to effect a Disposition which is entered into during the term of CMCA's engagement or the 12 months following termination or expiration of CMCA's engagement with whom CMCA had a material discussion, who signed a confidentiality agreement during the term of this Agreement, or who received offering materials from CMCA during the term of this Agreement.

   D. Reasonableness of Fees - The Company acknowledges and agrees that the fees payable to CMCA hereunder are reasonable. The Company and CMCA acknowledge and agree that the time worked, results achieved and ultimate benefit to the Company of the work performed in connection with this engagement may be variable, all of which has been fully considered and factored into establishing the fees hereunder.

   E. Payment of Fees and Expenses - The Company will pay all fees and expenses as prescribed in invoices to the Company.

3. **Retention Application**

   A. In the event the Company files for relief under the Bankruptcy Code during the term this Agreement is effective:

      i. The Company shall apply promptly to the Bankruptcy Court pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of (i) this Agreement, including, without limitation, the compensation and expense reimbursement provisions, and indemnification documents associated with this Agreement, and (ii) CMCA's retention by the Company under the terms of this Agreement, nunc pro tunc to the date hereof, and shall use its best efforts to obtain Bankruptcy Court authorization thereof  The Company shall use its best efforts to obtain such Bankruptcy Court authorization under the standard of review provided in section 328(a) and not those of section 330. The Company shall supply CMCA with a draft of such application and any proposed order authorizing CMCA's retention sufficiently in advance of the filing of such application and proposed order to enable CMCA and at its election its independent counsel, time to review and comment thereon. CMCA shall have no obligation to provide any services under this Agreement unless and until CMCA's retention under the terms of this Agreement is approved by a final order of the Bankruptcy Court in form and

3

        substance acceptable to CMCA. Subject to being so retained, CMCA agrees that during the pendency of any such proceedings, it shall continue its obligations under this Agreement pursuant to the provisions of this Agreement so long as the Company is using its best efforts to seek CMCA's retention under terms acceptable to CMCA.

ii.    CMCA acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section, payment of CMCA's fees and expenses shall be subject to (i) any order approving CMCA's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications; provided, however, that CMCA shall not be required to maintain detailed time records. In the event that CMCA's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of CMCA hereunder as promptly as practicable in accordance with the terms hereof and the orders governing interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any.

iii.   With respect to CMCA's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and agrees that CMCA's industry and restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisition capabilities, some or all of which may be required by the Company during the term of CMCA's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of CMCA's services hereunder could not be measured merely by reference to the number of hours to be expended by CMCA's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of CMCA and its professionals hereunder over the life of the Agreement, and in light of the fact that such commitment may foreclose other opportunities for CMCA and that the actual time and commitment required of CMCA and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, the Company believes that given the numerous issues that CMCA may be required to address in the performance of its services hereunder, CMCA's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for CMCA's services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

iv.   CMCA is an affiliate of Conway MacKenzie, Inc. The Company may wish to engage Conway MacKenzie as a financial advisor concurrently with the investment banking services being provided hereunder by CMCA. The Company and its counsel acknowledge that it may be more efficient for certain professionals to simultaneously provide both investment banking services (under this Agreement with CMCA) and financial advisory services (under a separate engagement letter with Conway MacKenzie) than otherwise. In the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code and intends on relying on the services of both firms, the Company and its counsel agree that: (i) CMCA and Conway MacKenzie will each remain disinterested; (ii) the respective retentions of CMCA and Conway MacKenzie shall be structured with appropriate parameters and prophylactic

4

measures to ensure such retentions comply with the Bankruptcy Code, Bankruptcy Rules, court orders, and applicable guidelines and protocols established by the Office of the United States Trustee; and (iii) the Company shall use its best efforts to obtain the authorization for both retentions in a manner that effectuates the foregoing and is acceptable to CMCA in its sole discretion.

4. **Assignment; Association or Affiliation of Broker-Dealer**

   Neither CMCA nor the Company may assign this Agreement without the prior written consent of the other party, which consent may be given or withheld entirely within the discretion of the non-assigning party. Notwithstanding the above, if CMCA, in its sole discretion, determines that the transaction ultimately contemplated requires a registered broker-dealer in order to comply with applicable laws, CMCA may assign this Agreement and/or the securities compensation and related securities activities and services set forth herein at any time to Eight Pines Securities LLC, an affiliated broker-dealer of CMCA registered with the Securities Exchange Commission and member of the Financial Industry Regulatory Authority.

5. **Confidential Information**

   CMCA acknowledges that it will be provided with certain confidential information regarding the Company (the "Confidential Information") and that it will not use or disclose to any person, without the Company's prior consent, any Confidential Information, except in connection with rendering its services as advisor to the Company or as may be required by law.

6. **Indemnification**

   Since CMCA will be acting on behalf of you and the Company in connection with the engagement hereunder, the Company and CMCA have entered into a separate letter agreement, designated as Schedule I in this Agreement, dated the date hereof, providing for the indemnification of CMCA.

7. **Termination**

   It is understood that our services may be terminated with or without cause by you or us upon 30-days written notice to the other party at any time and without liability or continuing obligation to us or to you (except for payment by you of any compensation earned pursuant to the Fees and Expenses section above and any out-of-pocket expenses incurred by us pursuant to this engagement up to the date of termination). Notwithstanding the foregoing, the Fees and Expenses section, the Governing Law section, CMCA's status as an independent contractor, No Representation or Warranty and the indemnity provisions as found in Schedule I shall remain operative regardless of any such termination.

8. **No Representation or Warranty**

   The Company hereby acknowledges and agrees that it is a sophisticated business enterprise that has retained CMCA for the limited purposes set forth in this Agreement and that the rights and

5

obligations of the parties hereto are contractual in nature and that none of CMCA nor its affiliates have made any warranties or guarantees of any nature as to the success or satisfactory conclusion of any Disposition or as to the economic, financial or other results which may be obtained or experience by the Company as a result thereof. Each of the Company and CMCA (and its affiliate) disclaim any intention to impose fiduciary duties or obligations on the other (or any of their respective shareholders or other owners) by virtue of the engagement contemplated by this Agreement, and no other person or entity shall have any rights or obligations hereunder except as expressly provided herein.

9. **Marketing**

    CMCA is hereby authorized, upon an event of success as determined by the discretion of CMCA, at its own expense to place a customary "tombstone" advertisement or similar announcement in such form and in such media as CMCA deems appropriate, subject to the reasonable prior approval of the Company.

10. **Governing Law**

    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to such state's rules concerning conflict of laws.

11. **Severability**

    If any term, provision or portion of this Agreement shall be determined to be invalid, void or unenforceable, the remainder of the terms, provisions and portions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

12. **Complete Understanding**

    This Agreement sets forth the entire understanding of the parties concerning the matters contained herein and supersedes all prior agreements, arrangements and communications, whether oral or written, with respect to the matters contained herein.

If the foregoing is in accordance with your understanding, please sign and return to us a duplicate of this letter.

We sincerely look forward to working with you on this assignment.

Very truly yours,

CONWAY MACKENZIE CAPITAL ADVISORS LLC

By: _____
Scott J. Cockerham

Agreed to and Accepted:
CLARK-CUTLER-MCDERMOTT COMPANY

By: *[signature]*
James T. McDermott

**Schedule I**

April 14, 2016

Conway MacKenzie Capital Advisors LLC
1301 McKinney St., Suite 2025
Houston, Texas 77010

Gentlemen:

In connection with your engagement to advise and assist us pursuant to the engagement letter dated the date hereof, Clark-Cutler-McDermott Company and its affiliates and any related successor entities resulting from the transactions contemplated by the engagement letter (the "Company") hereby agree to indemnify and hold harmless Conway MacKenzie Capital Advisors LLC ("CMCA") which for purposes of this agreement includes its affiliates, the respective directors, officers, partners, agents and employees of CMCA and its affiliates and each controlling person (as such term is defined under the Securities Act of 1933, as amended), to the full extent lawful, from and against all losses, claims, damages, liabilities, joint or several (and all actions, claims, proceedings and investigations in respect thereof), and expenses incurred by them (including fees and disbursements of counsel) which (A) are related to or arise out of (i) actions taken or omitted to be taken (including any untrue statements made or any statements omitted to be made) by the Company or (ii) actions taken or omitted to be taken by CMCA with our consent or in conformity with our actions or omissions or (B) are otherwise related to or arise out of CMCA's activities on our behalf under CMCA's engagement, and we will reimburse CMCA for all expenses (including fees and disbursements of counsel) as they are incurred by CMCA in connection with investigating, preparing or defending any such action or claim, whether or not in connection with pending or threatened litigation in which CMCA is a party. We will not be responsible, however, for any losses, claims, damages, liabilities or expenses pursuant to clauses (A) or (B) of the preceding sentence which are finally judicially determined to have resulted primarily from the bad faith, gross negligence or willful misconduct of CMCA. We also agree that CMCA shall not have any liability to us for or in connection with such engagement except for such liability for losses, claims, damages, liabilities or expenses incurred by us which is finally judicially determined to have resulted primarily from CMCA's bad faith, gross negligence or willful misconduct. If for any reason the foregoing indemnification (including the reimbursement provisions described above) or exculpation is unavailable to CMCA or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by CMCA as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect not only the relative benefits received (or anticipated to be received) by the Company on the one hand and CMCA on the other hand but also the relative fault of the Company and CMCA as well as any relevant equitable considerations, provided, that in no event will CMCA's aggregate contribution hereunder exceed the amount of fees actually paid to CMCA in respect of the subject matter of such loss, claim, damage or liability pursuant to the Agreement. The indemnity, exculpation, reimbursement and contribution obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall survive any termination of the Agreement and shall be binding upon and extend to the benefit of any successors and assigns of the Company and CMCA. If any action, claim, proceeding or investigation is instituted or threatened against CMCA in respect of which indemnity may be sought against the Company hereunder, CMCA shall promptly notify the Company thereof in writing, but the omission to so notify the Company shall not relieve the Company from any obligation or liability that the Company may have to CMCA under this letter or otherwise. CMCA will have the right to retain counsel of its choice to represent CMCA in connection with

any such action, claim, proceeding or investigation, provided that such counsel shall be reasonably satisfactory to the Company. Notwithstanding anything to the contrary above, CMCA shall not have any obligation to provide notice to the Company as to any action, claim, proceeding or investigation in which the Company is named a defendant. We also agree that we will not, without the prior written consent of CMCA, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not CMCA is an actual or potential party to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of CMCA from all liability arising out of such claim, action, suit or proceeding.

It is understood that, in connection with CMCA's above-mentioned engagement, CMCA may also be engaged to act for us in one or more additional capacities and that the terms of the original engagement or any such additional engagement may be embodied in one or more separate written agreements. This indemnification shall apply to the original engagement, any such additional engagement and any modification of the original engagement or such additional engagement and shall remain in full force and effect following the completion or termination of CMCA's engagement(s).

We further understand that if CMCA is asked to act for us in any other formal capacity, such further action may be subject to a separate agreement containing provisions and terms to be mutually agreed upon.

Very truly yours,
CLARK-CUTLER-MCDERMOTT COMPANY

By: _____
    James T. McDermott

Agreed to and Accepted:
CONWAY MACKENZIE CAPITAL ADVISORS LLC

By: _____
Scott J. Cockerham

**Schedule II**

For the purposes of this Agreement:

A. "Disposition" means any transaction or a series of related transactions which result, directly or indirectly, in the transfer of control of the Company or any material part of its assets or businesses (a "Business"), including without limitation: (i) any merger, consolidation, reorganization, recapitalization or other business combination pursuant to which a Business is transferred to or combined with that of another non-affiliated entity; (ii) the acquisition by an acquirer (or a "group," as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) of (A) beneficial ownership of any shares of capital stock (or rights to acquire the same) of the Company representing more than 50% of the voting power of the Company or the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the members of the Company's board of directors; or (B) all or substantially all of the assets of the Company, including, without limitation, a secured creditor acquiring assets through a credit bid; or (iii) a lease of a material part of the assets of the Company, with or without a purchase option, or the formation of a joint venture or partnership, or similar transaction with another party. For purposes hereof, any assets or businesses of the Company which in the aggregate account for more than 10% of the Company's consolidated revenue during the twelve months immediately preceding any transaction, shall be deemed "material."

B. "Transaction Date" means the date of the closing of a Disposition.

C. As used in this Agreement, "Enterprise Value" shall mean the enterprise value of the Company (or the unit or joint venture of the Company that is the subject of the Disposition) based on the aggregate consideration directly or indirectly paid or payable to the Company and all shareholders, partners and members, as well as holders of options, warrants, convertible securities, phantom equity and similar rights (collectively, "Equity Owners") in connection with or as a result of the Disposition (including certain retained assets and equity) determined as follows:

   i. In the case of a Disposition involving the acquisition of equity securities, the Enterprise Value shall include the total consideration paid or payable to Equity Owners (or the Company in the case of a new issuance), plus: (w) the amount of all indebtedness for borrowed money or otherwise evidenced by a note (including capitalized leases and repayment obligations under letters of credit) of the Company outstanding immediately prior to the Disposition, plus (x) the amount of all trade payables that are outside normal terms, plus (y) the amount by which any defined benefit pension liabilities exceed the value of the corresponding assets of the applicable plan (determined, for a single-employer plan, on a plan termination basis and, for a multiemployer plan, based on withdrawal liability that would be incurred assuming a withdrawal at the time of the sale), plus (z) the amount of any liabilities under deferred compensation plans in existence immediately prior to the Disposition, in each case without any double counting. If less than all of the Company's fully diluted outstanding equity securities are acquired pursuant to the Disposition, then the Enterprise Value shall be calculated as if 100% of the Company's outstanding equity securities were acquired for the same per share price as those equity securities actually acquired.

ii. In the case of a Disposition involving the acquisition of assets, the Enterprise Value shall include the total consideration paid or payable for the assets acquired (including the amount of any credit bid by the Company's secured creditors), plus (v) the amount of all assumed indebtedness for borrowed money or otherwise evidenced by a note (including capitalized leases and repayment obligations under letters of credit), plus (w) the amount of all trade payables and other liabilities repaid, retired, extinguished or assumed, plus (x) the amount by which any assumed defined benefit pension liabilities exceed the value of the corresponding transferred assets of the applicable plan (determined, for a single-employer plan, on a plan termination basis and, for a multiemployer plan, based on withdrawal liability that would be incurred assuming a withdrawal at the time of the sale), plus (y) the sum of (i) the net book value of any current assets less trade payables within normal terms (determined in accordance with accounting practices consistent with the Company's historical practice) retained by the Company, and (ii) the fair market value of any assets other than working capital assets retained by the Company, plus (z) the amount of any assumed liabilities under deferred compensation plans.

iii. In any Disposition, the Enterprise Value will include consideration paid or payable to the Company and its Equity Owners under covenants not to compete and management or consulting arrangements (excluding reasonable wages payable under bona fide agreements for actual services) entered into or modified concurrently with the Transaction Date or otherwise in connection with the Disposition.

iv. In any Disposition, the Enterprise Value will include amounts payable pursuant to any earnout, royalty or similar arrangement. To the extent payment of any consideration is contingent, then any portion of CMCA's fees payable hereunder related to such portion of Enterprise Value shall be payable in cash on the Transaction Date based on an estimate by the parties determined in good faith as to the net present value thereof as of the Transaction Date. Amounts payable pursuant to notes or an escrow arrangement will not be deemed contingent for purposes of calculating the Enterprise Value, except to the extent that such notes do not have a date certain at which they become due and payable as a general obligation of the acquirer.

v. The Enterprise Value will be deemed to include all forms of consideration, including without limitation, cash and cash equivalents, notes and other evidence of indebtedness, securities and other property, including, without limitation, any credit bid or similar action made or taken by a secured creditor. Consideration other than cash and cash equivalents will be valued as follows:

(i) notes and other evidence of indebtedness will be valued at fair market value (as determined in good faith by agreement of the Company and CMCA);

(ii) preferred stock and common stock and securities convertible into common stock will be valued at fair market value (as determined in good faith by agreement of the Company and CMCA); and

(iii) securities and property not referenced above will be valued at fair market value (as determined in good faith by agreement of the Company and CMCA).