## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| In re | ) | |
| | ) | **Chapter 11** |
| **CLARK-CUTLER-MCDERMOTT** | ) | |
| **COMPANY, et al.,**[1] | ) | **Case No. 16-41188 (CJP)** |
| | ) | |
| Debtors. | ) | **(Joint Administration Requested)** |
| | ) | |

## GENERAL MOTORS LLC'S MOTION
## FOR RELIEF FROM THE AUTOMATIC STAY

### REQUEST FOR EMERGENCY DETERMINATION

General Motors LLC ("GM") hereby submits this motion (the "Motion"), pursuant to section 362(d) of title 11 of the United States Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Rules for the United States Bankruptcy Court for the District of Massachusetts (the "Local Rules"), for relief from the automatic stay so that GM may immediately recover possession of: (a) certain tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, used by the Debtors in connection with their manufacture of component parts for GM (collectively, the "GM Tooling"), which is the owned-property of GM; (b) certain machinery and equipment, along with any related accessions, attachments, parts, accessories, substitutions, replacements, documents, software, and appurtenances, used by the Debtors in connection with their manufacture of component parts for GM (collectively, the

---

[1] The Debtors in these chapter 11 cases are Clark-Cutler-McDermott Company and CCM Automotive Lafayette LLC. CCM's corporate headquarters are located at 5 Fisher Street, Franklin, Massachusetts, 02038. Lafayette, a wholly owned subsidiary of CCM Automotive LLC, has its principal place of business at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia 30728.

22074515.6

"Dedicated Equipment"), upon which GM properly exercised an enforceable option to purchase on July 6, 2016; and (c) certain finished component parts inventory manufactured by the Debtors for GM pursuant to the Purchase Orders and the Interim Agreement (collectively, "Finished Goods Inventory"), upon which GM properly exercised an enforceable option to purchase on July 6, 2016.[2]  In support of the Motion, GM respectfully states as follows:

### Preliminary Statement

1.      The Debtors' chapter 11 filings are the direct result of the self-interested and wrongful conduct of the Debtors' ownership and management who, having run the Debtors' businesses into financial distress, sought only to protect their personal assets and avoid personal liabilities, and ignored the Debtors' responsibilities and their fiduciary duties to creditors. Incredibly, notwithstanding GM's willingness to continue to fund the Debtors' ongoing costs of operations as GM had done for four months, the Debtors have twice elected to shut down their operations to the detriment of their secured and unsecured creditors and their employees, causing significant damages to GM, and jeopardizing the businesses of thousands of North American automotive suppliers.  The only rationale for the Debtors' actions is an improper effort to extract value for their insiders and owners, who are almost certainly out of the money, at the expense of these real parties in interest who were owed fiduciary duties from the Debtors' officers and directors given the Debtors' insolvency.

2.      On June 17, 2016, the Debtors first shut their doors and ceased operations, upon mere hours' notice to GM.  The U.S. District Court for the Eastern District of Michigan (the "District Court") recognized the severity of the Debtors' actions, and that day granted GM a temporary restraining order (the "TRO"), requiring the Debtors to continue production of certain

---

[2] Certain of the facts and circumstances surrounding this Motion are set forth in the *Declaration of Mark W. Fischer* (the "Fischer Declaration") attached hereto as **Exhibit 1**.

Component Parts (as defined below) for GM in accordance with the contracts between GM and the Debtors. *See Temporary Restraining Order and Order to Show Cause* [District Court Docket No. 8], *General Motors, LLC v. Clark-Cutler-McDermott Co., et. al.*, Case No. 16-cv-12246 (E.D. Mich. June 17, 2016), a copy of which is attached hereto as **Exhibit 2**. GM continued to fund the Debtors' operations following the entry of the TRO, yet despite GM's willingness to continue to do so and the District Court's order requiring the Debtors to produce in accordance with GM's requirements contracts and the Interim Agreement (as defined below), the Debtors continued to condition future operations on irrational demands.

3.        Based on the Debtors' actions, GM dedicated significant resources and funding to re-source the Component Parts (as defined below). A critical part of this resourcing, however, is moving the GM Tooling and the Dedicated Equipment to new suppliers. The Interim Accommodation Agreement, dated April 1, 2016, by and among General Motors LLC (for itself and on behalf of its subsidiaries and affiliates), Clark-Cutler-McDermott Company, CCM Automotive LLC, AirLoc LLC, Duffy's Park LLC, CCM Automotive Lafayette LLC, CCM Automotive Hildenbran LLC and, solely with respect to Section 4 thereof, Wells Fargo Bank, National Association (as amended, the "Interim Agreement"), a copy of which is attached hereto as **Exhibit 3**, includes an express acknowledgement by the Debtors that GM owns the GM Tooling, as well as an exclusive and irrevocable option for GM to purchase the Dedicated Equipment and Finished Goods Inventory. Prior to the Debtors' chapter 11 filings, GM properly exercised the purchase option with respect to certain of the Dedicated Equipment and the Finished Goods Inventory. Specifically, on July 6, 2016, GM notified the Debtors that GM was exercising the option on the Dedicated Equipment, and on July 7, 2016 (prior to the Debtors' chapter 11 filings) GM notified the Debtors that GM intended on picking up the GM Tooling,

22074515.6

Dedicated Equipment, and Finished Goods Inventory on the morning of July 8, 2016. Within hours, the Debtors commenced these chapter 11 cases, and sought to promptly reject their contracts with GM. *See Motion of the Debtors for an Order Authorizing and Approving the Rejection of All GM Contracts* Nunc Pro Tunc *to the Date of the Motion* [Docket No. 10] (the "Rejection Motion").[3]

4.      If the Court does not grant the Motion, and GM is unable to obtain immediate possession of the GM Tooling and Dedicated Equipment to enable new suppliers to produce the Component Parts, GM will be reliant on continued production from the Debtors. The Debtors have made clear, however, that they have no intention on continuing this production. As a result, GM will be required to shut down all of its North American plants and suffer immense, immediate economic damages in the tens of millions of dollars. GM will also suffer immeasurable and irreparable injury to its goodwill and reputation, in addition to the significant disruption of the North American supply chain in the automotive industry and potential consequences for the economy as a whole.

5.      By contrast, the Debtors and the Debtors' estates will not suffer any damages if the Court grants this Motion and affords GM relief from stay. As described in detail herein, and in light of the Rejection Motion, the Debtors have acknowledged that there will be no continued production for GM. As a result, there is no basis for the Debtors to assert any right to possess or "use" the GM Tooling and the Finished Goods Inventory, which is specialized for GM and can only be used in connection with GM's production, and the Debtors have no right to the

---

[3] Concurrently herewith, GM is filing *General Motors LLC's Objection to the Motion of the Debtors for an Order Authorizing and Approving the Rejection of All GM Contracts Nunc Pro Tunc to the Date of the Motion.* GM agrees to defer the hearing on this Motion in the event that the Court conditions the Debtors' rejection of the Debtors' contracts with GM on GM's right to take immediate possession of the GM Tooling, Dedicated Equipment, and Finished Goods Inventory, and GM agrees to withdraw this Motion upon taking possession of the GM Tooling, Dedicated Equipment, and Finished Goods Inventory.

22074515.6

possession of the Dedicated Equipment that was being used in the production of the Component Parts, and for which GM has exercised its purchase option prior to the commencement of these cases.  Although GM submits that the Debtors' loss of possession of property that they cannot use for any productive purposes simply cannot result in harm to these estates, to remove any debate about whether the estates will be adequately compensated, GM is willing to escrow with the Court an amount of money equal to any dispute regarding the fair market value of the Dedicated Equipment and the contract prices of the Finished Goods Inventory, as well as to immediately pay to the estates any undisputed amounts.

6.      The Debtors clearly understood their position as a sole source supplier to GM when they proposed that GM pay off all their liabilities with the stated intent of securing for their principals and non-Debtor affiliates assets free and clear of claims as a condition to continuing to operate and supply for GM.  They then "doubled down" by precipitously ceasing operations on June 17 after GM made clear it would not accede to the Debtors' demands but instead would continue to fund the Debtors' operations, purchase product and negotiate in good faith over a price increase.  And now the Debtors appear to be using this chapter 11 case as another way to try to get GM to pay off the Debtors' obligations for the benefit of their principals and non-Debtor affiliates.  It is difficult to infer anything else from the Debtors' conduct.  They commenced these cases immediately on the heels of GM invoking a negotiated process that requires GM to pay fair market value as part of the purchase of the Dedicated Equipment and Finished Goods Inventory.  The Debtors cannot reasonably think that they will receive more than fair market value for these items from a third party.

7.      In addition to the foregoing, GM is also entitled to relief from the stay in order to foreclose its security interests in the Dedicated Equipment and Finished Goods inventory.  These

22074515.6

assets constitute GM's collateral, the Debtors have no equity in these assets, and the Debtors have no reasonable likelihood of any reorganization.

## Background

### A.   The Purchase Orders

8.   The Debtors manufacture and supply GM's requirements of various vehicle acoustic insulation parts, service parts, and assembled goods (the "Component Parts").  For more than 45 years, GM and the Debtors have entered into various purchase orders, supply agreements, and/or releases (collectively, the "Purchase Orders"), pursuant to which the Debtors are obligated to manufacture the Component Parts in quantities and at such times as needed to meet GM's requirements.  GM is the Debtors' largest customer by volume, accounting for more than 80% of the Debtors' revenues.

9.   GM uses the Component Parts in nearly every vehicle that GM manufactures and assembles in the United States, Canada, and Mexico.  The Component Parts are integrated primarily in the interior of vehicles for acoustic insulation, including, but not limited to, behind dashboards, in truck cabs, under carpets, and in wheel liners.

10.   The Debtors are the sole supplier to GM of the Component Parts, meaning that GM obtains all of its requirements of the Component Parts from the Debtors.  Since at least the early 1970s, GM has issued hundreds of Purchase Orders to the Debtors, pursuant to which the Debtors have supplied millions of Component Parts to GM.  The Component Parts supplied by the Debtors are unique and essential components of GM's vehicle manufacture and assembly operations throughout North America, and without sufficient quantities of Component Parts, GM cannot maintain production of vehicles at its assembly facilities.

6

11.     Over the past several months, as the Debtors have threatened to cease production, GM has worked tirelessly, at a cost of millions of dollars, to procure alternative sources of supply of Component Parts.  However, because the Component Parts use specially manufactured and unique tooling—which is owned by GM, but in the possession of the Debtors—the new suppliers need the tooling in order to produce the Component Parts.  Even one day's disruption in the supply of Component Parts could cause a shutdown of GM assembly operations, so without an ability to get the GM Tooling and the Dedicated Equipment immediately, GM's North American plants will be shut down and all vehicle production will be ceased.

12.     A continued disruption in the supply of Component Parts would also cause a catastrophic disruption in the supply chain and the operations of countless GM suppliers, dealers, customers, and other stakeholders.  There are approximately 6,000 automotive suppliers that supply to, and depend upon, the operations of GM's North American plants.  Depending on the level of their business with GM, these suppliers will also be directly, and potentially significantly, harmed by the Debtors' failure to ship Component Parts, or by any delay in GM's ability to obtain Component Parts from new suppliers.  Tens of thousands of workers would potentially be laid off in the event GM's North American operations are shut down.

13.     GM's damages that would result from such a shutdown would be in the millions of dollars per plant per day.  Further, GM would suffer loss of customer relations and goodwill as a result of its inability to deliver vehicles and replacement parts as ordered by customers, all of which would constitute damage claims against the Debtors.  These damages, however, will be substantially reduced if this Motion is granted without delay.

**B.      The Accommodation Agreement**

22074515.6

14.    On or about March 1, 2016, the Debtors notified GM that they were in default under their senior secured credit facility with Wells Fargo Bank, National Association ("Wells Fargo"), and that absent accommodations from GM, Wells Fargo would foreclose on its security interest and the Debtors would be forced to shut down operations.    These requested accommodations included, but were not limited to, payment by GM of increased Component Part prices over the agreed-upon prices set forth in the Purchase Orders, immediate payment of all outstanding GM accounts payable, payment on a hyper-accelerated basis for Component Parts shipped by the Debtors going forward, and the funding of any budget shortfalls necessary to continue the Debtors' operations.

15.    While GM and the Debtors were negotiating an interim accommodation agreement, on or about March 13, 2016, the Debtors informed GM that the Debtors would be forced to immediately shut down operations without emergency funding from GM.  As a result of the Debtors' request, and in order to enable the Debtors to continue producing Component Parts, on March 14, 2016, GM provided the Debtors with a $300,000 secured loan.  On March 15, 2016, again to ensure the flow of critical Component Parts, GM provided the Debtors with an additional $700,000 secured loan.

16.    On March 15, 2016, GM and the Debtors entered into an Amended and Restated Security Agreement (the "Security Agreement"), pursuant to which the Debtors granted to GM a security interest in and lien on substantially all of their assets (as defined in the Security Agreement, the "Collateral") then owned or at any time thereafter acquired by the Debtors, second in priority only to the liens and security interests of Wells Fargo.  On or about March 15, 2016, GM perfected the security interests granted by the Debtors pursuant to the Security Agreement by filing UCC-1 financing statements with the Secretary of State for the State of

Massachusetts.  On March 23, 2016, GM provided the Debtors with an additional $950,000 secured loan.

17.    On or about April 1, 2016, following extensive negotiations, GM, the Debtors, and Wells Fargo entered into an Interim Accommodation Agreement (as amended, the "Interim Agreement").    Pursuant to the Interim Agreement, GM provided substantial financial accommodations to the Debtors to ensure production of the Component Parts through the Interim Agreement's expiration on April 29, 2016.  Among other things, GM agreed to: (i) negotiate potential price increases for the Component Parts; (ii) immediately pay all outstanding accounts payable; (iii) pay for all Component Parts shipped by the Debtors during the term of the Interim Agreement on a "net instant" basis; and (iv) fund any budget shortfalls necessary to continue the Debtors' operations through a combination of loans and Component Part price surcharges (effectively a lump sum temporary price increase).  The Debtors also requested that GM resource certain Component Parts to other suppliers, as the Debtors would be unable to meet their obligations under the Purchase Orders even with the accommodations being provided by GM, which GM agreed to do at significant cost and expense.

18.    The Interim Agreement contemplated that GM and the Debtors would negotiate in good faith the terms of a final accommodation agreement that would replace and supersede the Interim Agreement, and which would include long-term price adjustments for the Component Parts, with the final agreement continuing through at least September 30, 2016.  The Interim Agreement also included an agreement by GM and the Debtors to negotiate the time frame and other terms and conditions for the process of a sale of the Debtors' businesses.  In connection therewith, the Interim Agreement required the Debtors to promptly engage an investment banker for this purpose.

22074515.6

19.    On or about April 29, 2016, GM and the Debtors entered into the First Amendment to Interim Accommodation Agreement, pursuant to which, among other things, the parties extended the term of the Interim Agreement through June 3, 2016 (the "First Amendment").  Prior to the parties executing the First Amendment, the Debtors retained Conway MacKenzie, Inc. as their investment banker to run a sale process for their businesses.  The First Amendment included milestone dates for that sale process.

20.    During the term of the Interim Agreement, including the extensions pursuant to the amendments thereto, GM provided the Debtors with additional secured loans of $425,000 on April 25, 2016; $270,000 on May 6, 2016; $185,000 on May 13, 2016; $125,000 on May 23, 2016; $320,000 on May 27, 2016; and $175,000 on June 10, 2016.

21.    In accordance with the Interim Agreement, the parties attempted to negotiate a final accommodation agreement.  During those negotiations, it became clear that a continuation of the Debtors' businesses as going concerns under current ownership was not sustainable, and GM and the Debtors agreed that either a sale or wind-down of the businesses would need to occur.

22.    As the parties negotiated the terms of a final accommodation agreement, the Debtors informed GM, for the first time, that in order for the Debtors to continue production of Component Parts, the final accommodation agreement would need to include more than just increases in the price of Component Parts and a commitment by GM to fund any budget shortfall.  Specifically, the Debtors further demanded that GM: (i) pay all of the Debtors' unsecured creditors in full (and use the proceeds of a sale of the Debtors' businesses to make those payments prior to GM obtaining any repayment of GM's secured loans); (ii) pay the more than approximately $18 million in pension withdrawal liability (for which certain non-Debtor

22074515.6

affiliates may be liable) that would be triggered by the wind-down of the Debtors' business in Franklin, Massachusetts or other termination of the collective bargaining agreement at the Franklin plant due to the Debtors' failure to properly fund their pension obligation; (iii) permit the Debtors to exclude certain real estate and the AirLoc business from any sale or wind-down and release any claims GM may have against these entities or the proceeds of such assets; and (iv) provide a full and complete release of any and all claims against the Debtors and any of their affiliates, employees, officers, directors or equity holders.  The stated reason for these demands was the Debtors' owners' desire to walk away from any sale or wind-down of their businesses with ownership of their real estate and the AirLoc business intact and, effectively, a full and complete release of any and all potential claims, including any claims for piercing the corporate veil and any pension withdrawal liability that could attach to the owners or the real estate owned by certain of the non-Debtor affiliates.

23.    The Debtors did not raise these demands prior to a scheduled meeting between GM and the Debtors on May 25, 2016.  Instead, the Debtors sprung them on GM at that meeting, and made clear that unless GM agreed to each of these demands, the Debtors would immediately cease operations and cease shipments of Component Parts.  The Debtors' demands and tactics were not used to preserve the going concern value of the Debtors' businesses, preserve jobs for their employees, or maximize potential recoveries to creditors; rather, they were intended to insulate the Debtors' owners from potential personal liability upon the completion of a sale or wind-down of the Debtors' businesses.  These actions were not and are not in the best interest of the Debtors, their estates, or their creditors, but rather solely for the benefit of the Debtors' insiders and owners.

22074515.6

24.     On June 2, 2016, the Debtors informed GM that the likely amount of the pension withdrawal liability from the Debtors' Franklin location would be approximately $18 million (with a present cash value settlement amount of approximately $8 million), and that the Debtors would consider capping the total value of the funding sought from GM as part of a final agreement.

25.     On June 3, 2016, GM and the Debtors entered into the Second Amendment to Interim Accommodation Agreement (the "Second Amendment"), pursuant to which, among other things, GM and the Debtors extended the term of the Interim Agreement through June 17, 2016.  On June 9, 2016, the Debtors revised their demand that in order to continue to operate past June 17, 2016, the Debtors would cap the payments to be made by GM under the final agreement at $19 million plus the amount of any loans previously provided by GM.

26.     The Debtors defaulted under the Interim Agreement by, among other things: (i) failing to operate the business in accordance with the budget set forth therein by failing to make required payments to vendors and other third-parties; and (ii) failing to conduct the sale process under the guidelines set forth in the Second Amendment.  These defaults constitute Events of Default under the Interim Agreement.  Notwithstanding GM's continued good faith negotiations to ensure a continued supply of Component Parts, on June 17, 2016, the Interim Agreement expired.

## C.     The Debtors' Initial Shut-Down and Subsequent Litigation

27.     GM offered, as a part of a final accommodation agreement and otherwise, to continue funding the Debtors' operating requirements on the terms of the Interim Agreement, including funding various employee-related expenses during a sale process and, if a sale could not be consummated, an orderly wind-down of the Debtors' businesses.

22074515.6

28.    Notwithstanding GM's willingness to continue to fund the Debtors' operations, the Debtors refused to negotiate in good faith, and instead stood by their extraordinary demands for monies and releases of liability from GM.

29.    On the morning of June 17, 2016, GM issued to the Debtors a demand letter for adequate assurance of performance of the parties' requirements contracts and Purchase Orders. The Debtors responded late in the afternoon on June 17, 2016, stating that they could not provide GM with any such assurances, and that as of the close of business on June 17, the Debtors were going to lay off their employees and commence an orderly wind down.   That afternoon, the Debtors sent their employees home and ceased all production.

30.    On June 17, 2016, following receipt of the Debtors' response, GM filed *General Motors LLC's Verified Complaint* [District Court Docket No. 1] against the Debtors, which included counts for: (i) specific performance of the Purchase Orders; (ii) breach of contract under the Purchase Orders; (iii) breach of contract under the Interim Agreement; (iv) breach of contract under the Notes and Security Agreement; (v) a declaratory judgment against the Debtors; and (vi) the claim and delivery of certain tooling and equipment.  *See General Motors, LLC v. Clark-Cutler-McDermott Co., et. al*, Case No. 16-cv-12246 (E.D. Mich. June 17, 2016).  GM also filed *Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction* [District Court Docket No. 2] (the "TRO Motion"), and an *Emergency Ex Parte Motion for Immediate Appointment of Receiver* [District Court Docket No. 4].

31.    After an emergency hearing on June 17, 2016, the court granted the TRO Motion over the objections of Debtors' counsel who participated in the hearing, requiring the Debtors to continue in operation and to produce and ship Component Parts to GM, in accordance with GM's

13

contracts with the Debtors, until 5:00 p.m. on July 1, 2016.  In granting the TRO Motion, the

Court found, among other things, that:

a.  GM is likely to succeed on the merits of its claims against the Debtors because the parties have requirements contracts requiring the Debtors — the sole suppliers of various vehicle acoustic insulation parts, service parts, and assembled goods (the "Component Parts")—to supply all of GM's requirements of Component Parts. *See* Ex. 2.

b.  GM is likely to succeed on the merits of its claims that the Debtors have materially breached the requirements contracts by refusing to provide Component Parts to GM in accordance with the terms of the parties' requirements contracts (the "Purchase Orders"). *Id*.

c.  GM is likely to succeed on the merits of its claims that GM will suffer immediate and irreparable injury if a TRO and preliminary injunction are not granted because the Debtors are the sole suppliers of Component Parts and, therefore, GM has no other supplier or set of tools for these parts, which are essential components in nearly every vehicle GM manufactures and assembles at all of GM's North American plants. *Id*.

d.  If the Debtors do not resume supplying Component Parts, there will be a catastrophic disruption in the supply chain for the automotive industry and all of GM's North American plants will be forced to shut down.  In addition, GM will suffer significant financial harm in an amount in the millions of dollars per day per plant, in addition to immeasurable harm to its goodwill and reputation. *Id*.

e.  Any remedy at law would be futile because the Debtors would not be able to compensate GM for the tens of millions of dollars in losses GM would sustain daily if the Debtors are not compelled to perform under the parties' requirements contracts. *Id*.

f.  GM is likely to succeed on the merits of its claims that the irreparable and immeasurable harm to GM in the absence of a TRO and preliminary injunction outweighs any harm to the Debtors if an injunction is granted. As GM will continue to fund the operations of the Debtors in a manner consistent with the parties' Interim Accommodation Agreement, as amended, the Debtors face little or no harm by continuing to manufacture the Component Parts pending a preliminary injunction hearing. *Id*.

g.  GM is likely to succeed on the merits of its claims that the issuance of a TRO and preliminary injunction is in the public interest in that it will promote the predictability of contract, discourage parties from frustrating judicial proceedings by seeking unwarranted releases of liability, and avoid the shutdown of all of GM's North American plants with

14

consequent disruption to the automotive supply chain and attendant layoffs and other significant harm to the economy. *Id.*

h.    Compelling the Debtors to comply with the terms of the Purchase Orders will not injure the Debtors. *Id.*

i.    No bond is required, as the Debtors will not be damaged by the requested relief and, in any event, GM is adequately able to respond in damages if the relief requested herein were improvidently granted. *Id.*

32.    The Debtors agreed to comply with the TRO, and the parties negotiated a budget for the two-week period through July 1, 2016.

33.    On June 24, 2016, GM and the Debtors stipulated to an adjournment of the hearing on GM's motion for a preliminary injunction and an extension of the TRO, and the District Court entered an order setting the hearing for July 8, 2016 and extending the TRO through July 11, 2016.

34.    During the term of the TRO, GM provided the Debtors with additional secured loans of $3,450,000.

35.    Notwithstanding the extension of the TRO and GM's willingness to continue to fund the Debtors' operations consistent with the parties' course of dealing over the past number of months, including during the period of the TRO to date, on July 7, 2016, the Debtors elected to commence these chapter 11 proceedings.

**D.    GM Ownership of Tooling and Exercise of Option to Purchase Dedicated Equipment and Finished Goods**

**i.    Tooling Ownership**

36.    The parties' requirements contracts are governed by GM's General Terms and Conditions (the "Terms and Conditions"), a copy of which is attached hereto as **Exhibit 4**. The Terms and Conditions grant GM the right to immediate possession of the GM Tooling:

**All supplies, materials, prototype and production tools**, jigs, dies, gauges, fixtures, molds, patterns, equipment, related software

15

and other items (together with any accessions, appurtenances, modifications, repairs, refurbishments and replacements thereof) furnished by Buyer, either directly or indirectly, to Seller to perform this Contract, or for which Seller has been paid (other than through piece price amortization) by Buyer ("Buyer's Property"), **will be and remain the property of Buyer**, and all right, title and interest in Buyer's Property will remain with Buyer, subject only to the limited right of possession granted to Seller under this Section. **Buyer will, at any time, have the right to immediate possession of Buyer's Property, on Buyer's demand**.

See Terms and Conditions (emphasis added).

37.     GM issued purchase orders to CCM for the GM Tooling, and GM purchased such tooling so that it is all owned by GM.  The Debtors acknowledge this in Section 3.M of the Interim Agreement, which provides that the GM Tooling is and remains GM's property and grants GM the right to immediate possession of the GM Tooling on demand:

Supplier acknowledges and agrees that, exclusive of Supplier Tooling and Unpaid Tooling (each as defined below), all Tooling that is now being utilized to manufacture the Component Parts by Supplier for GM, whether under direct agreements between Supplier and GM or agreements between Supplier and third parties ("GM Tooling"), is subject to the terms of this Interim Agreement and is (i) owned by GM . . . .

\*\*\*

**GM and its affiliates have the right to take immediate possession of GM Tooling at any time** without payment of any kind to Supplier, should GM elect to exercise such right, and Supplier hereby agrees to cooperate with GM in its taking possession of the GM Tooling including by preparing such GM Tooling for pick up by GM at Supplier's dock.  Without further notice or court hearings, which rights, if any, are hereby waived, **GM will have the right to enter immediately the premises of Supplier and take possession of any and all GM Tooling**, and Supplier agrees to provide GM or its nominee(s) with such access.

Interim Agreement at Section 3.M; 3.M.vii (emphasis added).  And even though the Interim Agreement has expired by its terms, these provisions expressly survived termination or expiration. *Id*. at Section 9.B.

16

### ii.    Equipment Option and Exercise Thereof

38.    Section 3.J of the Interim Agreement grants GM an irrevocable and exclusive option to purchase the Dedicated Equipment:

> **Supplier will grant GM an irrevocable and exclusive option (the "Equipment Option") to purchase (i) any or all machinery and equipment** and/or (ii) any returnable containers or dunnage (along with any related accessions, attachments, parts, accessories, substitutions, replacements, documents, software, and appurtenances, as applicable) used in the production of Component Parts for GM (collectively, "Dedicated Equipment").

*Id.* at Section 3.J (emphasis added).  GM's option is exercisable at "the current fair market value of such Dedicated Equipment as determined by an appraiser mutually agreeable to GM, Supplier and Lender." *Id.* at Section 3.J.i.

39.    By letter dated June 17, 2016 (the "Debtors' June 17 Letter"), the Debtors expressly acknowledged the existence of GM's option regarding the Dedicated Equipment: "We are mindful of the options granted to GM with respect to inventory, tooling and equipment. Please be advised the GM must exercise those options within 30 days from today."[4]  On June 28, 2016, GM requested an extension of those options, which the Debtors denied on July 1, 2016—but again affirmed that GM retained its option until July 17, 2016.[5]

40.    GM formally exercised its option to purchase the Dedicated Equipment on July 6, 2016, and offered to immediately pay the corresponding purchase price for the Dedicated Equipment upon the Debtors' execution of a bill of sale for the Dedicated Equipment.[6]  By exercising this option, GM cemented its rights in the Dedicated Equipment, and the payment to be made to the Debtors is a receivable, and not an executory obligation.  Nonetheless, the

---

[4] A copy of this letter is attached hereto as **Exhibit 5**.

[5] Copies of these letters are attached hereto as **Exhibit 6** and **Exhibit 7**.

[6] A copy of this letter is attached hereto as **Exhibit 8**.

22074515.6

Debtors have refused to turn over possession of the Dedicated Equipment in a bad faith attempt

to inflict harm on GM and without any basis in law or fact.  The Court should order the Debtors

to specifically perform their obligations under the Interim Agreement and grant GM immediate

possession of the Dedicated Equipment.

### iii.    Finished Goods Inventory

41.    Like the GM Tooling and Dedicated Equipment, GM is entitled to immediate

possession of the Finished Goods Inventory pursuant to the Interim Agreement.  Section 3.H of

the Interim Agreement requires the Debtors to build an inventory bank of Component Parts for

GM and ship those Component Parts to GM as produced:

> At GM's request, and subject to Supplier's reasonable internal
> capacity limitations, **Supplier will build an inventory bank of
> Component Parts** ("<u>Inventory Bank Parts</u>") for GM or GM's
> designee.  **Supplier will ship Inventory Bank Parts as directed
> by GM as they are produced**, but not until GM approves the
> Incremental Bank Costs (defined below) associated with such
> shipment.  GM will, subject to any then current Price Increases, (i)
> timely pay for Inventory Bank Parts and (ii) reimburse Supplier for
> the incremental costs that Supplier reasonably incurs in connection
> with building and shipping the Inventory Bank Parts, including,
> without limitation, all special packaging and handling costs . . . .

Interim Agreement at Section 3.H (emphasis added).

42.    Further, the Interim Agreement provides GM with an irrevocable and exclusive

option to purchase the Finished Goods Inventory.

> **Supplier will grant GM an irrevocable and exclusive option
> (the "<u>Inventory Option</u>") to purchase all of Supplier's
> Component Parts, raw-materials (including purchased
> components) and finished goods inventory** related exclusively to
> the Component Parts (collectively, "<u>Customer Inventory</u>").  The
> Inventory Option is exercisable by GM in its sole discretion.
>
> ***
> The Inventory Option purchase price shall be: (i) for raw materials
> – one hundred (100%) percent of Supplier's actual and
> documented cost and delivery of the raw materials and (ii) for

> finished Component Parts – one hundred (100%) percent of the existing Purchase Order price in effect on the date of purchase of the Customer Inventory giving effect to any price adjustment agreed to in Section 2.G above.

Interim Agreement at Section 3.L (emphasis added).  Like GM's right to immediate possession of the GM Tooling, GM's option to purchase the Finished Goods Inventory survived expiration of the Interim Agreement, and the Debtors confirmed GM's option in the Debtors' June 17 Letter.  *Id*. at Section 9.B.

43.     In its July 1, 2016 letter, GM requested that the Debtors ship as a part of GM's requirements all of the Finished Goods Inventory.  *See* Exhibit 6.  The Debtors refused, claiming that the Interim Agreement has expired, and this somehow relieved the Debtors of their obligations to ship the finished goods inventory.  *See* Exhibit 7.  Yet the TRO Order directed the Debtors to "[s]pecifically perform all of their obligations under the parties' requirements contracts and all Purchase Orders issued by GM, including but not limited to, by producing and delivering to GM 100% of GM's requirements of the Component Parts . . . ."  TRO Order at p.5.  GM's requirements include the Finished Goods Inventory and Debtors' refusal to ship the Finished Goods Inventory is in direct violation of the TRO.

44.     Likewise, GM exercised its option to purchase the Finished Goods Inventory by letter dated July 6, 2016, and offered to immediately pay the corresponding purchase price for the Finished Goods Inventory upon their release to GM.  *See* Exhibit 8.  By exercising this option, GM cemented its rights in the Finished Goods Inventory, and the payment to be made to the Debtors is a receivable, and not an executory obligation.  The purchase price for that Finished Goods Inventory is the price stated in the applicable Purchase Orders.  Notwithstanding GM's exercise of its option and willingness to pay the contractual price, the Debtors refused to ship the

22074515.6

Finished Goods Inventory in violation of their obligations under the TRO and Interim Agreement.

## Jurisdiction and Venue

45.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief requested herein is 11 U.S.C. § 362.

## Relief Requested

46.      By this Motion, GM requests that the Court enter an order lifting the automatic stay to permit GM to immediately remove the GM Tooling, Dedicated Equipment, and Finished Goods Inventory from the Debtors' facilities.

## Basis for Relief

**A.      GM is Entitled to Relief from the Automatic Stay for "Cause" Pursuant to 11 U.S.C. §362(d)(1)**

47.      Section 362(d)(1) of the Bankruptcy code provides as follows:

(d)      On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–

(1)  for cause, including the lack of adequate protection of an interest in property of such party in interest; . . .

48.      "Cause" is not defined by the Bankruptcy Code.  Consequently, a Bankruptcy Court must decide on a case-by-case basis what constitutes "cause" to lift the automatic stay.  *In re Haines*, 309 B.R. 668, 674 (Bankr. D. Mass. 2004); *In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991)).  The legislative history of Section 362 states that "cause may be established by a

22074515.6

single factor such as a desire to permit an action to proceed . . . in another tribunal, or lack of any connection with or interference with the pending bankruptcy case." *Rexene Products Co.*, 141 B.R. at 576 (citing H.R. REP. NO. 95-595, at 343-44 (1977)) (internal citations omitted). Generally, however, in balancing the interests of the debtor and the movant, courts consider three factors:  (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probable success on the merits if the stay is lifted. *See Rexene Products Co.*, 141 B.R. at 576; *In re Haines,* 309 B.R. at 674-75.  Here, consideration of the factors weighs in favor of granting GM relief from the automatic stay and granting immediate possession of the GM Tooling, Dedicated Equipment, and Finished Goods Inventory from the Debtors' facility.

### i.    Lifting the Stay Will Not Prejudice the Debtors

49.    The first factor supports the relief requested herein because neither the Debtors nor the bankruptcy estate will suffer any "great prejudice" if this Court grants relief from the automatic stay.  *See In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (noting that the standard for showing prejudice is particularly high, requiring the debtor to show "great prejudice" either to itself or to the estate).  Courts have held that when a debtor does not need to avail itself of the benefits provided by the automatic stay to successfully reorganize, it is less likely that "great prejudice" has occurred. *See In re Tribune Co.*, 418 B.R. 116, 127 (Bankr. D. Del. 2009) (holding that the purpose of the automatic stay is "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor").

50.    Here, as set forth above, the Debtors' actions and statements made during the first day of these chapter 11 cases demonstrate that the GM Tooling, Dedicated Equipment, and Finished Goods Inventory are not part of the Debtors' restructuring plans, as the Debtors are seeking to immediately reject the Purchase Orders and cease operations.  This was contemplated by the Debtors when they entered into the Interim Agreement with GM, by which the Debtors acknowledged GM's ownership of the GM Tooling, and provided GM with an exclusive and irrevocable option to purchase the Dedicated Equipment, and Finished Goods Inventory.  By allowing GM to take possession of the tooling that it owns, as well as the Dedicated Equipment and Finished Goods Inventory for which GM properly exercised its option prior to the Debtors' chapter 11 filings, there will be no prejudice to the Debtors or the Debtors' estates.  The only party being harmed by the Debtor remaining in possession of the GM Tooling, Dedicated Equipment, and Finished Goods Inventory is GM, and as set forth in additional detail below, the damages that GM will incur are extraordinary.

51.    To the extent that the Court has any concerns about the prejudice to the Debtors' estates by GM's removal of the Dedicated Equipment and Finished Goods Inventory, GM is willing to escrow with the Court any disputed amount with respect to the fair market value of the Dedicated Equipment or the applicable price of the Finished Goods Inventory pursuant to the Purchase Orders, as well as to pay the estates any undisputed amounts.

**ii.    Balancing the Hardships Weighs in Favor of Lifting the Stay**

52.    In contrast to the lack of prejudice to the Debtors, the harm that GM will sustain in the absence of the Court granting the requested relief will be extraordinary.  In granting the TRO Motion, the District Court recognized the "irreparable and immeasurable harm" to GM in the absence of a TRO and a preliminary injunction.  As stated above, the Debtors are the sole

22074515.6

supplier to GM of the Component Parts, meaning that GM obtains all of its requirements of the

Component Parts from the Debtors.  The Component Parts supplied by the Debtors are unique

and essential components of GM's vehicle manufacture and assembly operations throughout

North America, and without sufficient quantities of Component Parts, GM cannot maintain

production of vehicles at its assembly facilities.

53.     If GM is able to take immediate possession of the GM Tooling, Dedicated

Equipment, and Finished Goods Inventory, the disruption to GM's North American automotive

supply would be minimal.  In light of the Debtors' demands in order to maintain production, GM

worked tirelessly to be ready to pick up the GM Tooling, Dedicated Equipment, and Finished

Goods Inventory on July 8, 2016, and GM informed the Debtors of this prior to the bankruptcy

filings.  Instead of allowing GM to take possession of the GM Tooling, Dedicated Equipment,

and Finished Goods Inventory, and thereby allowing the Purchase Orders to terminate—which

the Debtors now seek to do through emergency relief in the bankruptcy cases—the Debtors opted

to commence these chapter 11 cases and hold the GM Tooling, Dedicated Equipment, and

Finished Goods Inventory hostage.  These actions immediately put at risk the supply chain and

the operations of countless GM suppliers, dealers, customers, and other stakeholders, in addition

to the approximately 6,000 automotive suppliers that supply to, and depend upon, the operations

of GM's North American plants.  Depending on the level of their business with GM, these

suppliers will also be directly, and potentially significantly, harmed by the Debtors' failure to

ship Component Parts.  Tens of thousands of workers would potentially be laid off in the event

GM's North American operations are shut down.

54.     GM's damages that would result from such a shutdown would be in the millions

of dollars per plant per day.  Further, GM would suffer loss of customer relations and goodwill

22074515.6

as a result of its inability to deliver vehicles and replacement parts as ordered by customers, all of which would constitute damage claims against the Debtors. In sum, these damages are at present incalculable, but clearly likely to be immense, and would leave GM with a claim against the Debtors for rejection damages in such an extraordinary amount that there would be a massive dilution in the potential recoveries for the Debtors' unsecured creditors. Conversely, granting GM relief from stay will greatly reduce GM's damage claims, to the benefit of all parties in interest.

### iii. GM Has a Reasonable Likelihood of Prevailing on the Merits

55. The third and final factor, the probability of success on the merits, also supports granting relief from the automatic stay.

56. In granting the TRO Motion, the District Court determined that GM is likely to succeed on the merits of its claims against the Debtors for breach of the Purchase Orders. Further, as stated above, the Purchase Orders and the Interim Agreement make clear that GM owns the GM Tooling, and that GM has validly exercised its exclusive option to purchase the Dedicated Equipment and the Finished Goods Inventory.

57. The Purchase Orders are governed by Michigan law.

58. Pursuant to Fed. R. Civ. P. 64, "[s]tate provisions about the circumstances and manner in which provisional remedies can be used . . . must be honored. *Weener Plastics, Inc. v. HNH Packaging, LLC*, 590 F. Supp. 2d 760, 764 (E.D.N.C. 2008) (ellipsis in original) (quoting 11A C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE § 2932, p. 7 (2d ed. 1995)).

59. In Michigan, the action of replevin has been replaced by claim and delivery. *See* MCR 3105(A) ("A statutory reference to the action of replevin is to be construed as a reference

24

to the action of claim and delivery.").  Michigan Court Rule 3.105 outlines the procedures to be followed in claim and delivery actions.  *See also* MCL § 600.2920 (calling for court rules to be adopted regarding claim and delivery actions, which rules become part of the claim-and-delivery remedy).  Under MCR 3.105(E)(1), a plaintiff in a claim-and-delivery action may file a verified motion seeking possession pending final judgment.  The motion must:

> (1)    describe the property to be seized, and
>
> (2)    state sufficient facts to show that the property described will be damaged, destroyed, concealed, disposed of, or used so as to substantially impair its value, before final judgment unless the property is taken into custody by order of the Court.

MCR 3.105(E).

60.    After such a motion is filed, the Court, if good cause is shown, **must** order the defendant to:

> (1)    refrain from damaging, destroying, concealing, disposing of, or using so as to substantially impair its value, the property until further order of the court; and
>
> (2)    appear before the court at a specified time to answer the motion.

MCR 3.105(E)(2) (emphasis added).

61.    Michigan Court Rule 3.105 does not expressly define "good cause," and there appear to be no cases defining "good cause" within the context of Rule 3.105.  GM submits that "good cause" is shown upon satisfying the requirements of MCR 3.105(E)(1).  *See* 4 Ronald S. Longhofer and Elizabeth Norma McKenna, *Michigan Court Rules Practice*, § 3.105.2 (4th ed. 2001), n. 2 ("The good cause required likely equates with compliance with MCR 3.105(C) and MCR 3.105(E)(1).")

22074515.6

62.     Michigan Court Rule 3.105 provides that a motion for possession before judgment will be granted where:

    a.     the movant's right to possession is **probably** valid; and

    b.     the property will be damaged, destroyed, concealed, disposed of or used so as to substantially impair its value before trial.

MCR 3.105(E)(3)(b) (emphasis added).

63.     Here, GM has shown good cause for entry of an order under MCR 3.105(E)(2). GM has specifically described the GM Tooling, Dedicated Equipment and Finished Goods Inventory and stated facts showing that such items will be harmed and their value impaired if not immediately recovered from the Debtors.  Additionally, there is simply no basis for the Debtors to contest entry of such an order.  The Debtors have no possible basis for possessing or "using" the GM Tooling, Dedicated Equipment and Finished Goods Inventory, as GM terminated the applicable Purchase Orders for Component Parts manufactured utilizing such GM Tooling and Dedicated Equipment on July 7, 2016.  After breaching and refusing to perform under the parties' requirements contracts, the Debtors are holding hostage the GM Tooling, Dedicated Equipment and Finished Goods Inventory in an attempt to obtain significant concessions from GM.

64.     GM's right to possession of the GM Tooling is not in doubt.  GM indisputably owns the GM Tooling, the Debtors have no right to possess the GM Tooling, and the parties' requirements contracts and the Interim Agreement require that the Debtors immediately surrender possession of the GM Tooling to GM.  The Debtors have not argued otherwise, and there would be no legitimate basis for any such argument.  Thus, GM can readily satisfy the requirement of showing that its right to possession is "probably" valid.  The Debtors have no basis for asserting any right to possess or "use" the GM Tooling.  GM formally terminated the

22074515.6

Purchase Orders for the Component Parts manufactured utilizing the GM Tooling on July 7, 2016, which relieved the Debtors from any obligations to manufacture Component Parts using such GM Tooling subject to the release of the GM Tooling to GM.  The Debtors therefore have no need to continue to possess or use the GM Tooling.  The Debtors seek only to wrongfully "use" the GM Tooling to attempt to extract significant concessions from GM by refusing to release the GM Tooling and thereby causing harm to the GM Tooling, GM, and its supply network.

65.    Similarly, GM's right to possession of the Dedicated Equipment and Finished Goods Inventory is clear.  GM exercised its enforceable option under the Interim Agreement—which such option the Debtors acknowledged in writing—to purchase the Dedicated Equipment and Finished Goods Inventory, and are prepared to immediately pay to the Debtors the applicable purchase price for the Dedicated Equipment and Finished Goods Inventory.  The Debtors are required to deliver the Dedicated Equipment and Finished Goods Inventory to GM free and clear of all liens, claims and encumbrances, and the Debtors have no basis for asserting any right to possess or "use" the Dedicated Equipment.

66.    Even if GM's likelihood of success could be questioned, however, the showing required to satisfy this third prong of the test is very slight.  *See Rexene Products Co.*, 141 B.R. at 578 (stating that the required showing of probability of success on the merits is "very slight"); *see also In re Continental Airlines*, 152 B.R. at 426 (the third factor involving likelihood of success on the merits can be satisfied with a showing of even a "slight probability of success on the merits.").  Indeed, "[t]he third prong of the test is less significant than the first two, especially if there is insufficient evidence for the court to determine the likelihood of the creditor's success." *In re Jenkins*, No. 03-60548, 2004 WL 768574, at *3 (Bankr. S.D. Ga. Mar. 30, 2004)

27

(citation omitted). Moreover, it is unnecessary that all factors be found in favor of a party requesting relief from the stay before the stay may be lifted. *See In re Love*, No. 00-83615, 2001 WL 34076354, at *9 (Bankr. C.D. Ill. Mar. 9, 2001). The factors "are not independent elements of a three part test, each of which must be satisfied in order for the movant to prevail." *Id*. Instead, the factors are "guideposts that a bankruptcy court should follow and apply in light of all of the facts and circumstances surrounding the motion." *Id*. Therefore, "[i]f one or even two of the factors militate against stay relief, the Court could still grant relief in light of all of the facts and circumstances." *Id*.

67.    In light of GM's rights under the Purchase Orders and the Interim Agreement, as well as GM's related arguments for possession and recovery under Michigan state law, GM has far greater than the "slight probability" of success on the merits that is required for the Court to grant the relief requested herein.

**B.**     **GM is Entitled to Relief from the Automatic Stay Pursuant to 11 U.S.C. §362(d)(2)**

68.    Section 362(d)(2) of the Bankruptcy Code provides that a bankruptcy court may lift the automatic stay with respect to certain property if (A) the debtor does not have an equity interest in such property, and (B) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). The party seeking relief from the stay has the burden of proving that the debtor has no equity interest in the property, while the debtor opposing relief from the stay bears the burden of proving the property is necessary to effective reorganization. 11 U.S.C. § 362(g).

69.    First, GM is a secured lender, with a valid security interest in, among other things, substantially all of the Debtors' assets.  As of the date hereof, GM's secured claims against the Debtors are at least $6,022,500 for secured loans provided by GM between March 2016 and the

Petition Date—far exceeding the value of the Dedicated Equipment and the Finished Goods Inventory.

70.     Having established the Debtors' lack of equity in the GM Tooling, Dedicated Equipment, and Finished Goods Inventory, the burden is on the Debtors to prove that such property is necessary to an effective reorganization.  As stated above, this is not possible because: (a) GM owns the GM Tooling; (b) GM has properly exercised its exclusive right to purchase the Dedicated Equipment for its fair market value; and (c) GM has properly exercised its exclusive right to purchase the Finished Goods Inventory—which would likely be of little or no value to any party other than GM.

71.     Moreover, the Debtors have indicated that they have no intention of reorganizing in these chapter 11 cases and seek instead to shut down their operations and liquidate after rejecting their contracts with GM.  Because the Debtors by their own admission do not seek to reorganize in these chapter 11 cases, the GM Tooling, Dedicated Equipment, and Finished Goods Inventory are not necessary to an effective reorganization of the Debtors.

**C.     Request for Waiver of Federal Rule of Bankruptcy Procedure 4001(a)(3)**

72.     In order to avoid the harms that will be inflicted upon it, and the resulting massive damage claims against these estates which will arise from a delay in GM taking possession of the GM Tooling, Dedicated Equipment, and Finished Goods Inventory, GM requests that the Court waive the 10-day stay requirement of Bankruptcy Rule 4001(a)(3)

**Notice**

73.     Notice of this Motion has been provided by first-class mail or electronically, as appropriate, to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel for the Debtors; and (c) those parties that have

29

requested service under Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, GM respectfully submits that no further notice is necessary.[7]

## Conclusion

WHEREFORE, for the foregoing reasons, GM respectfully requests that this Court enter an Order substantially in the form of attached **Exhibit 9**: (i) lifting the automatic stay to permit GM to immediately remove the GM Tooling, Dedicated Equipment, and Finished Goods Inventory from the Debtor's facility; and (ii) granting to GM such further and other relief as may be just and appropriate in the circumstances.

Dated:  July 8, 2016.

By:  /s/ Andrew M. Troop
     Andrew M. Troop

Andrew M. Troop (BBO #547179)
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036
(212) 858-1000
andrew.troop@pillsburylaw.com

-and-

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Joseph R. Sgroi (*pro hac vice* pending)
Scott B. Kitei (*pro hac vice* pending)
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226
Telephone:  (313) 465-7570
Facsimile:  (313) 465-7571
Email:  jsgroi@honigman.com

*Counsel for General Motors LLC*

---

[7] Contemporaneously with the filing of this Motion, GM is filing the *Motion to Shorten Notice and Time for Hearing Regarding Motion of General Motors LLC for Relief from the Automatic Stay*, pursuant to which GM is requesting that the Court schedule the hearing on the Motion for July 8, 2016 at 4:00 p.m. (prevailing Eastern time).

22074515.6