# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re | ) |
|  | ) |
|  | ) **Chapter 11** |
| **CLARK-CUTLER-MCDERMOTT** | ) |
| **COMPANY,** *et al.*,[1] | ) **Case No. 16-41188 (CJP)** |
|  | ) |
| Debtors. | ) **(Joint Administration Requested)** |
|  | ) |

## DECLARATION OF MARK W. FISCHER

I, Mark W. Fischer, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I have personal knowledge of the facts set forth herein and, if called as a witness, I would be competent to testify as to such facts.

2.  I am the Director of Supply Risk Management for General Motors LLC ("GM").

3.  I make this declaration in support of GM's Motion for Relief from the Automatic Stay (the "Motion").

**A.    The Purchase Orders**

4.  The Debtors in the above-captioned cases manufacture and supply GM's requirements of various vehicle acoustic insulation parts, service parts, and assembled goods (the "Component Parts"). For more than 45 years, GM and the Debtors have entered into various purchase orders, supply agreements, and/or releases (collectively, the "Purchase Orders"), pursuant to which the Debtors are obligated to manufacture the Component Parts in quantities and at such times as needed to meet GM's requirements.

---

[1] The Debtors in these chapter 11 cases are Clark-Cutler-McDermott Company and CCM Automotive Lafayette LLC. CCM's corporate headquarters are located at 5 Fisher Street, Franklin, Massachusetts, 02038. Lafayette, a wholly owned subsidiary of CCM Automotive LLC, has its principal place of business at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia 30728.

1

22087388.2

5. GM uses the Component Parts in nearly every vehicle that GM manufactures and assembles in the United States, Canada, and Mexico. The Component Parts are integrated primarily in the interior of vehicles for acoustic insulation, including, but not limited to, behind dashboards, in truck cabs, under carpets, and in wheel liners.

6. The Debtors are the sole suppliers to GM of the Component Parts, meaning that GM obtains all of its requirements of the Component Parts from the Debtors. Since at least the early 1970s, GM has issued hundreds of Purchase Orders to the Debtors, pursuant to which the Debtors have supplied millions of Component Parts to GM. The Component Parts supplied by the Debtors are unique and essential components of GM's vehicle manufacture and assembly operations throughout North America, and without sufficient quantities of Component Parts, GM cannot maintain production of vehicles at its assembly facilities.

7. Over the past several months, as the Debtors have threatened to cease production, GM has worked tirelessly, at a cost of millions of dollars, to procure alternative sources of supply of Component Parts. However, because the Component Parts use specially manufactured and unique tooling—which is owned by GM, but in the possession of the Debtors—the new suppliers need the tooling in order to produce the Component Parts. Even one day's disruption in the supply of Component Parts could cause a shutdown of GM North American assembly operations, so without an ability to get the GM Tooling and the Dedicated Equipment immediately, GM's North American plants will be shut down and all vehicle production will be ceased.

8. A continued disruption in the supply of Component Parts would also cause a catastrophic disruption in the supply chain and the operations of countless GM suppliers, dealers, customers, and other stakeholders. There are approximately 6,000 automotive suppliers that

supply to, and depend upon, the operations of GM's North American plants. Depending on the level of their business with GM, these suppliers will also be directly, and potentially significantly, harmed by the Debtors' failure to ship Component Parts, or by any delay in GM's ability to obtain Component Parts from new suppliers. Tens of thousands of workers would potentially be laid off in the event GM's North American operations are shut down.

9. GM's damages that would result from such a shutdown would be in the millions of dollars per plant per day. Further, GM would suffer loss of customer relations and goodwill as a result of its inability to deliver vehicles and replacement parts as ordered by customers, all of which would constitute damage claims against the Debtors. These damages, however, will be substantially reduced if this Motion is granted without delay.

**B.    The Accommodation Agreement**

10. On or about March 1, 2016, the Debtors notified GM that they were in default under their senior secured credit facility with Wells Fargo Bank, National Association ("Wells Fargo"), and that absent accommodations from GM, Wells Fargo would foreclose on its security interest and the Debtors would be forced to shut down operations. These requested accommodations included, but were not limited to, payment by GM of increased Component Part prices over the agreed-upon prices set forth in the Purchase Orders, immediate payment of all outstanding GM accounts payable, payment on a hyper-accelerated basis for Component Parts shipped by the Debtors going forward, and the funding of any budget shortfalls necessary to continue the Debtors' operations.

11. While GM and the Debtors were negotiating an interim accommodation agreement, on or about March 13, 2016, the Debtors informed GM that the Debtors would be forced to immediately shut down operations without emergency funding from GM. As a result

of the Debtors' request, and in order to enable the Debtors to continue producing Component Parts, on March 14, 2016, GM provided the Debtors with a $300,000 secured loan. On March 15, 2016, again to ensure the flow of critical Component Parts, GM provided the Debtors with an additional $700,000 secured loan.

       12.      On March 15, 2016, GM and the Debtors entered into an Amended and Restated Security Agreement (the "Security Agreement"), pursuant to which the Debtors granted to GM a security interest in and lien on substantially all of their assets (as defined in the Security Agreement, the "Collateral") then owned or at any time thereafter acquired by the Debtors, second in priority only to the liens and security interests of Wells Fargo. On or about March 15, 2016, GM perfected the security interests granted by the Debtors pursuant to the Security Agreement by filing UCC-1 financing statements with the Secretary of State for the State of Massachusetts. On March 23, 2016, GM provided the Debtors with an additional $950,000 secured loan.

       13.      On or about April 1, 2016, following extensive negotiations, GM, the Debtors, and Wells Fargo entered into an Interim Accommodation Agreement (as amended, the "Interim Agreement"). Pursuant to the Interim Agreement, GM provided substantial financial accommodations to the Debtors to ensure production of the Component Parts through the Interim Agreement's expiration on April 29, 2016. Among other things, GM agreed to: (i) negotiate potential price increases for the Component Parts; (ii) immediately pay all outstanding accounts payable; (iii) pay for all Component Parts shipped by the Debtors during the term of the Interim Agreement on a "net instant" basis; and (iv) fund any budget shortfalls necessary to continue the Debtors' operations through a combination of loans and Component Part price surcharges (effectively a lump sum temporary price increase). The Debtors also requested that GM resource

4

22087388.2

certain Component Parts to other suppliers, as the Debtors would be unable to meet their obligations under the Purchase Orders even with the accommodations being provided by GM, which GM agreed to do at significant cost and expense.

14. The Interim Agreement contemplated that GM and the Debtors would negotiate in good faith the terms of a final accommodation agreement that would replace and supersede the Interim Agreement, and which would include long-term price adjustments for the Component Parts, with the final agreement continuing through at least September 30, 2016. The Interim Agreement also included an agreement by GM and the Debtors to negotiate the time frame and other terms and conditions for the process of a sale of the Debtors' businesses. In connection therewith, the Interim Agreement required the Debtors to promptly engage an investment banker for this purpose.

15. On or about April 29, 2016, GM and the Debtors entered into the First Amendment to Interim Accommodation Agreement, pursuant to which, among other things, the parties extended the term of the Interim Agreement through June 3, 2016 (the "First Amendment"). Prior to the parties executing the First Amendment, the Debtors retained Conway MacKenzie, Inc. as their investment banker to run a sale process for their businesses. The First Amendment included milestone dates for that sale process.

16. During the term of the Interim Agreement, including the extensions pursuant to the amendments thereto, GM provided the Debtors with additional secured loans of $425,000 on April 25, 2016; $270,000 on May 6, 2016; $185,000 on May 13, 2016; $125,000 on May 23, 2016; $320,000 on May 27, 2016; and $175,000 on June 10, 2016.

17. In accordance with the Interim Agreement, the parties attempted to negotiate a final accommodation agreement. During those negotiations, it became clear that a continuation

5

of the Debtors' businesses as going concerns under current ownership was not sustainable, and GM and the Debtors agreed that either a sale or wind-down of the businesses would need to occur.

18.  As the parties negotiated the terms of a final accommodation agreement, the Debtors informed GM, for the first time, that in order for the Debtors to continue production of Component Parts, the final accommodation agreement would need to include more than just increases in the price of Component Parts and a commitment by GM to fund any budget shortfall. Specifically, the Debtors further demanded that GM: (i) pay all of the Debtors' unsecured creditors in full (and use the proceeds of a sale of the Debtors' businesses to make those payments prior to GM obtaining any repayment of GM's secured loans); (ii) pay the more than approximately $18 million in pension withdrawal liability (for which certain non-Debtor affiliates may be liable) that would be triggered by the wind-down of the Debtors' business in Franklin, Massachusetts or other termination of the collective bargaining agreement at the Franklin plant due to the Debtors' failure to properly fund their pension obligation; (iii) permit the Debtors to exclude certain real estate and the AirLoc business from any sale or wind-down and release any claims GM may have against these entities or the proceeds of such assets; and (iv) provide a full and complete release of any and all claims against the Debtors and any of their affiliates, employees, officers, directors or equity holders. The stated reason for these demands was the Debtors' owners' desire to walk away from any sale or wind-down of their businesses with ownership of their real estate and the AirLoc business intact and, effectively, a full and complete release of any and all potential claims, including any claims for piercing the corporate veil and any pension withdrawal liability that could attach to the owners or the real estate owned by certain of the non-Debtor affiliates.

22087388.2

19. The Debtors did not raise these demands prior to a scheduled meeting between GM and the Debtors on May 25, 2016. Instead, the Debtors sprung them on GM at that meeting, and made clear that unless GM agreed to each of these demands, the Debtors would immediately cease operations and cease shipments of Component Parts. The Debtors' demands and tactics were not used to preserve the going concern value of the Debtors' businesses, preserve jobs for their employees, or maximize potential recoveries to creditors; rather, they were intended to insulate the Debtors' owners from potential personal liability upon the completion of a sale or wind-down of the Debtors' businesses. These actions were not and are not in the best interest of the Debtors, their estates, or their creditors, but rather solely for the benefit of the Debtors' insiders and owners.

20. On June 2, 2016, the Debtors informed GM that the likely amount of the pension withdrawal liability from the Debtors' Franklin location would be approximately $18 million (with a present cash value settlement amount of approximately $8 million), and that the Debtors would consider capping the total value of the funding sought from GM as part of a final agreement.

21. On June 3, 2016, GM and the Debtors entered into the Second Amendment to Interim Accommodation Agreement (the "Second Amendment"), pursuant to which, among other things, GM and the Debtors extended the term of the Interim Agreement through June 17, 2016. On June 9, 2016, the Debtors revised their demand that in order to continue to operate past June 17, 2016, the Debtors would cap the payments to be made by GM under the final agreement at $19 million plus the amount of any loans previously provided by GM.

22. The Debtors defaulted under the Interim Agreement by, among other things: (i) failing to operate the business in accordance with the budget set forth therein by failing to

7

make required payments to vendors and other third-parties; and (ii) failing to conduct the sale process under the guidelines set forth in the Second Amendment. These defaults constitute Events of Default under the Interim Agreement. Notwithstanding GM's continued good faith negotiations to ensure a continued supply of Component Parts, on June 17, 2016, the Interim Agreement expired.

C.   **The Debtors' Initial Shut-Down and Subsequent Litigation**

23.   GM offered, as a part of a final accommodation agreement and otherwise, to continue funding the Debtors' operating requirements on the terms of the Interim Agreement, including funding various employee-related expenses during a sale process and, if a sale could not be consummated, an orderly wind-down of the Debtors' businesses.

24.   Notwithstanding GM's willingness to continue to fund the Debtors' operations, the Debtors refused to negotiate in good faith, and instead stood by their extraordinary demands for monies and releases of liability from GM.

25.   On the morning of June 17, 2016, GM issued to the Debtors a demand letter for adequate assurance of performance of the parties' requirements contracts and Purchase Orders. The Debtors responded late in the afternoon on June 17, 2016, stating that they could not provide GM with any such assurances, and that as of the close of business on June 17, the Debtors were going to lay off their employees and commence an orderly wind down. That afternoon, the Debtors sent their employees home and ceased all production.

26.   On June 17, 2016, following receipt of the Debtors' response, GM filed *General Motors LLC's Verified Complaint* against the Debtors, which included counts for: (i) specific performance of the Purchase Orders; (ii) breach of contract under the Purchase Orders; (iii) breach of contract under the Interim Agreement; (iv) breach of contract under the Notes and

Security Agreement; (v) a declaratory judgment against the Debtors; and (vi) the claim and delivery of certain tooling and equipment. GM also filed *Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction* (the "TRO Motion"), and an *Emergency Ex Parte Motion for Immediate Appointment of Receiver*.

27. After an emergency hearing on June 17, 2016, the court granted the TRO Motion over the objections of Debtors' counsel who participated in the hearing, requiring the Debtors to continue in operation and to produce and ship Component Parts to GM, in accordance with GM's contracts with the Debtors, until 5:00 p.m. on July 1, 2016.

28. The Debtors agreed to comply with the TRO, and the parties negotiated a budget for the two-week period through July 1, 2016.

29. On June 24, 2016, GM and the Debtors stipulated to an adjournment of the hearing on GM's motion for a preliminary injunction and an extension of the TRO, and the District Court entered an order setting the hearing for July 8, 2016 and extending the TRO through July 11, 2016.

30. During the term of the TRO, GM provided the Debtors with additional secured loans of $3,450,000.

31. Notwithstanding the extension of the TRO and GM's willingness to continue to fund the Debtors' operations consistent with the parties' course of dealing over the past number of months, including during the period of the TRO to date, on July 7, 2016, the Debtors elected to commence these chapter 11 proceedings.

22087388.2

**D. GM Ownership of Tooling and Exercise of Option to Purchase Dedicated Equipment and Finished Goods**

    **i.    Tooling Ownership**

    32.    The parties' requirements contracts are governed by GM's General Terms and Conditions (the "Terms and Conditions").

    33.    GM issued purchase orders to CCM for the GM Tooling, and GM purchased such tooling so that it is all owned by GM. The Debtors acknowledge this in Section 3.M of the Interim Agreement, which provides that the GM Tooling is and remains GM's property and grants GM the right to immediate possession of the GM Tooling on demand. Even though the Interim Agreement has expired by its terms, these provisions expressly survived termination or expiration.

    **ii.    Equipment Option and Exercise Thereof**

Section 3.J of the Interim Agreement grants GM an irrevocable and exclusive option to purchase the Dedicated Equipment. GM's option is exercisable at "the current fair market value of such Dedicated Equipment as determined by an appraiser mutually agreeable to GM, Supplier and Lender."

    34.    By letter dated June 17, 2016 (the "Debtors' June 17 Letter"), the Debtors expressly acknowledged the existence of GM's option regarding the Dedicated Equipment. On June 28, 2016, GM requested an extension of those options, which the Debtors denied on July 1, 2016—but again affirmed that GM retained its option until July 17, 2016.

    35.    GM formally exercised its option to purchase the Dedicated Equipment on July 6, 2016, and offered to immediately pay the corresponding purchase price for the Dedicated Equipment upon the Debtors' execution of a bill of sale for the Dedicated Equipment. By

exercising this option, GM cemented its rights in the Dedicated Equipment, and the payment to be made to the Debtors is a receivable, and not an executory obligation. Nonetheless, the Debtors have refused to turn over possession of the Dedicated Equipment in a bad faith attempt to inflict harm on GM.

### iii.   Finished Goods Inventory

36.   Like the GM Tooling and Dedicated Equipment, GM is entitled to immediate possession of the Finished Goods Inventory pursuant to the Interim Agreement, which requires the Debtors to build an inventory bank of Component Parts for GM and ship those Component Parts to GM as produced.

37.   Further, the Interim Agreement provides GM with an irrevocable and exclusive option to purchase the Finished Goods Inventory. Like GM's right to immediate possession of the GM Tooling, GM's option to purchase the Finished Goods Inventory survived expiration of the Interim Agreement, and the Debtors confirmed GM's option in the Debtors' June 17 Letter.

38.   In its July 1, 2016 letter, GM requested that the Debtors ship as a part of GM's requirements all of the Finished Goods Inventory. The Debtors refused, claiming that the Interim Agreement has expired, and this somehow relieved the Debtors of their obligations to ship the finished goods inventory.

39.   GM's requirements include the Finished Goods Inventory.

40.   Likewise, GM exercised its option to purchase the Finished Goods Inventory by letter dated July 6, 2016, and offered to immediately pay the corresponding purchase price for the Finished Goods Inventory upon their release to GM. By exercising this option, GM cemented its rights in the Finished Goods Inventory, and the payment to be made to the Debtors is a receivable, and not an executory obligation. The purchase price for that Finished Goods

Inventory is the price stated in the applicable Purchase Orders. Notwithstanding GM's exercise of its option and willingness to pay the contractual price, the Debtors refused to ship the Finished Goods Inventory.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: July 8, 2016

_____
Mark W. Fischer

22087388.2