## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re | **Chapter 11** |
| **CLARK-CUTLER-MCDERMOTT COMPANY**, *et al.*,[1] | **Case No. 16-41188 (CJP)** |
| **Debtors.** | **(Jointly Administered)** |

## THE DEBTORS' LIMITED OPPOSITION TO GENERAL MOTORS LLC'S
## MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Clark-Cutler-McDermott Company ("CCM"), together with its affiliate CCM Automotive Lafayette LLC ("Lafayette" and, together with CCM, the "Debtors"), hereby submit this limited opposition (the "Opposition"), pursuant to Rule 4001-1 of the Local Rules of the United States Bankruptcy Court for the District of Massachusetts (the "Local Rules"), to *General Motors LLC's Motion for Relief from the Automatic Stay (Request for Emergency Determination)* [Docket No. 27] (the "Motion for Relief") and respectfully state as follows:

### Preliminary Statement

On the second day of these Chapter 11 Cases, General Motors, LLC ("GM")—the Debtors' largest customer and a secured creditor—asked this Court to grant truly extraordinary relief on an emergency basis. Specifically, GM would have this Court lift the automatic stay to the extent necessary to allow it to remove certain tooling, inventory, and equipment from the Debtors' manufacturing and warehouse facilities, in a cynical attempt to end-run an orderly "turn-key" sale process, which would yield a far greater return for all stakeholders. As

---

[1] The Debtors in these chapter 11 cases are Clark-Cutler-McDermott Company and CCM Automotive Lafayette LLC. CCM's corporate headquarters are located at 5 Fisher Street, Franklin, Massachusetts, 02038. Lafayette, a wholly owned subsidiary of CCM Automotive LLC, has its principal place of business at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia 30728.

justification for such relief, GM relies on that certain Interim Accommodation Agreement (the "Interim Agreement") entered into as of April 1, 2016, which purports to acknowledge GM's interest in and/or right to purchase various tooling, equipment, and inventory.[2]  Not only has GM failed to meet the standard for obtaining relief under section 362(d) of the Bankruptcy Code, but the Motion for Relief is also a poorly disguised action to compel the Debtors to sell estate property at a below-market price determined unilaterally by GM.  GM's Motion for Relief is the latest in a series of heavy-handed maneuvers designed to prevent one of its very best suppliers from breaking the chains of bondage that forced the Debtors to continue producing auto parts for GM at a substantial loss.  GM's Motion for Relief is improper and should be denied.

Notwithstanding GM's failure to meet the standards of section 362(d), and subject to the Debtors' admission and denials to the specific allegations set forth in the Motion for Relief, the Debtors hereby consent to certain limited relief in favor of GM as follows:

(A)  GM Tooling.  The Debtors consent to a modification of the automatic stay to the extent necessary to allow GM to recover possession of certain GM-owned tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, used by the Debtors in connection with their manufacture of Component Parts for GM (collectively, the "GM Tooling"), subject, however, to the following conditions:

    i.  in taking possession of the GM Tooling, GM will use reasonable care when removing such property from the Debtors' premises;

    ii.  GM shall ensure that, after removing the GM Tooling, the Debtors' premises are restored to the same condition in which GM found them prior to removing the GM Tooling;

    iii.  GM shall be responsible for any damage to the Debtors' assets caused by GM's removal of the GM Tooling; and

---

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Agreement, a copy of which is attached at Exhibit A to the Supplemental Declaration of James T. McDermott.  See Docket No. 23.

BOS-4150808 v2

iv.  any disputes as to ownership of, or competing claims against, specific items of GM Tooling will be adjudicated by this Court.

(B)  <u>Finished Goods Inventory</u>.  The Debtors consent to a modification of the automatic stay to the extent necessary to allow GM to purchase and take delivery of all Component Parts, including all Component Parts in the so-called inventory bank (collectively, the "<u>Finished Goods Inventory</u>"), <u>subject</u>, <u>however</u>, to the following conditions:

i.  prior to the removal of any Finished Goods Inventory from the Debtors' facilities, GM shall pay the Debtors, by wire transfer, the sum of **$3,046,497.84** (the "<u>Purchase Price</u>") consisting of:

(a)  $719,319.12, representing one hundred percent (100%) of the existing Purchase Order price in effect as of the Petition Date for Finished Goods Inventory which had not yet been delivered; and

(b)  $2,327,178.72 for amounts owed to the Debtors by GM as of the Petition Date for prior shipments of Finished Goods Inventory.

The Debtors do <u>not</u> consent to relief from stay with respect to any other item of estate property, including their machinery and equipment.

<u>**Responses to GM's Allegations**</u>

Pursuant to Local Rule 4001-1, the Debtors respond to the allegations set forth in GM's Preliminary Statement and Background by denying each and every allegation unless specifically admitted below:

1.    The Debtors deny the allegations set forth in Paragraph 1 of the Motion for Relief.

2.    The Debtors admit that they shut down their operations on June 17, 2016, and that the United States District Court for the Eastern District of Michigan (the "<u>District Court</u>") granted GM a temporary restraining order (the "<u>TRO</u>"), requiring the Debtors to continue producing Component Parts for GM.  The Debtors further admit that GM made several loans to the Debtors following the entry of the TRO.  Further responding, despite GM's assurances to the District Court that it would continue to support the Debtors in accordance with the Interim Agreement, which called for payment on "net immediate" terms, GM did not pay for a single

shipment of Component Parts after the TRO was entered.   The Debtors deny remaining allegations set forth in Paragraph 2 of the Motion for Relief.

3.      The Debtors lack sufficient information to admit or deny the allegations set forth in the first and second sentences of Paragraph 3 of the Motion for Relief.  The Debtors further respond that the Interim Agreement is a written document that speaks for itself such that no further response to the third sentence of Paragraph 3 is required.   The Debtors deny the allegations set forth in the fourth sentence of Paragraph 3, and further respond that GM's prior material breach of the Interim Agreement excused the Debtors' performance obligations (if any). Notwithstanding GM's representation that during the term of the TRO (if granted), it would adhere to the Interim Agreement, GM has failed to make payment for any Component Parts that it has received from the Debtors in violation of section 2.B of the Interim Agreement.  Moreover, even if GM was entitled to exercise its options to purchase the Dedicated Equipment and Finished Goods Inventory, it did not properly exercise those rights.   In particular, GM did not offer to pay the full fair market value for certain Dedicated Equipment, nor did it offer to pay outstanding accounts receivable, both of which are required under section 3.J of the Interim Agreement.  The Debtors further respond that GM's letters dated July 6 and July 7, 2016 are written documents that speak for themselves such that no further response to sentence 4 of Paragraph 3 is required.

4.      The Debtors lack sufficient information to admit or deny the allegations set forth in the first sentence of Paragraph 4 of the Motion for Relief.  The Debtors admit the allegation set forth in the second sentence of Paragraph 4.  The Debtors lack sufficient information to admit or deny the allegations set forth in the third and fourth sentences of Paragraph 4.

5.      The Debtors deny the allegations set forth in the first sentence of Paragraph 5 of the Motion for Relief.  The Debtors admit that in light of the Rejection Motion, they do not anticipate an ongoing production relationship with GM and further respond that they will consent to limited relief from stay as to the GM Tooling and Finished Goods Inventory subject to the conditions and limitations set forth herein.  The Debtors deny the remaining allegations set forth in the second and third sentences of Paragraph 5.  The fourth sentence of Paragraph 5 contains no allegations for which a response is required.  To the extent that a response is required, the Debtors deny the allegations set forth in the fourth sentence of Paragraph 5 and deny that GM is entitled to the relief requested in the Motion for Relief.

6.      Paragraph 6 of the Motion for Relief comprises legal conclusions to which no response is required.  To the extent that a response is required, the Debtors deny the allegations set forth in Paragraph 6 and deny that GM is entitled to the relief requested in the Motion for Relief.

7.      The Debtors deny the allegations set forth in Paragraph 7 of the Motion for Relief.

8.      The Debtors admit the allegations set forth in Paragraph 8 of the Motion for Relief.

9.      The Debtors admit the allegations set forth in Paragraph 9 of the Motion for Relief.

10.     Upon information and belief, the Debtors understand that GM has identified and possibly contracted with alternate suppliers for certain Component Parts previously supplied by the Debtors.  The Debtors admit the remaining allegations set forth in the first and second sentences of Paragraph 10 of the Motion for Relief.  The Debtors lack sufficient information to admit or deny the allegations set forth in the third sentence of Paragraph 10.

BOS-4150808 v2

11.    The Debtors admit that over the past several months, with the benefit of financial and investment banking advice from two highly respected firms, and after attempting good faith yet unsuccessful negotiations, the Debtors explained to GM that they simply could not remain in business unless a permanent solution to their pricing arrangement with GM could be reached. The Debtors further understand that GM has attempted to find (and may have already identified and contracted for) alternate sources for supply of the Component Parts, contrary to assurances that it made to the Debtors when the parties executed the Interim Agreement.  The Debtors lack sufficient information to admit or deny the remaining allegations set forth in Paragraph 11 of the Motion for Relief.

12.    The Debtors lack sufficient information to admit or deny the allegations set forth in Paragraph 12 of the Motion for Relief.

13.    The Debtors lack sufficient information to admit or deny the allegations set forth in Paragraph 13 of the Motion for Relief.

14.    The Debtors admit that they communicated with GM on or about March 1, 2016 concerning imminent defaults under the Wells Fargo senior secured credit facility.

15.    The Debtors admit that they communicated with GM on or about March 13, 2016 concerning critical funding issues, explaining to GM that Wells Fargo would not continue funding the Debtors and that that emergency funding from GM was necessary to sustain operations.

16.    The Debtors state that the documents identified by GM in Paragraph 16 of the Motion for Relief speak for themselves, and that no response is required.

17.    The Debtors state that the Interim Agreement identified by GM in Paragraph 17 of the Motion for Relief speaks for itself, and that no answer is required.  The Debtors deny the

last sentence of Paragraph 17 of the Motion for Relief the extent that it alleges that the Debtors consented to GM's attempt to secure alternative suppliers for Component Parts other than certain Components Parts specified in section 3.F of the Interim Agreement.

18.     The Debtors state that the Interim Agreement identified by GM in Paragraph 18 of the Motion for Relief speaks for itself, and that no response is required.

19.     The Debtors admit that they retained Conway MacKenzie as their investment banker with respect to a going-concern sale process.  Further responding, the Debtors made clear to GM that they could only market their business for sale if they could obtain increased prices for Component Parts that would allow a purchaser to earn a profit.  Otherwise, the sale process would be a pointless exercise.  The Debtors otherwise state that the documents identified by GM in Paragraph 19 of the Motion for Relief speak for themselves, and that no other response is required.

20.     The Debtors state that the loan documents identified by GM in Paragraph 20 of the Motion for Relief speak for themselves, and that no response is required.

21.     The Debtors admit that the operation of their businesses as a going concern was not sustainable due to GM's unwillingness to compromise on improved pricing for the Component Parts, and the Debtors admit that they attempted to negotiate a final accommodation agreement with GM in good faith.  Unfortunately, GM was unwilling to make price concessions that would make the Debtors saleable.  As a result, the Debtors concluded that their assets would be more valuable in an orderly turn-key sale environment, where the money-losing operations would be discontinued.  The Debtors otherwise deny every remaining allegation set forth in Paragraph 21.

7

22.    The Debtors deny the allegations set forth in Paragraph 22 of the Motion for Relief.

23.    The Debtors deny the allegations set forth in Paragraph 23 of the Motion for Relief.  Further responding, the Debtors informed GM that given its unwillingness to make price concessions, GM would be required to guarantee a minimum purchase price for the Debtors' assets.    Otherwise, the Debtors would be forced to continue losing money, deepening the companies' insolvency and being forced into bankruptcy when their assets could not be sold for more than their debts.  GM was simply not concerned about the Debtors' employees or their creditors.  Rather, GM was singularly focused on continuous production and the ability to force the Debtors to sell their assets at a price controlled by GM—all at the expense of unpaid vendors and employees who supplied the materials and labor that created Component Parts in the first place.

24.    The Debtors admit the allegations set forth in Paragraph 24 of the Motion for Relief.

25.    The Debtors deny the allegations set forth in Paragraph 25 of the Motion for Relief.

26.    The Debtors deny the allegations set forth in Paragraph 26 of the Motion for Relief.

27.    The Debtors admit the allegations set forth in Paragraph 27 of the Motion for Relief.

28.    The Debtors deny the allegations set forth in Paragraph 28 of the Motion for Relief.

BOS-4150808 v2

29.      The Debtors admit the allegations set forth in Paragraph 29 of the Motion for Relief.

30.      The Debtors admit the allegations set forth in Paragraph 30 of the Motion for Relief.

31.      The Debtors admit that the District Court granted the TRO Motion identified in Paragraph 31 of the Motion for Relief.  The Debtors otherwise state that the District Court's decision speaks for itself, and that no response is required.

32.      The Debtors admit the allegations set forth in Paragraph 32 of the Motion for Relief.

33.      The Debtors admit the allegations set forth in Paragraph 33 of the Motion for Relief.

34.      The Debtors admit that GM provided additional financing during the term of the TRO.

35.      The Debtors admit that they elected to commence the Chapter 11 Cases on July 7, 2016.  The Debtors otherwise deny every other allegation set forth in Paragraph 35 of the Motion for Relief.

36.      The Debtors state that the Terms and Conditions identified in Paragraph 36 of the Motion for Relief speak for themselves, and that no response is required.  The remainder of Paragraph 36 comprises legal conclusions to which no response is required.

37.      The Debtors state that the documents identified in Paragraph 37 of the Motion for Relief speak for themselves, and that no response is required.  The remainder of Paragraph 37 comprises legal conclusions to which no response is required.

BOS-4150808 v2

38.    The Debtors state that the documents identified in Paragraph 38 of the Motion for Relief speak for themselves, and that no response is required.  The remainder of Paragraph 38 comprises legal conclusions to which no response is required.

39.    The Debtors admit the allegations set forth in Paragraph 39 of the Motion for Relief.

40.    The Debtors deny that GM properly exercised its option to purchase the Dedicated Equipment (or the Finished Goods Inventory) identified in Paragraph 40 of its Motion for Relief.  The Debtors deny that GM is entitled to any of the relief that it seeks with regard to the Dedicated Equipment (or Finished Goods Inventory) in its Motion for Relief.  As an initial matter, the TRO was obtained by GM based on its representation that it would continue to support the Debtors in accordance with the Interim Agreement, which required payment by GM for shipments of Component Parts on a "net immediate" basis.  See Interim Agreement, ¶ 2.B. Despite this representation, GM never paid for any Component Parts following entry of the TRO. In addition, the Interim Agreement provides that (i) the option price for the Dedicated Equipment is the **fair market value** of such equipment determined by a mutually agreeable appraiser; and (ii) before GM may take possession of tooling or equipment in accordance with the proper exercise of its option rights, GM must pay down its accounts owing to the Debtors.  See, e.g., Interim Agreement, ¶¶ 3.J.i, 3.J.v (emphasis added).  The Debtors contend that as of July 6, 2016, GM was not entitled to exercise any option rights by virtue of its own prior breach and violation of the TRO.  Moreover, GM's attempts to exercise its option rights fell short of the contractual requirements contained in the Interim Agreement.  The remainder of Paragraph 40 comprises legal conclusions to which no response is required.

10

41.     The Debtors state that the Interim Agreement speaks for itself, and that no response is required.  The remainder of Paragraph 41 comprises legal conclusions to which no response is required.  The Debtors submit that GM had no right to exercise any purchase option on July 6, 2016, and that its attempts to exercise any such rights failed to satisfy the contractual requirements set forth in the Interim Agreement.

42.     The Debtors state that the Interim Agreement speaks for itself, and that no response is required.  The remainder of Paragraph 42 comprises legal conclusions to which no response is required.  The Debtors submit that GM had no right to exercise any purchase option on July 6, 2016, and that its attempts to exercise any such rights failed to satisfy the contractual requirements set forth in the Interim Agreement.

43.     The Debtors state that the communications and TRO Order identified by GM in paragraph 43 of its Motion for Relief speak for themselves, and that no response is required.  The remainder of Paragraph 43 comprises legal conclusions to which no response is required.

44.     The Debtors deny that GM properly exercised its option to purchase the Finished Goods Inventory (or the Dedicated Equipment) identified in Paragraph 44 of its Motion for Relief.  The Debtors deny that GM is entitled to any of the relief that it seeks with regard to the Finished Goods Inventory (or the Dedicated Equipment) in its Motion for Relief.  Nonetheless, the Debtors will consent to limited relief from stay as to the Finished Goods Inventory subject to the conditions and limitations set forth herein.  The remainder of Paragraph 44 comprises legal conclusions to which no response is required.

45.     The Debtors admit the allegations set forth in Paragraph 45 of the Motion for Relief.

BOS-4150808 v2

46.     As further set forth below, the Debtors deny that GM is entitled to any of the

relief that it seeks in its Motion for Relief.

<u>Argument</u>

**A. The Automatic Stay Prohibits GM from Recovering the GM Tooling, Dedicated Equipment, and Finished Goods Inventory.**

47.     In an attempt to justify the extraordinary relief it seeks less than one week into

these Chapter 11 Cases, GM speaks repeatedly of its contractual rights to immediate possession

of property owned and/or controlled by the Debtors.   <u>See</u> Motion for Relief, ¶¶ 36-44.

Regardless of their merit outside of a bankruptcy case, the arguments advanced by GM are

precisely the kinds of rights that the automatic stay (among other Bankruptcy Code provisions)

was designed to curtail in the early stages of a bankruptcy case, to prevent the piecemeal

dissipation of a debtor's assets.   As the Supreme Court recognized more than thirty years ago,

property interests, created and defined by state law, shall be honored in bankruptcy "unless some

federal interest requires a different result."   <u>See</u> <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979).

In this case, the federal interest requires that the Debtors be afforded a breathing spell and

opportunity to reorganize their affairs.

48.     Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of

property of the estate, or of property from the estate."   The legislative history behind section

362(a)(3) reveals that Congress intended the provision to "prevent dismemberment of the estate

and insure its orderly distribution."   <u>See</u> <u>SEC v. First Fin. Grp. of Tex.</u>, 645 F.2d 429, 439 (5th

Cir. 1981) (citing S.R. Rep. No. 95-989 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5836,

6298).   An action dismembers an estate "by eliminating or reducing the potential value of an

asset of the estate."   <u>In re J.F.D. Enters., Inc.</u>, 183 B.R. 342, 348 (Bankr. D. Mass. 1995).   The

relief requested by GM in the Motion for Relief would plainly reduce the value of the Debtors'

BOS-4150808 v2

assets, as the removal of estate property, and machinery and equipment in particular, would constitute the very sort of piecemeal liquidation that would frustrate the Debtors' efforts to accomplish a "turn-key" sale.

49.     Nevertheless, the Debtors are willing to consent to limited relief from stay as to the GM Tooling and Finished Goods Inventory, subject to the conditions and limitations set forth herein.  Otherwise, GM has failed to carry its burden to obtain relief under section 362(d) of the Bankruptcy Code and, if the Court is not inclined to grant relief subject to the Debtors' conditions and limitations, it should deny the Motion for Relief entirely.  Moreover, under no circumstances do the Debtors consent to granting GM relief as to any machinery or equipment.

**B.  Cause Does Not Exist to Lift the Stay Pursuant to Section 362(d)(1).**

50.     Section 362(d)(1) of the Bankruptcy Code states that the Court shall grant relief from the automatic stay for "cause."  The Bankruptcy Code does not define "cause," requiring the courts to determine the same on a case-by-case basis.  See In re Podmostka, 527 B.R. 51, 54 (Bankr. D. Mass. 2015).  In determining whether sufficient cause exists to lift the automatic stay, bankruptcy courts consider a multitude of factors, which generally coalesce around the following: (1) the overall goals of the Bankruptcy Code and the policies underlying the automatic stay; (2) the competing interests of the debtors and the party seeking relief from the stay; and (3) the probability of success on the merits of the underlying action if the stay were lifted.  See In re C & S Grain Co., 47 F.3d 233, 238 (7th Cir. 1995) ("In determining whether cause exists, the bankruptcy court should base its decision on the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code."); Columbus Bank & Trust (In re Caves), 309 B.R. 76, 80 (Bankr. M.D. Ga. 2004); In re Cardinal Indus., Inc., 116 B.R. 964, 983 (Bankr. S.D. Ohio 1990); see also Peerless Ins. Co. v. Rivera, 208 B.R. 313, 315

(Bankr. D.R.I. 1997) (citing the relative harm to the parties, the interests of creditors, and the effective on the fair and efficient administration of justice as the relevant considerations in granting relief from stay).

51.     As the movant, GM bears the initial burden of demonstrating that cause exists to warrant terminating the automatic stay.  See In re Lopez, 446 B.R. 12, 20 (Bankr. D. Mass. 2011).  Cause is, however, an "elastic" concept, where less scrutiny is given to the debtor when relief from stay is requested at the early stages of the bankruptcy case.  Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.), 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992). As set forth below, GM has failed to establish cause for relief.

**1.  The Motion for Relief is Contrary to the Policy of the Bankruptcy Code to Provide the Debtors with a Breathing Spell in Order to Successfully Reorganize.**

52.     The automatic stay is one of the fundamental debtor protections in the Bankruptcy Code, designed to give the debtor a "breathing spell" from creditors and to stop all collection efforts, harassment, and foreclosure actions.  See In re Sores, 107 F.3d 969, 975 (1st Cir. 1997). The stay benefits both debtors and creditors alike as it enables a debtor to resolve its debts in a more orderly fashion.  See id.; see also In re Holly's, Inc., 140 B.R. at 685 ("[C]ertain creditors would be able to pursue their own remedies against the debtor's property [without the automatic stay].  Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.").  In evaluating whether GM has cause for relief, therefore, the Court must consider the impact on all of the Debtors' stakeholders.

53.     Here, GM's actions have not afforded the Debtors the respite to which they are entitled under the Bankruptcy Code.  To the contrary, GM filed the Motion for Relief one day after the commencement of these Chapter 11 Cases.  In the first weeks of their bankruptcy proceedings, the Debtors need to focus on their reorganization efforts and maximize the value of

14

their assets.  As discussed further below, and in the First Day Declaration, the Debtors believe that the actions they are taking with respect to use of cash collateral and the proposed turn-key sale of their assets will adequately protect GM's interest in their equipment and other collateral. If the Court were to grant GM relief from stay at this juncture, it would be rewarding GM for acting precipitously at a time when the Debtors' efforts need to be focused more broadly on the benefitting the interests of all stakeholders.

54.     GM argues that granting it relief to recover immediate possession of the Dedicated Equipment will not harm the Debtors since they intend to reject the GM Contracts and cease manufacturing operations.  See Motion for Relief, ¶ 50.  This argument ignores the Debtors' exclusive right to decide, in the early stages of these Chapter 11 Cases, how to best use their assets.  As set forth in Schedule A to GM's July 6, 2016 letter to the Debtors, the specific items of Dedicated Equipment which GM seeks to purchase have an alleged orderly liquidation value of $312,500.00.  The Debtors believe that they will achieve a substantially higher and better price for this equipment, however, when it is sold with the remainder of their assets—in place—together with an opportunity to lease their manufacturing facilities, hire the Debtors' workforce, and resume manufacturing operations at a profit.  The Dedicated Equipment will realize substantially more value in place as part of a larger turn-key sale effort, thereby inuring to the benefit of all stakeholders.  On the other hand, removal of these estate assets at this juncture will simply enrich GM at the expense of all others.[3]

---

[3]  GM's offer to escrow any disputed amount with respect to the fair market value of the Dedicated Equipment is insufficient to offset the prejudice to the Debtors and their estates should the Court grant the Motion for Relief, and adds additional burdens to the costs of these Chapter 11 Cases.  See Motion for Relief, ¶ 51.  In order to pursue their chapter 11 strategy, the Debtors need the equipment, not GM's assurances.  The best method for determining the fair market value of the Dedicated Equipment is to offer it for sale under a court-supervised auction.  The Debtors have no desire to exchange one fight with GM (i.e., whether it has a right to immediate possession of the Dedicated Equipment) for another (i.e., the value of the loss of said equipment from the estate).

**2. On Balance, the Interests of the Debtors Will Suffer Greater Harm in the Event GM is Allowed to Recover the Dedicated Equipment.**

55.     Compelling the Debtors to sell GM the Dedicated Equipment would have a substantial negative effect on these proceedings.   Removal of a portion of the Debtors' equipment from its manufacturing facilities would be an equally needless distraction at this stage of the Chapter 11 Cases, particularly where, as here, the Dedicated Equipment in question is so large that it virtually fills one section of a building in Franklin, Massachusetts.  As set forth in the First Day Declaration, the Debtors have shut down operations effective July 8, 2016 and continue with only a skeleton staff of employees.  Were the Court to grant GM the relief it seeks to compel the Debtors to sell GM the Dedicated Equipment, the Debtors would have to devote significant time and expense dealing with issues related to the removal of these extremely large machines from their facilities.   Removal of such equipment would potentially damage the Debtors' premises, pose unforeseen risks, and portend significant liabilities.

56.     GM argues that it also will suffer significant harm if this Court denies the Motion for Relief because without sufficient quantities of Component Parts, it will be unable to maintain production of vehicles at its assembly plants.  See Motion for Relief, ¶ 52.  First, any harm to GM was self-inflicted.  As set forth in the First Day Declaration, GM has refused for several months to negotiate reasonable pricing for its Component Parts that would have allowed the Debtors' business to be sold as a going concern to a new supplier approved by GM.  GM, quite literally, forced the Debtors into bankruptcy by obtaining a TRO that required the Debtors to incur additional debt with no realistic possibility of turning their affairs around or selling their business for a meaningful price.  Second, any harm to GM is not irreparable because, as GM concedes, it is only economic harm.  See id., ¶ 54.  Economic harm does not constitute irreparable harm for purposes of demonstrating relief from the automatic stay.  See In re Nw.

Airlines Corp., No. 05-17930, 2006 WL 694727, at *2 (Bankr. S.D.N.Y. Mar. 13, 2006).

Moreover, as previously discussed, the Debtors consent to the removal of the GM Tooling and

the delivery of Finished Goods Inventory subject to the payment and other conditions stated

herein.  GM can walk away with the property it owns and the finished goods that it wants, so

long as the goods are fully paid for.  Any further economic harm that GM suffers in the delays

caused by integrating its tooling with a new supplier must be balanced against the loss in value to

the estates.

57.     Moreover, GM has failed to show how its position will be substantially improved

were the Court to grant its Motion for Relief.  GM argues that if it is able to take immediate

possession of the GM Tooling and Dedicated Equipment, the disruption to its North American

automotive supply would be minimal.  See Motion for Relief, ¶ 53.  This argument is suspect at

best.  Even if GM obtained the relief it seeks, disassembling and removing the Dedicated

Equipment, transporting it to a new supplier, and reassembling it, would take several months.  In

the meantime, GM will need a new supplier for the parts produced by the Dedicated Equipment,

which begs the question—why bother seeking to remove the Dedicated Equipment in the first

place?  Further, as discussed below, there are several outstanding factual and legal issues

regarding whether GM is even entitled to exercise the option to purchase the Dedicated

Equipment under the Interim Agreement.  GM does not avoid these legal issues simply by

obtaining relief from stay.

58.     While the Debtors regret any disruption caused to GM's supply chain, they

believe that the harm suffered by GM would be mitigated most effectively if GM were to support

the Debtors' sale process.  The Debtors are the party in the best position to effectuate a speedy

transition of their manufacturing operations to a new buyer, with whom GM is free to negotiate

BOS-4150808 v2

new supply terms.  If GM acted cooperatively, it could have a new supplier of Component Parts

in approximately 90 days.

### 3.  GM Has Not Demonstrated a Likelihood of Success on the Merits.

59.     Finally, and most importantly, GM has not demonstrated a likelihood of success

on numerous issues that must be resolved in its favor before it may be permitted to take

possession of the Dedicated Equipment or the Finished Goods Inventory.   GM states in

conclusory fashion that it would likely prevail under Michigan law in a statutory action for

"claim and delivery."   Under Michigan law, a statutory action for claim and delivery allows a

party to recover possession of goods or chattels unlawfully detained.  See Mich. Comp. Laws §

600.2920(1).  The person bringing the action must have, at the time the action is commenced, a

right to possession of the goods.  See id.  In this regard, GM argues that it would be entitled to

possession of the Dedicated Equipment and Finished Goods Inventory upon showing that its

right to possession was "probably" valid.  See Motion for Relief, ¶ 62 (citing relevant law).

60.     Indeed, GM makes much of its attempted pre-petition exercise of options under

the Interim Agreement to purchase the Dedicated Equipment and Finished Good Inventory.

According to GM, its exercise of these options on July 6, 2016 "cemented its rights" to the

Dedicated Equipment and Finished Goods Inventory, see Motion for Relief, ¶¶ 40 and 44,

rendering its payment to the Debtors a "receivable, and not an executory obligation," see id.

Arguing that it would likely prevail on the merits of its claims against the Debtors, GM states

that since it has terminated the relevant Purchase Order related to the GM Tooling and Dedicated

Equipment, the Debtors have simply no possible basis for contesting entry of an order for claim

and delivery under Michigan law.  See id. ¶ 63.

61.     What GM overlooks is that its <u>unsecured</u> rights under the Interim Agreement and Michigan law are not property rights.  Rather, GM holds unsecured, non-priority claims under section 101(5) of the Bankruptcy Code.   Under the Bankruptcy Code, GM's claims may be liquidated and discharged under a chapter 11 plan.  <u>See</u> 11 U.S.C. § 1141.  In the context of a sale, the Debtors may sell their assets, including equipment and inventory, free and clear of GM's claims and interests which, at a minimum, are the subject of a bona fide dispute.  <u>See</u> 11 U.S.C. § 363(f)(4).

62.     Moreover, the Debtors struggle to follow the logic of GM's argument regarding its pre-petition exercise of the purchase options.  It appears that GM's position is that the Debtors are presently subject to an action for claim and delivery under Michigan law, and for this reason it should be granted relief from stay.  It is beyond good faith debate, however, that (a) GM violated the TRO and Interim Agreement when it failed to make payment for even a single shipment of goods following entry of the order; (b) GM did not propose to pay fair market value for the Dedicated Equipment as required by the Interim Agreement; and (c) GM did not offer to make payment of its outstanding invoices as required by the Interim Agreement.  Moreover, GM has not properly tendered payment for either the Dedicated Equipment or the Finished Goods Inventory, and the Debtors have not delivered the same.  Even assuming that GM's prior breach did not excuse the Debtors' performance, at best, the purchase options were improperly exercised and remain executory.  <u>See</u> <u>In re FBI Distrib. Corp.</u>, 330 F.3d 36, 40 n.5 (1st Cir. 2003) (quoting <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513 (1977) for the proposition that a contract is executory when performance remains due to some extent on both sides).  GM is thus in no position to enforce any alleged "rights" under the Interim Agreement.

63.     GM misinterprets cases in which creditors have been granted relief from stay to liquidate but not recover claims against a debtor, as standing for the proposition that it should be permitted to compel the Debtors to deliver the Dedicated Equipment in another forum.  See, e.g., In re Haines, 309 B.R. 668, 669 (Bankr. D. Mass. 2004) (granting creditor relief from stay to liquidate her claim where she would seek payment from a non-debtor guaranty fund); In re Rexene Prods. Co., 141 B.R. 574, 577 (Bankr. D. Del. 1992) (granting relief from stay where movants sought only to liquidate their claim, not implement it).  Even if the Court were to grant GM relief from stay to try its unsecured claim and delivery action in Michigan, and even if GM prevailed, it would simply have a claim against the Debtors' estates.

64.     As of the commencement of these Chapter 11 Cases, this Court has "exclusive jurisdiction" over property of the debtor and of property of the estate, wherever located, as of the commencement of the case.  See 28 U.S.C. § 1334(e).  No other court would have the jurisdiction to compel the Debtors to sell or deliver the Dedicated Equipment or Finished Goods Inventory to GM.  For this reason, GM cannot show that it has anything to gain by obtaining relief from stay, regardless of the merits of its legal claims (of which there are none).

65.     In light of the breathing spell the Bankruptcy Code affords the Debtors, the balance of the relative harms to the Debtors, their estates, and GM, and GM's inability to show that it would gain anything meaningful by being permitted to commence or continue litigation against the Debtors in another forum, the Court should deny the Motion for Relief.

**C.  GM Has Not Met the Requirements to Terminate the Automatic Stay Under Section 362(d)(2) of the Bankruptcy Code.**

66.     Next, GM claims in its Motion for Relief that it is entitled to relief from the automatic stay under section 362(d)(2).  In this aspect of its Motion for Relief, GM is pursuing its rights as a secured creditor with a second lien against the Dedicated Equipment.  For GM to

BOS-4150808 v2

succeed, it bears the burden of proving that the Debtors have no equity in the Dedicated Equipment that it seeks immediate possession of. <u>See</u> 11 U.S.C. § 362(d)(2)(A); 362(g)(1). The burden then shifts to the Debtors to demonstrate that the Dedicated Equipment is "necessary to an effective reorganization." <u>See</u> 11 U.S.C. § 362(d)(2); 362(g)(2). Thus, for the Court to lift the automatic stay, it must find both that GM has satisfied its burden of demonstrating that the Debtors lack equity in the Dedicated Equipment, **<u>and</u>** that the Debtors have <u>not</u> satisfied their burden of showing that the Dedicated Equipment is "necessary to an effective reorganization." <u>See</u> 11 U.S.C. § 362(d)(2); 362(g).

**1. GM Has Failed Its Burden of Proving that the Debtors Lack Equity in the Dedicated Equipment.**

67. As an initial matter, GM has failed its burden to prove that the Debtors lack equity in the Dedicated Equipment. GM asserts, without any evidentiary support, that the "$6,022,500 for secured loans provided by GM . . . far exceed[s] the value" of the property. <u>See</u> Motion for Relief, ¶ 69. Notably, neither the Motion for Relief nor the Fischer Declaration in support of the Motion for Relief identifies the total value of the entire collateral package securing the GM obligations, which would be necessary to argue that the Debtors have no equity in their equipment. GM has an <u>evidentiary</u> burden of proof to demonstrate the Debtors' lack of equity by a preponderance of the evidence. <u>See, e.g.</u>, <u>In re RYYZ, LLC</u>, 490 B.R. 29, 35 (Bankr. E.D.N.Y. 2013) (requiring a party seeking relief from stay to meet its burden "by a preponderance of the evidence"); <u>In re Our Secret, Ltd.</u>, 282 B.R. 697, 704 (Bankr. D.N.M. 2002) (denying motion for relief from stay when secured party "introduced no evidence" to "show that [the debtor] had no equity in the property at issue").

68. GM's inability to demonstrate the value of the Debtors' property dooms its request for relief under section 362(d)(2). "'Equity . . . is the value, above all secured claims

against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors.'" See, e.g., Stephens Indus., Inc. v. McClung, 789 F.2d 386, 392 (6th Cir. 1986) (quoting In re Mellor, 734 F.2d 1396, 1400 n.2 (9th Cir. 1984)). Thus, to determine whether equity exists, it is imperative for GM to set forth evidence regarding the value of the entire collateral package, so that it can be compared against the total amount of the secured claims. See, e.g., In re EnCap Golf Holdings, LLC, No. 08-18581, 2008 WL 4200324, at *9 (Bankr. D.N.J. 2008) ("[F]or the purposes of determining the debtors' equity under § 362(d)(2), the value of all the collateral should be considered."). In this regard, equipment is one of several categories of property against which GM asserts a lien, and the Court must assess the value of all collateral to determine whether equity exists. As GM has submitted only a conclusory statement of the value of the property with no evidentiary support, it has not satisfied its burden of proof.

69.     In fact, it appears, based on the only evidence available, that the Debtors may very well have equity in the Dedicated Equipment. As set forth in the First Day Declaration, as of the Petition Date, the Debtors' equipment was believed to have an orderly liquidation value of $5,157,400.00,[4] and the Debtors had cash on hand of $1,930,973.00, accounts receivable of $2,910,900.69, and inventory with a book value of $1,185,748.04. See, e.g., Docket No. 8, ¶ 33. Moreover, the Debtors believe that a turn-key sale process will generate greater sale proceeds for the equipment. See, e.g., id. ¶ 43. The First Day Declaration demonstrates that the aggregate value of all the collateral easily exceeds a secured loan amount of $6,022,500.00 (or approximately $7,500,000 when amounts owed to Wells Fargo are included). Therefore, GM's request for relief from the automatic stay under section 362(d)(2) should be denied.

---

[4] Pursuant to Local Rule 4001-1(c), the Debtors have attached the most recent appraisal available of the Debtors' equipment at **Exhibit B** to this Opposition, which shows an orderly liquidation value of $5,157,400.00. See Ex. B, at 3, 10.

BOS-4150808 v2

**2.    The Debtors Have Satisfied Their Low Burden of Proving that the Dedicated Equipment is Necessary to an Effective Reorganization.**

70.    Even if the Court somehow determines that GM has satisfied its burden of proving that the Debtors lack equity in the Dedicated Equipment, it should still deny the Motion for Relief because such equipment is necessary, and indeed critical, to an effective reorganization.  See 11 U.S.C. § 362(d)(2)(B).  At this early stage of bankruptcy, under the "necessary to an effective reorganization" test, the Debtors bear the light burden of showing a "reasonable possibility of a successful reorganization within a reasonable time." See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 376 (1988).  As the Supreme Court recognized in Timbers, "bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan." Id.  In other words, in the early stages of a bankruptcy case, the Debtors' burden "requires a less strenuous showing of a reasonable possibility of a successful reorganization within a reasonable time." See, e.g., In re Holly's, Inc., 140 B.R. at 701.  "This is especially true when a creditor requests relief from the stay fast on the heels of a bankruptcy filing," see id., as is the case here, where GM filed its Motion for Relief the day after the petition date.  "At such an early stage in the bankruptcy, the burden of proof under § 362(d)(2)(B) is satisfied if the debtor offers sufficient evidence to indicate that a successful reorganization within a reasonable time is 'plausible.'" See, e.g., id. at 701.

71.    The Debtors satisfy this "less stringent" burden of proof imposed by section 362(d)(2)(B) in the "early stages of [this] bankruptcy case." See id. at 700 (citing Timbers, 484 U.S. at 376).  As evidenced by the First Day Declaration, it is the well-considered business judgment of the Debtors that substantially more value can be generated for all stakeholders through a turn-key sale of the Debtors' equipment than a piecemeal liquidation.  See Docket No.

8, ¶ 21.  The Debtors arrived at this conclusion after consultations with their investment banker,

Conway MacKenzie, and their financial advisor, KPMG.  See id.  Through the Chapter 11 Cases,

the Debtors have petitioned the Court to employ Conway MacKenzie as investment banker to

assist with the turn-key sale process.  See Docket No. 15.  As demonstrated by the MacKenzie

Declaration in support of the motion to employ Conway MacKenzie, the firm is a widely

recognized and respected investment banker on matters concerning bankruptcy, especially in the

automobile industry.  See Docket No. 15-3, at ¶¶ 4-5.  Moreover, the Debtors have also hired

K&L Gates LLP as proposed bankruptcy counsel, and the Debtors' application to the Court to

employ K&L Gates LLP is forthcoming.  Finally, the Debtors have now filed pleadings to

establish sale procedures and to conduct a sale process in under 90 days.  The Debtors' plans for

a turn-key sale of their assets (including the Dedicated Equipment), along with their employment

of numerous professionals and advisors to assist with such a turn-key sale, are well underway

and demonstrate that a successful reorganization in these Chapter 11 Cases in a reasonable time

is more than plausible.

72.    As an analogous case, the Debtors point the Court to In re Plastech Engineered

Products, Inc., 382 B.R. 90 (Bankr. E.D. Mich. 2008).  In that case, a tier-one automobile parts

supplier named Plastech Engineered Products, Inc. ("Plastech") declared bankruptcy after

liquidity issues and outstanding debts because unsustainable, even despite numerous

accommodation agreements executed with Chrysler, LLC ("Chrysler").  The day after the

bankruptcy petition was filed, Chrysler moved for relief from the automatic stay, arguing that it

had a right to immediate possession and removal of certain tooling and equipment at Plastech's

plants.  Id. at 103.  The Court denied Chrysler's motion for relief under section 362(d)(2),

finding that Plastech had satisfied its low burden of proving, at the early stage of that bankruptcy

case, that "it has a prospect for an effective reorganization." <u>Id.</u> at 111.  The Court found the testimony of Plastech's investment banker and financial advisor credible, concluding that "this Debtor 'has a heart beat' and there are many ingredients present upon which a restructuring transaction could be built." <u>Id.</u> at 110-11.  The Court further determined that "[p]ermitting Chrysler to take possession of its tooling at this time will likely destroy the possibilities for an effective reorganization." <u>Id.</u> at 111.

73.    Here, the facts are apposite.  GM's demands for the immediate possession of the Debtors' Dedicated Equipment would be detrimental to the success of the turn-key process contemplated by the Debtors through these Chapter 11 Cases, similar to how Chrysler's request for immediate possession of Plastech's tooling and equipment would "likely destroy the possibilities for an effective reorganization." <u>See</u> <u>id.</u>  GM, in its Motion for Relief, fundamentally misunderstands the turn-key sale process.[5]  GM assumes that the Debtors wish "to shut down their operations and liquidate after rejecting their contracts with GM." <u>See</u> Motion for Relief, ¶ 71.  However, a necessary element of a turn-key sale for the Debtors is that the Dedicated Equipment, which is both owned by the Debtors and critical to the manufacturing processes, remains intact and ready for a lessee to simply "turn a key and flick a switch" to resume production.  Clearly, should GM remove the Dedicated Equipment from the Debtors' manufacturing facilities, the very purposes of the turn-key sale process, and indeed its advantages over a piecemeal liquidation, would be eviscerated.

74.    Therefore, the Debtors believe that a successful reorganization can be achieved in a reasonable time if they are provided with the "'breathing spell from . . . creditors'"

---

[5] GM also argues that the equipment cannot be necessary to a reorganization because GM "properly exercised" its purchase option with respect to the Dedicated Equipment.  <u>See</u> Motion for Relief, ¶ 70.  However, as discussed in elsewhere in this Opposition, GM has—at most—an inchoate right to purchase certain of the Debtors' assets, which is stayed by section 362.  To the extent that right flows from an executory contract, the Debtors may avoid performance by rejecting the contract, which is precisely what they seek to do.

BOS-4150808 v2

contemplated by the Bankruptcy Code.  See In re Holly's Inc., 140 B.R. at 685 (quoting H.R.

Rep. No. 595, at 340-41 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296-97)); see also

Bildisco & Bildisco, 465 U.S. at 532 (recognizing that the overall purpose of the Bankruptcy

Code is to "give a debtor-in-possession some flexibility and breathing space").

### Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this

Court enter an order in the form attached hereto at **Exhibit A** granting certain limited conditional

relief as it pertains to GM Tooling and Finished Goods Inventory, but DENYING all other relief

requested by GM in its Motion for Relief.


Dated: Boston, Massachusetts
       July 12, 2016

Respectfully submitted,

CLARK-CUTLER-MCDERMOTT COMPANY
and CCM AUTOMOTIVE LAFAYETTE LLC,

By their proposed counsel,


*/s/ Charles A. Dale III*
Charles A. Dale III (BBO No. 558839)
Mackenzie L. Shea (BBO No. 666241)
David A. Mawhinney (BBO No. 681737)
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Tel:  (617) 261-3100
Fax: (617) 261-3175

E-mail:
    chad.dale@klgates.com
    mackenzie.shea@klgates.com
    david.mawhinney@klgates.com

BOS-4150808 v2