**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re | ) |
|  | ) |
|  | ) Chapter 11 |
| **CLARK-CUTLER-MCDERMOTT** | ) |
| **COMPANY**, *et al.*,[1] | ) Case No. 16-41188 (CJP) |
|  | ) |
| **Debtors.** | ) (Jointly Administered) |
|  | ) |

**GENERAL MOTORS LLC'S OBJECTION TO MOTION OF THE DEBTORS FOR FINAL ORDER (A) AUTHORIZING USE OF CASH COLLATERAL; (B) GRANTING ADEQUATE PROTECTION; AND (C) GRANTING RELATED RELIEF**

General Motors LLC ("GM"), for its objection (this "Objection") to the entry of a Final Order granting the *Motion of the Debtors for Interim and Final Orders (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief* (the "Motion") [Docket No. 12],[2] states as follows:

**Preliminary Statement**

Through the Motion, the Debtors are seeking this Court's approval to use GM's cash collateral to fund a sale process that only three weeks prior to the Petition Date the Debtors repeatedly informed GM was a worthless endeavor. Although GM was willing to continue funding the Debtors' operating costs in connection with a sale process at that time, and GM had,

---

[1] The Debtors in these chapter 11 cases are Clark-Cutler-McDermott Company and CCM Automotive Lafayette LLC. CCM's corporate headquarters are located at 5 Fisher Street, Franklin, Massachusetts, 02038. Lafayette, a wholly owned subsidiary of CCM Automotive LLC, has its principal place of business at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia 30728.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion. On July 8, 2016, GM filed *General Motors LLC's Objection to the Motion of the Debtors for Interim and Final Orders (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief* [Docket No. 29], which GM incorporates herein by reference.

22189669.7

in fact, strongly recommended the commencement of such a sale process as much as four months earlier, the Debtors opted instead to cease production, shut their doors, and indefinitely lay-off all employees. Only when compelled by a temporary restraining order (the "TRO") from the U.S. District Court for the Eastern District of Michigan did the Debtors resume operations and the production of GM's component parts, with such operations being funded entirely by GM. But even then the Debtors did not commence any sale process for their businesses.

Now, however, despite the rejection of the Debtors' contracts with GM, the removal of all GM-owned tooling from the Debtors' facilities, the cessation of all business operations, and the termination of substantially all of their employees, the Debtors are seeking to use GM's cash collateral over 90 days to fund what the Debtors describe as a "turn-key sale of assets," but in reality is a forced liquidation. While GM consented to the limited use of cash collateral as set forth in the *Interim Order (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief* [Docket No. 69] (the "Interim Order") to provide for the payment of certain costs and expenses incurred in connection with the production of component parts for GM in accordance with the TRO or while GM was removing its tooling from the Debtors' facilities, that is not what the Debtors are proposing to do here. Instead, the Debtors have ceased all production, and seek to primarily fund the forced liquidation sale with: (i) cash provided by GM pursuant to the TRO, which was provided solely to fund ongoing production and is not property of the estates; and (ii) cash and accounts receivable in which GM holds a perfected first-lien security interest and which are subject to GM's setoff and recoupment rights, and which will not be replenished during the chapter 11 cases given the cessation of the Debtors' business and inability to generate additional accounts receivable.

2

22189669.7

The Bankruptcy Code requires that the value of the GM's interest in its collateral be adequately protected from diminution while the Debtors are using such collateral, yet the Debtors' proposed budget contemplates a spending of approximately $2 million over the next 10 weeks—including $600,000 in professional fees—to fund a sale process for assets with an appraised gross forced liquidation value of only $3,106,045.  GM does not consent to the use of GM's cash or cash collateral as requested by the Debtors.

### Background[3]

1. In early March 2016, the Debtors notified GM that they were in default under their senior secured credit facility with Wells Fargo and requested certain accommodations from GM.  These requested accommodations included, without limitation, payment by GM of increased part prices over the agreed-upon prices set in the GM Contracts, immediate payment of all outstanding GM accounts payable, payment on an accelerated basis for the Parts shipped by the Debtors going forward, and the funding of any budget shortfalls necessary to continue the Debtors' operations.

2. While the parties negotiated based on the Debtors' requested accommodations, in order to enable the Debtors to continue producing component parts for GM (the "Component Parts"), on March 14, 2016, GM provided the Debtors with a $300,000 secured loan.  On March 15, 2016, again to ensure the flow of critical Component Parts, GM provided the Debtors with an additional $700,000 secured loan.  On March 23, 2016, GM provided the Debtors with an additional $950,000 secured loan.

3. On or about April 1, 2016, following extensive negotiations, GM, the Debtors, and Wells Fargo entered into an Interim Accommodation Agreement (as amended, the "Interim

---

[3] A detailed description of the facts and circumstances supporting this Objection can be found in *General Motors LLC's Motion for Relief from the Automatic Stay* [Docket No. 27], and are incorporated herein by reference.

Agreement"). Pursuant to the Interim Agreement, GM provided substantial financial accommodations to the Debtors to ensure production of the Component Parts.

4. The Debtors and GM were unable to successfully negotiate a final accommodation agreement given the Debtors' unrealistic demands, including, without limitation, that GM pay all of the Debtors' unsecured creditors in full (ahead of GM's secured loans) and pay the significant pension withdrawal liability of the Debtors, which also is a claim against the Debtors' principals and non-debtor affiliates. The Debtors threatened that unless GM agreed to pay all of the Debtors' obligations, the Debtors' would shut down operations, potentially causing massive harm to GM.

5. During the term of the Interim Agreement, including the extensions pursuant to the amendments thereto, GM provided the Debtors with additional secured loans of $425,000 on April 25, 2016; $270,000 on May 6, 2016; $185,000 on May 13, 2016; $125,000 on May 23, 2016; $320,000 on May 27, 2016; and $175,000 on June 10, 2016.

6. On June 17, 2016, the Debtors shut down production, in breach of the GM Contracts and various other agreements between the parties. In response to this shutdown, GM went to court that day and obtained a Temporary Restraining Order and Order to Show Cause (as extended, the "TRO") in the United States District Court for the Eastern District of Michigan (the "District Court"), which provided that the Debtors must perform under the GM Contracts. *See* **Exhibit 1**. In accordance with the TRO, GM provided continued funding of the Debtors' operations in a manner consistent with how such operations were funded under the Interim Agreement, in exchange for the Debtors' performance under the GM Contracts. All of the funds provided by GM to the Debtors in accordance with the TRO were provided pursuant to detailed budgets—agreed upon by GM and the Debtors—that specified how such funds would be spent in

order for the Debtors to continue producing parts for GM. During the term of the TRO, through the Petition Date, GM provided the Debtors with additional secured loans of $3,450,000. The term of the TRO ran through 5:00 p.m. on Monday, July 11, 2016.

7. Pursuant to the TRO and the funding budgets thereunder, GM paid the Debtors $910,000 on July 6, 2016 and another $910,000 on the Petition Date, for a total of $1.82 million—half of which was in the form of secured loans, and the other half in the form of price increases to the Debtors.

8. The Debtors stated that as of the Petition Date, the Debtors had $1,930,973 in cash on hand. See *Declaration of James T. McDermott in Support of Chapter 11 Petitions and First Day Motions and Applications* at Paragraph 33. Those funds are almost entirely funds that were supplied by GM pursuant to the conditions of the TRO, and were to be utilized pursuant to an agreed-upon budget solely to fund continuing operations and production of component parts for GM. In addition, pursuant to the *Order on General Motors, LLC's Motion for Relief from the Automatic Stay* [Docket No. 71], GM paid the Debtors $2,930,138.90, consisting of $719,319.12 for finished goods inventory which had not yet been delivered by the Debtors to GM, and $2,210,819.78 in full satisfaction of amounts owed to the Debtors by GM as of the Petition Date for prior shipments of finished goods. All of this cash on hand, plus any remaining accounts receivable, is subject to GM's security interest.

9. On July 8, 2016, Wells Fargo assigned its senior debt claim to GM, leaving GM as the Debtors' sole senior secured lender. As of the date hereof, GM's secured claims against the Debtors are at least: (a) $6,022,500 for the secured loans provided by GM between March 2016 and the Petition Date; and (b) $1,486,296.44 in secured claims that were originally held by Wells Fargo, for a total secured claim of at least $7,508,796.44. Without ongoing operations,

5

22189669.7

and taking into account the value of the Debtors' assets, GM is not adequately protected, and the Debtors' proposed adequate protection (as discussed below) is grossly inefficient to protect GM's interest in its collateral.

## **Objection[4]**

**A.  The Debtors Should Not Be Permitted to Utilize GM's Cash Collateral to Fund the Chapter 11 Cases**

10.     The Court should deny the Motion because the Debtors have not—and cannot—provide GM, a secured lender, with sufficient adequate protection to protect GM's collateral.

### **i.  The Debtors' Proposed Adequate Protection Is Insufficient**

11.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . will prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  A secured creditor is entitled to adequate protection if the value of its interest in collateral is declining as a result of the automatic stay. *See* 11 U.S.C. § 362(g).  "The purpose of adequate protection is to provide a secured creditor the benefit of its bargain while enabling a debtor to use secured property." *In re Northeast Chick Servs., Inc.,* 43 B.R. 326, 332 (Bankr. D. Mass. 1984); *see also In re Pawtuxet Valley Prescription & Surgical Ctr., Inc.,* 2008 WL 1990887, at *2 (Bankr. D. R.I. Mar. 10, 2008) ("It is generally understood

---

[4] GM believes that an evidentiary hearing will be required for the Court to resolve issues involving the use of GM's cash collateral.  GM was informed by the Court's clerk that the hearing on Tuesday, August 2, 2016, is scheduled as a non-evidentiary hearing.  Nonetheless, GM began the process of discovery from the Debtors informally earlier this week before filing this Objection, asking a limited number of questions and requesting a limited number of documents and information.  Although the Debtors have provided a response to these requests, the Debtors' responses do not appear to be complete.  Furthermore, it would be efficient for depositions to be taken sufficiently in advance of any hearing to permit parties to prepare appropriately.  The Debtors also have informally asked for documents from GM and for GM to produce for deposition any witnesses upon which it intends to rely.  The Debtors have asked for the documents by noon on Monday, August 1, and GM will produce non-privileged, responsive documents at or before that time.

6

22189669.7

that adequate protection relates to maintaining the status quo for the period between filing the petition and before confirmation or rejection of the plan of reorganization.").

12. Adequate protection requires that the value of the creditor's interest in the collateral be protected from diminution while the debtor is using the collateral. *See United Savings Association of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365 (1988). In other words, it is "intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate." *In re Markos Gurnee Partnership,* 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997).

13. In the Motion and the Debtors' proposed order granting the Motion on a final basis, the Debtors propose to grant additional and replacement adequate protection liens to GM that will secure the Junior Debt and the Senior Debt, including replacement liens on property purchased or acquired with the Cash Collateral but excluding causes of action under chapter 5 of the Bankruptcy Code. The Debtors also propose to pay GM $66,276.00 in regularly scheduled principal and interest on account of the Senior Debt on or before the 1st day of each month.

14. The Debtors maintain that this proposed adequate protection package will protect GM's interests from any post-petition diminution in value of its secured position because (1) "a buyer with the ability to purchase the Debtors' assets in place and to operate the Debtors' manufacturing plants will pay more for those assets, which it can put to immediate use by resuming operations, than it would otherwise pay in a liquidation," and (2) "the adequate protection payments that the Debtors propose to pay to [GM] will protect [GM's] interests as ongoing payments to [GM] will increase its equity cushion . . ." Motion at ¶ 25.

7

22189669.7

15.     The adequate protection proposed by the Debtors is insufficient for at least two reasons.  First, the Debtors use an incorrect valuation for the collateral, which leads them to overstate the "cushion" available to protect GM's interests.  Second, even if the Debtors' valuation were correct, the Debtors propose to consume almost the entire cushion, which means that GM would not be adequately protected.  And, if the correct valuation of the collateral is used, this problem only gets worse.

16.     In the Motion, the Debtors submit that "[a]s of the Petition Date, the Debtors had approximately $1,930,973 in cash on hand, $2,910,900.69 of accounts receivable, inventory with a book value of approximately $1,185,748.04, and equipment with an *orderly liquidation value* of $5,157,400." *Id.* at ¶ 1 (p. 6) (emphasis added).

17.     In the asset appraisal upon which the Debtors rely [Docket No. 58, Ex. 4] (the "Machinery and Equipment Appraisal"), the orderly liquidation value is premised upon a twelve month sale process. Machinery and Equipment Appraisal, p. 4.  And, the Debtors contend that they are conducting a "turn-key sale," under which a new buyer will swiftly restart operations at the Debtors' facilities.  However, due to the Debtors' decision to reject the GM contracts at the outset of these cases, that is not what we have here.  Further, there is no indication in the Motion that anyone is or will be willing to buy the company "as is" and resume operations.  This is a true forced liquidation of the Debtors' assets and GM's collateral should be valued using a methodology that reflects this reality.  Indeed, in the asset appraisal, there is a figure given for "forced liquidation value," which is premised upon a four month sale process and is predicted to yield a gross $3,106,045.  *Id.* at p. 3.  Not only is the time period of a forced liquidation sale more in-line with the Debtors' proposed process, but the First Circuit requires the use of this sort of liquidation valuation.

18. Under First Circuit precedent, when determining the value of collateral for purposes of adequate protection, courts should employ a valuation methodology that recognizes the liquidation value of the debtor's assets, not the book value or other value that is not relevant to the situation at hand. *See, e.g.*, *In re Ralar Distributors, Inc.*, 166 B.R. 3, 7 (Bankr. D. Mass. 1994), judgment aff'd by 69 F.3d 1200 (1st Cir. 1995) ("The value relevant for adequate protection purposes, however, is not book value. It is liquidation value realizable by the creditor.") (citing *In re Robbins*, 119 B.R. 1 (Bankr. D. Mass. 1990)); *see also In re SW Boston Hotel Venture, LLC*, 748 F.3d 393, 406 (1st Cir. 2014) (noting the First Circuit's previous recognition of the statutory directive of section 506(a) of the Bankruptcy Code to determine collateral's value "in light of the purpose of the valuation and of the proposed disposition or use of such property"). Accordingly, the value of the collateral securing GM's secured claims should be determined by reference to a forced liquidation process. Simply put, it is the "forced liquidation" concept in the asset appraisal that is relevant here.

19. In the Debtors' motion for an order establishing bidding procedures and approving a sale of substantially all of their assets [Docket No. 50] (the "<u>Bid Procedures Motion</u>"), the Debtors have proposed that bids for their assets will be due on August 26 and the sale will close during the week of September 12, 2016. Bid Procedures Motion, ¶ 8. As a practical matter, bids for the Debtors' assets would be due less than one month from today. There cannot be a clearer example of a forced fire sale liquidation than a less than one-month sale process. Despite the Debtors and Conway Mackenzie having begun their marketing efforts prior to the Petition Date—though such efforts were stopped at the Debtors' request—the entire proposed process will be significantly shorter than twelve month sales, thereby making the Debtors' reliance on the valuation of the collateral based on such a process misplaced. The

9

22189669.7

Debtors fail to realize the consequence of their own decision to precipitously cease operations, and instead rely on an unrealistic valuation to impose additional damages upon GM by using GM's cash collateral to complete a hail-mary "turn-key" sale.

20.     Accepting, for purposes of this Motion only, the figures in the Machinery and Equipment Appraisal, the appropriate liquidation value for the non-cash collateral is $3,106,405. According to the Debtors' most recent *Proposed Budget for Use of Cash Collateral* [Docket No. 112] (the "Proposed Cash Collateral Budget"), the Debtors expect to have $4,574,128.36 of cash available as of July 29, 2016.  Based on these figures, the Debtors would have total assets valued at $7,680,533.36 as of July 29.  As noted above, GM currently holds a secured claim of at least $7,508,796.44.  Accordingly, as of July 29, GM would have an equity cushion of approximately 2.3% to protect its interests.  Due to the Debtors' proposed use of cash to fund the sale process and other expenses, this cushion would rapidly deteriorate and quickly become negative in the upcoming weeks.

21.     Although the sufficiency of an equity cushion for purposes of adequate protection is determined on a case by case basis, courts generally consider an equity cushion of 20% to be sufficient, while an equity cushion of under 11% is typically found to be insufficient. *See, e.g.*, *In re Las Torres Development, L.L.C.*, 413 B.R. 687, 696 (Bankr. S.D. Tex. 2009) (noting that "case law is clear that an equity cushion of 20% or more constitutes adequate protection."); *Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 700 n.24 (E.D. N.C. 2009) (rejecting an equity cushion of slightly under 11% despite the payment of monthly interest payments to the creditor, and noting that a 20% or more equity cushion "almost uniformly . . . constitutes adequate protection [while courts] almost as uniformly held that an equity cushion under 11% is insufficient [and are] divided on whether a cushion of 12% to 20% constitutes adequate

protection.") (quoting *In re James River Associates*, 148 B.R. 790, 796 (E.D. Va. 1992)); *see also In re Franklin Equipment Co.*, 416 B.R. 483, 528 (Bankr. E.D. Va. 2009) (same) (quoting *In re Kost*, 102 B.R. 829, 831 (D. Wyo. 1989)).

22. Due to the posture of this case, including the non-operational status of the Debtors' business and the impending liquidation of the Debtors' assets, an equity cushion of at least 20% is warranted throughout the duration of this case. *See Las Torres Development*, 413 B.R. at 698 n.9 (noting that the Fifth Circuit has indicated that other factors, including the likelihood of the collateral's appreciation or depreciation over time and the prospects for a successful reorganization, can be considered in the adequate protection analysis).

23. Although the Court should not use anything other than forced liquidation value to determine whether GM is adequately protected on the facts of this liquidation, utilizing the higher 12-month liquidation value on which the Debtors seem to rely still does not support an order permitting the Debtors to use cash in accordance with the budget they have proposed. That use would eliminate almost the entire equity cushion. And, accordingly, GM still is not adequately protected.

24. Accepting the Debtors' proposed orderly liquidation value of $5,157,400 for their remaining equipment, the Debtors expect to have total assets valued at $9,731,528.36 as of July 29, 2016. Based on GM's secured claim of at least $7,508,796.44 and according to the Proposed Cash Collateral Budget, this would give GM an equity cushion of approximately 29.6% as of July 29. Although this may be an acceptable equity cushion at the start of the process, it quickly breaks down. Because the Debtors elected to shutter their operations and reject the GM contracts, there is nothing coming into these estates that GM does not already have a lien on or is not the proceeds of GM's existing collateral. The Motion and the Proposed Cash Collateral

11

Budget seek authority for the Debtors to spend $1,851,820.48 during the period from July 29, 2016 through October 7, 2016. This would leave the Debtors with available cash of $2,486,994.52 and total assets of $7,644,394.52. By their own admission through the figures in the Proposed Cash Collateral Budget, the Debtors seek to reduce the equity cushion to approximately 1.8%.

25.  Consequently, even accepting the Debtors' proposed use of orderly liquidation value for their remaining equipment, the most that the Debtors should be permitted to spend is $720,972.63 (which would leave the Debtors with total assets valued at $9,010,555.73) to maintain a 20% equity cushion that adequately protects GM's interests in its collateral. However, that proposed valuation is based on a twelve month sale process, which the Debtors are not seeking authority to implement. Using the valuation figure from the four month process (which may be overstated due to the timeline proposed in the Bid Procedures Motion), it is impossible for the Debtors to provide an equity cushion that is anywhere near 20%.

      **ii.**      **The Debtors' Proposed Sale Process Will Drain Significant Estate Assets**

26.  The Debtors seek to use cash collateral to fund their proposed sale process, and contend this will improve GM's financial position. The Motion does not support the Debtors' contention. First, the Debtors propose to fund the chapter 11 case with cash on hand and accounts receivable, despite having already ceased operations. To fund that process, the Debtors have proposed a budget that contemplates spending approximately $2 million over the next 10 weeks, including $600,000 in professional fees. The proposed budget also includes $400,000 ($40,000 per week) to pay employees for facilities that are no longer operating, and approximately $340,000 in health insurance, 401(k) plan payments, and other benefits. These are significant expenditures for a company that will not be generating any additional income

12

22189669.7

while in chapter 11, especially when considering that the appraised gross fixed liquidation value of the Debtors' assets is only $3,106,045,[5] and that the appraisal itself contemplated that a four-month sale process could be conducted at a cost of approximately $375,000. Without any replacement in sight for the cash and cash collateral, GM will not be adequately protected through the Debtors' proposed sale process.

27.    Second, the Debtors' proposed "turn-key sale" is a stark about-face from their recent discussions with GM, in which the Debtors told GM that their best option was to liquidate the businesses. In response to a demand by GM for adequate assurance of performance under section 2-609 of the Uniform Commercial Code (as incorporated by MCL 440.2609), the Debtors responded that:

> Rather, with the benefit of financial and investment banking advice from two highly respected firms (KPMG and Conway Mackenzie), and after CCM's good faith yet unsuccessful negotiations with [counsel to GM] and [GM], CCM's board of directors has concluded that the company should be liquidated. At the close of business today, CCM will lay off its employees and commence an orderly wind down.

June 17, 2016 Letter from Charles A. Dale III to Joseph Sgroi, attached hereto as **Exhibit 2**. In that same letter, the Debtors also explained that:

> Indeed, as a result of the company's pension withdrawal liability, it is now clear that a "going concern" sale of CCM can only be accomplished through a Chapter 11 process which benefits only one party—GM. Every stakeholder _other_ than GM is a loser in that scenario.

*Id.* (emphasis in original).

---

[5] This gross fixed liquidation value does not include the proposed minimum disposition fee of $450,000 to Conway MacKenzie, to which GM has objected in *General Motors LLC's Limited Objection to Application of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) of the Bankruptcy Code Authorizing the Employment and Retention of Conway MacKenzie Capital Advisors LLC as Investment Banker to the Debtors* Nunc Pro Tunc *to the Petition Date*, filed on the same date as this Objection.

13

22189669.7

28.     Inexplicably, although just three weeks before the Petition Date the Debtors chose to cease operations rather than accept a proposal whereby GM would fund 100% of operational expenses in connection with an orderly sale and wind-down process—a process which would have given a prospective purchaser the option to negotiate a continuing business relationship with GM and other customers—the Debtors and their same advisors now believe that a chapter 11 sale process is the way to maximize value for the estates, despite the option for a "going concern" sale being off the table because of the Debtors' decision to cease operations and reject the GM contracts.

29.     As part of this process, the Debtors have proposed to provide GM with replacement liens while gutting the underlying value of the collateral secured by such replacement liens. Rather than maximize the value for all creditors, the Debtors' proposed use of cash collateral as provided in the Motion will result in the Debtors burning through their cash on hand solely at the expense of GM. The law requires the Debtors to adequately protect GM from a diminution in the value of its cash collateral.

30.     Further, as the Debtors acknowledge in the Motion, the Court must balance the protection of GM against the Debtors' need for the use of the cash collateral to reorganize. Here, the Debtors admittedly have no prospect of reorganization. Indeed, at this point, these chapter 11 cases are nothing more than liquidations as the Debtors have already ceased all operations and rejected the contracts with GM that constituted more than 80 percent of their business. For that reason, among others, there is no reason to believe that the value to be realized will be more in chapter 11 than if these cases were the chapter 7 cases they should and must be. Therefore, if cash collateral use is permitted, it should be limited to and staged the way a chapter 7 trustee

14

would proceed: focus exclusively on the sale, expend funds only to further a sale, see what proceeds the sale generates, and then figure out what to do with these cases.

31. While GM was more than willing to fund an orderly wind-down and sale process of the Debtors' operations in cooperation with the Debtors outside of bankruptcy, the Debtors do not have a valid legal basis for the use of GM's cash collateral without GM's consent. The request to consume GM's cash collateral in furtherance of a sale effort when GM cannot be adequately protected (and does not consent) should be denied.

B. **The Debtors' Use of the Funds Provided by GM Pursuant to the TRO for Any Purpose Other Than Production of Parts for GM is Prohibited**

32. Although the Debtors seek the authority to utilize their cash on hand to fund these chapter 11 cases, the Debtors fail to mention that $1.82 million of those funds were provided by GM in accordance with the TRO, and were specifically paid to maintain the Debtors' production for GM in accordance with that order.

33. Pursuant to the TRO, the Debtors were required to "specifically perform all of their obligations under the parties' requirements contract and all Purchase Orders issued by GM . . . ," and that GM is required to "continue to fund the operations of Defendants in a manner consistent with the parties' Interim Accommodation Agreement, as amended . . . ." TRO at pp. 4-5.

34. While the TRO was in place, the Debtors and GM would negotiate a weekly budget for the Debtors' operations, and GM would provide funding in connection therewith. On the night of July 5, 2016, KPMG submitted the budget for the week ending July 8, 2016, with a request for GM to fund $1.95 million for the week's production. *See* **Exhibit 3**. In that e-mail, William J. Byrne of KPMG wrote: "GM please initiate the wire to the CCM Operating Account for the $1,950,000 referenced as soon as the [loan] documents are signed, to allow CCM to

15

operate through the week and comply with the TRO." According to the budget attached to Mr. Byrne's e-mail, with the $1.95 million from GM, the Debtors would end the week with a cash balance of $46,905. Following negotiations, the parties agreed that the amount to be funded by GM for the week's operations would be $1.82 million, of which 50% would be paid as price increases to the Debtors, and 50% would be funded as a secured loan by GM.

35. When GM had not made the payments by the morning of July 6, the Debtors' counsel, Charles A. Dale III, sent an e-mail to GM's professionals stating "May I suggest that the financial advisors and the company get on the phone now to resolve CCM's immediate need for funding." *See* **Exhibit 4**. In light of these requests, and in compliance with the TRO, GM proceeded to wire $910,000 to the Debtors on July 6, 2016, and $910,000 to the Debtors on July 7, 2016, to ensure uninterrupted production of critical component parts. Within hours after GM sent the wire on July 7, CCM filed the chapter 11 cases, and the Debtors' stated amount of cash on hand was approximately $1,930,973.

36. The filling of a bankruptcy petition does not terminate an active temporary restraining order. *See Capital Source Finance, LLC v. Delco Oil, Inc.*, 520 F. Supp. 2d 684, 697-98 (D. Md. 2007). As a result, to the extent any of the Debtors' cash on hand as of the Petition Date consisted of the funds provided by GM pursuant to the TRO to fund operations for the week ending July 8, 2016, those funds cannot be used for any other purpose and do not constitute property of the Debtors' estates. Given that the Debtors had approximately $200,397 in cash on hand at the end of the week ending July 1, 2016, it is certain that the majority of the Debtors' cash on hand as of the Petition Date was the operational funding provided by GM in accordance with the TRO. It is for that reason that GM consented to the limited use of its cash collateral in the Interim Order, as the majority of the funds used pursuant to that budget were to pay amounts

due in connection with either the production of GM's component parts or the removal of GM-owned tooling from the Debtors' facilities.

37. Any use of the Debtors' cash on hand for purposes other than the production of component parts for GM—which is no longer possible given the Debtors' cessation of operations and rejection of the contracts with GM—would directly violate the TRO. The Debtors' request for permission to use the cash on hand for any other purpose, in violation of a binding order from another court, should be rejected by this Court. If anything, the Court should lift the automatic stay to allow the issue of whether the Debtors can use any of the funds provided pursuant to the TRO to be determined by the United States District Court for the Eastern District of Michigan, which entered the TRO.

## Conclusion

38. Therefore, based on the foregoing, GM requests that the Court deny the Motion.

Dated: July 29, 2016

Respectfully submitted,

By: /s/ Andrew M. Troop
    Andrew M. Troop

Andrew M. Troop (BBO #547179)
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036
(212) 858-1000
andrew.troop@pillsburylaw.com

-and-

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Joseph R. Sgroi (admitted *pro hac vice*)
Scott B. Kitei (*pro hac vice* pending)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7570

22189669.7

       Facsimile:  (313) 465-7571
       Email:  jsgroi@honigman.com

*Counsel for General Motors LLC*

22189669.7