**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| **In re**<br><br>**CLARK-CUTLER-MCDERMOTT COMPANY, *et al.*,**[1]<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 16-41188**<br><br>**(Jointly Administered)** |

**DISCLOSURE STATEMENT FOR THE DEBTORS'**
**SECOND MODIFIED JOINT CHAPTER 11 PLAN OF LIQUIDATION**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES. INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.**

**K&L GATES LLP**
Charles A. Dale III (BBO No. 558839)
Sven T. Nylen (admitted *pro hac vice*)
David A. Mawhinney (BBO No. 681737)
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Tel: (617) 261-3100
Fax: (617) 261-3175
E-mail: chad.dale@klgates.com
sven.nylen@klgates.com
david.mawhinney@klgates.com

*Counsel to the Debtors and Debtors in Possession*

Dated: February 24, 2017

[1] The Debtors in these chapter 11 cases are Clark-Cutler-McDermott Company and CCM Automotive Lafayette LLC. CCM's corporate headquarters are located at 5 Fisher Street, Franklin, Massachusetts, 02038. Lafayette, a wholly owned subsidiary of CCM Automotive LLC, has its principal place of business at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia 30728.

# DISCLAIMER

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT[2] IN CONNECTION WITH THE DEBTORS' SECOND MODIFIED JOINT CHAPTER 11 PLAN OF LIQUIDATION THAT THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

[2] Unless otherwise defined herein, capitalized terms contained in this Disclosure Statement shall have the same meanings provided in the Plan, or the Bankruptcy Code as the case may be.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. RATHER, HOLDERS OF CLAIMS OR INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTORS OR THE LIQUIDATING TRUSTEE, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CAUSES OF ACTION, AND MAY OBJECT TO CLAIMS BEFORE AND AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CAUSES OF ACTION OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE LIQUIDATING TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED THEREIN OR BY SEPARATE ORDER OF THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT AND ITS ADVISORS HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN

HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM OR INTEREST MUST RELY ON THEIR OWN EVALUATION OF AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN ORDER TO MAKE AN INFORMED JUDGEMENT ABOUT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN, IN ORDER TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

VOTES ON THE PLAN MAY NOT BE SOLICITED UNLESS A COPY OF THE DISCLOSURE STATEMENT IS FURNISHED PRIOR TO OR CONCURRENTLY WITH SUCH SOLICITATION. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE NOT CONTAINED IN THE DISCLOSURE STATEMENT ARE NOT AUTHORIZED, AND SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE ATTORNEYS FOR THE DEBTORS WHO, IN TURN, WILL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND ADVERSELY CHANGE THE TREATMENT OF CLASSES MAY BE MADE TO TEH PLAN PRIOR TO CONFIMRAITON WITHOUT FURTHER SOLICITATION. SUCH AMENDMENTS MAY BE APPROVED BY THE BANKRUPTCY COURT AT TEH CONFIRMATION HEARING IWHTOUT ENTITLING MEMBERS OF ANY CLASSES WHOSE TREATMENT IS NOT ADVERSELY CHANGED TO WITHDRAW ANY VOTES TO ACCEPT OR REJECT THE PLAN.

WHETHER OR NOT YOU VOTE ON THE PLAN, YOU WILL BE BOUND BY ITS TERMS IF THE BANKRUPTCY COURT CONFIRMS THE PLAN. HOW YOU VOTE ON THE PLAN WILL NOT DETERMINE YOUR RIGHT TO RECEIVE A DISTRIBUTION UNDER THE PLAN.

ALLOWANCE OR DISALLOWANCE OF ANY CLAIM FOR VOTING PURPOSES DOES NOT NECESSARILY MEAN THAT ALL OR A PORTION OF A CLAIM WILL BE ALLOWED OR DISALLOWED FOR PURPOSES OF DISTRIBUTION UNDER THE PLAN.

# TABLE OF CONTENTS

Page

I. INTRODUCTION. ..... 7
1.1 PURPOSE OF THE DISCLOSURE STATEMENT. ..... 7
1.2 CONFIRMATION OF THE PLAN. ..... 7
1.3 VOTING ON THE PLAN. ..... 9
1.4 ACCEPTANCE OF THE PLAN. ..... 10
1.5 SOURCES OF INFORMATION. ..... 11
1.6 ADDITIONAL INFORMATION. ..... 11
II. THE DEBTORS ..... 11
2.1 DESCRIPTION OF THE DEBTORS AND THE DEBTORS' BUSINESS ..... 11
2.2 THE DEBTOR'S PREPETITION CAPITAL STRUCTURE. ..... 13
2.3 EVENTS LEADING TO THE BANKRUPTCY FILING. ..... 15
2.4 THE DEBTOR'S BANKRUPTCY PROCEEDINGS. ..... 17
2.5 GLOBAL SETTLEMENT WITH GENERAL MOTORS ..... 28
2.6 SECURED CLAIMS ENCUMBERING THE DEBTOR'S PROPERTY. ..... 33
2.7 ADMINISTRATIVE CLAIMS. ..... 33
2.8 UNSECURED CLAIMS AGAINST THE DEBTOR. ..... 33
III. SUMMARY OF THE PLAN OF LIQUIDATION. ..... 34
3.1 IN GENERAL. ..... 34
3.2 CLASSIFICATION OF CLAIMS AND INTERESTS. ..... 34
3.3 TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES. ..... 35
3.4 TREATMENT OF IMPAIRED CLASSES. ..... 36
3.5 IMPLEMENTATION OF THE PLAN. ..... 36
3.6 FUNDING AND DISBURSEMENTS. ..... 43
3.7 EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ..... 46
3.8 RESOLUTION OF CLAIMS. ..... 47
3.9 SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS. ..... 49
3.10 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN. ..... 51
3.11 MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN. ..... 52
3.12 RETENTION OF JURISDICTION. ..... 52

3.13 MISCELLANEOUS PROVISIONS....................54
IV. POST-CONFIRMATION ISSUES. .................... 57
4.1 THE DEBTORS' CONTINUED EXISTENCE AFTER CONFIRMATION.............57
V. FEASIBILITY. .................... 57
5.1 FINANCIAL FEASIBILITY ANALYSIS. ....................57
VI. ALTERNATIVES TO THE PLAN. .................... 58
6.1 CHAPTER 7 LIQUIDATION. ....................58
6.2 ALTERNATIVE PLAN(S). ....................59
VII. TAX CONSEQUENCES OF PLAN. .................... 59
7.1 CERTAIN FEDERAL INCOME TAX CONSIDERATIONS....................59
7.2 CONSEQUENCES TO HOLDERS OF CLAIMS ....................62
7.3 CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS ....................63
7.4 INFORMATION REPORTING AND BACKUP WITHHOLDING ....................63
VIII. RISK FACTORS. .................... 64
8.1 CERTAIN BANKRUPTCY CONSIDERATIONS ....................64
8.2 CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION...........65
8.3 LIQUIDATION OF ASSETS ....................65
IX. CONCLUSION. .................... 65

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan of Liquidation |
| EXHIBIT B | Liquidation Analysis |
| EXHIBIT C | Term Sheet of Global Settlement with GM |

# EXECUTIVE SUMMARY

Clark-Cutler-McDermott Company ("CCM") and CCM Automotive Lafayette LLC ("Lafayette," and collectively with CCM, the "Debtors") propose this *Debtors' Second Mofidied Joint Chapter 11 Plan of Liquidation* (the "Plan") for the resolution of the Claims against, and equity in (referred to as "Interests") in the Debtors pursuant to chapter 11 of the Bankruptcy Code.

On July 7, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court").

Shortly after commencing these Chapter 11 Cases, the Debtors ceased their business operations and proceeded to market substantially all of their assets for sale under an auction process supervised by the Bankruptcy Court. Following a hearing on September 8, 2016, the Bankruptcy Court approved the sale of a significant portion of the Debtors' manufacturing assets to several third party buyers (the "Sales"), which Sales the Debtors closed shortly thereafter. After completing these Sales, the Debtors turned their attention to disposing of several unique assets, which included a parcel of residential real property as well as equity interests in and causes of action pertaining to two manufacturing concerns. In February 2017, the Debtors sought Bankruptcy Court approval of three separate transactions pursuant to which they will liquidate these assets prior to confirmation of the Plan.

In addition to their efforts to liquidate assets, the Debtors and the Committee commenced litigation against General Motors LLC ("General Motors" or "GM"), seeking damages for various tort and contract claims. Subsequent to several days of formal and informal mediation, the Debtors, the Creditors' Committee, and GM have negotiated a comprehensive settlement of all claims asserted by and against the Debtors and GM, as well as claims that GM has asserted against the Debtors, CCM Automotive, AirLoc, Duffy's Park, and CCM Hildebran. In addition, the Debtors and the Creditors' Committee negotiated additional settlements involving various third parties, including claims related to the Debtors' minority interests in subsidiaries in Mexico. The Debtors have filed the Plan, which implements the settlement with General Motors and provides for the creation of a Liquidating Trust to, among other things, oversee the liquidation of assets and distribution of proceeds to holders of Allowed Claims and to pursue other Causes of Action of the Debtors' bankruptcy estates (collectively, the "Estates"), for the benefit of such holders. The Debtors believe that the Liquidating Trust provides the most efficient mechanism for distributing the proceeds of the Debtors' assets, evaluating and liquidating the Debtors' remaining assets, including any Causes of Action, and resolving Claims against the Estates.

This Disclosure Statement describes the terms of the Plan, including the treatment of Claims against and Interests in the Debtors. This Executive Summary is intended only to be a summary of the distributions of the Plan. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, SETTING FORTH THE CLASSIFICATION AND TREATMENT OF THE PREPETITION CLAIMS AND INTERESTS UNDER THE PLAN AND THE ESTIMATED PERCENTAGE OF RECOVERY OF ALLOWED CLAIMS AND**

**INTERESTS YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN, AND ANY EXHIBITS THERETO IN THEIR ENTIRETY.**

The "Global Settlement" between the Debtors, the Committee, and GM contemplates: (i) the substantive consolidation or merger of the Debtors and certain non-Debtor affiliates, (ii) an orderly liquidation of assets via a newly created Liquidating Trust, and (iii) a consensual "waterfall" of distributions to creditors. Under this waterfall methodology, creditor recoveries will improve to the extent that the Liquidating Trustee is successful in selling assets at higher prices.

Under the Plan, Claims against and Interests in the Debtors are divided into six (6) Classes as summarized in the table below setting forth the classification and treatment of the prepetition Claims and Interests under the Plan and the estimated recovery of Allowed Claims and Interests. Certain unclassified Claims will be paid in full in Cash to the extent they become Allowed Claims. Other Secured Claims and Priority Non-Tax Claims will also be paid in full to the extent they become Allowed. The GM Secured Claims, General Unsecured Claims, and GM Unsecured Claims, will receive distributions, if any, as summarized in the following table. Intercompany Claims and equity Interests are cancelled and will neither receive distributions nor retain any property under the Plan. The classification and treatment for all Classes is described in more detail in Section III.

Estimated Claim and Interest amounts set forth in the table below constitute the Debtors' current estimate after a preliminary review of certain Proofs of Claims filed against the Debtors and a comparison of such Claims to the Debtors' books and records. The Debtors have not completed a detailed review of all Claims to determine their validity or any possible legal or equitable defenses, including claims of setoff and recoupment.

The Debtors estimate that, as of the Effective Date, the Liquidating Trust will consist of assets with a recoverable value of approximately $13.6 million, including Cash in the approximate amount of $5 million for distribution to holders of Allowed Claims.

Because of the uncertain value of the Debtors' assets and the inherently speculative nature of estimating potential recoveries, the Debtors have not estimated the value of Causes of Action. **THERE CAN BE NO ASSURANCE THAT THE ACTUAL CLAIM AMOUNTS WILL NOT BE DIFFERENT, AND PERHAPS SIGNIFICANTLY DIFFERENT, FROM THE ESTIMATES SET FORTH HEREIN.** The actual distribution to holders of Allowed Claims is dependent on numerous factors, including, without limitation, (i) the net value realized upon liquidation of the remaining assets, (ii) whether any Contingent or Unliquidated Claims against the Debtors become noncontingent or liquidated; and (iii) whether Disputed Claims are resolved in favor of the Estates. Accordingly, no representation can or is being made with respect to the realization of the distributions estimated below.

The table beginning on the following page is only a summary of the classification of treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and Plan for a complete description and understanding of the classification and treatment of Claims and Interests.

**SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

| CLAIMS/INTERESTS & DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | ESTIMATED RECOVERY |
|---|---|---|---|
| GM Secured Claim (Class 1) | $7,500,000 | Impaired | Estimated Recovery Percentage: up to **80%**<br><br>Form of Recovery: Cash |
| Other Secured Claims (Class 2) | $0 | Unimpaired | Estimated Recovery Percentage: **100%**<br><br>Form of Recovery: Return of Collateral |
| Priority Non-Tax Claims (Class 3) | $600,000 | Unimpaired | Estimated Recovery Percentage: **100%**<br><br>Form of Recovery: Cash |
| General Unsecured Claims (Class 4) | $12,500,000 | Impaired | Estimated Recovery Percentage: **20–36.8%**[3]<br><br>Form of Recovery: Cash |
| GM General Unsecured Claim (Class 5) | $39,000,000 | Impaired | Estimated Recovery Percentage: **0%**<br><br>Form of Recovery: Cash |
| Interests (Class 6) | N/A | Impaired | Estimated Recovery Percentage: **0%**<br><br>All Interests in the Debtors shall be cancelled |

[3] Pursuant to the waterfall set forth on the attached Term Sheet, General Unsecured Claims are entitled to receive up to 75% of their Allowed Claims. Given the estimated amount of distributable value in the Liquidating Trust Assets, however, the estimated recovery is lower than the capped recovery on General Unsecured Claims.

# I. INTRODUCTION.

## 1.1 PURPOSE OF THE DISCLOSURE STATEMENT.

The Debtors provide this Disclosure Statement to the Office of the United States Trustee and to all of the Debtors' known creditors and equity holders pursuant to Bankruptcy Code section 1125(b) for the purpose of seeking confirmation of the Plan. A copy of the Plan is attached hereto as **Exhibit A**. By Order dated February 24, 2017, the Disclosure Statement was approved by the Bankruptcy Court. A hearing on confirmation of the Plan will be held on March 31, 2017 at 10:00 a.m. (Eastern Time).

The Debtors strongly urge you to read this Disclosure Statement in its entirety before making any judgment on the Plan because the Disclosure Statement contains a summary of the Plan and other important information. The Disclosure Statement also provides information as to alternatives to the Plan. Summaries of the Plan are included herein for the purpose of seeking confirmation of the Plan and soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to the Plan.

**PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTORS' BOOKS AND RECORDS. STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.**

## 1.2 CONFIRMATION OF THE PLAN.

**1.2.1 <u>Requirements</u>.** The requirements for Confirmation of the Plan are set forth in detail in Bankruptcy Code Section 1129. The following summarizes some of the pertinent requirements:

**(a) <u>Acceptance by Impaired Classes</u>.** Except to the extent that the cram down provisions of Bankruptcy Code section 1129(b) may be invoked, each Class of

Claims and each must either accept the Plan *or* be deemed to accept the Plan if Claims of such Class are Unimpaired.

**(b)** **Feasibility.** The Bankruptcy Court is required to find that the Plan is capable of being implemented and will not subsequently fail, thereby requiring further relief from the Bankruptcy Court.

**(c)** **The "Best Interest" Test.** The Bankruptcy Court must find that the Plan is in the "best interest" of all creditors and equity holders. To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against the Debtors: (i) has accepted the Plan; or (ii) will receive or retain money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtors' property was liquidated under chapter 7 of the Bankruptcy Code on such date. In connection therewith, the Debtors and their professionals created a liquidation analysis (the "Liquidation Analysis"), a copy of which is attached hereto as **Exhibit B**.

**(d)** **"Cramdown" Provisions.** Under the circumstances which are set forth in detail in Bankruptcy Code section 1129(b), the Bankruptcy Court may confirm the Plan even though a Class of Claims or Interests has not accepted the Plan, so long as one Impaired Class of Claims has accepted the Plan, excluding the votes of insiders, if the Plan is fair and equitable and does not discriminate unfairly against such non-accepting Classes. The Debtors will invoke the "cram down" provisions of Bankruptcy Code section 1129(b) if the voting Classes fail to accept the Plan and with respect to the Classes deemed to reject the Plan.

**1.2.2** **Procedure.** To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Bankruptcy Code section 1129. The Bankruptcy Court has set March 31, 2017 at 10:00 a.m. (Eastern Time) for the hearing on confirmation of the Plan (the "Confirmation Hearing").

**1.2.3** **Objections to Confirmation of the Plan.** Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Court has set March 28, 2017, at 5:00 p.m. (Eastern Time), as the deadline for filing and serving objections to the confirmation of the Plan. Objections must be electronically filed with the Bankruptcy Court at the following address:

U.S. Bankruptcy Court for the District of Massachusetts
Harold D. Donohue Federal Bldg. and Courthouse
595 Main Street
Worcester, Massachusetts 01608

With a copy served upon counsel for the Debtor at the following address:

David A. Mawhinney
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111

**1.2.4 Effect of Confirmation.** Except as otherwise provided in the Plan or in the Confirmation Order, Consummation of the Plan will result in the vesting of title to all property of the Estates and property owned by certain non-Debtor affiliates in the Liquidating Trust, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity holders, subject to the provisions of the Plan. Confirmation serves to make the Plan binding upon the Debtors, all creditors, equity holders and other parties in interest, regardless of whether they cast a ballot ("Ballot") to accept or reject the Plan.

**1.3 VOTING ON THE PLAN.**

**1.3.1 Impaired Claims and Interests.** Pursuant to Bankruptcy Code section 1126, only the holders of Claims in Classes "Impaired" by the Plan may vote on the Plan. Pursuant to Bankruptcy Code section 1124, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable, or contractual rights of the holders of such Claims treated in such Class. The holders of Claims not Impaired (referred to as Unimpaired) by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The holders of Interests in Class 6 will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan, unless they have agreed otherwise, and, in either event, do not have the right to vote.

**1.3.2 Eligibility.** In order for a creditor's vote to be counted on the Plan, a creditor must have timely filed or been assigned a timely filed proof of Claim, which Claim is not a Disputed Claim (or, if is a Disputed Claim, such Claim is subject to a Resolution Event) unless its Claim is scheduled by the Debtors and is not identified as disputed, unliquidated, or contingent on the Debtors' Schedules of Assets and Liabilities (as amended, the "Schedules"). Creditors having a Claim in more than one Class that is entitled to vote may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class.

**1.3.3 Binding Effect.** Whether a creditor votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Absent some affirmative act constituting a vote, a creditor will not be included in the vote: (i) for purposes of accepting or rejecting the Plan or (ii) for purposes of determining the number of Persons voting on the Plan.

**1.3.4 Procedure.** Members of Class 1 (GM Secured Claim), Class 4 (General Unsecured Claims), and Class 5 (GM Unsecured Claim) are Impaired by the Plan and may vote to accept or reject the Plan. Members of Class 2 (Other Secured Claims), Class 3 (Priority Non-Tax Claims) are Unimpaired by the Plan and are deemed, therefore, to accept the Plan. Accordingly, holders of Claims in Classes 2 and 3 are not entitled to vote on the Plan. Class 6 (Interests), will not, under the Plan, receive any payment or distribution, or retain any property pursuant to the Plan, and are deemed to reject the Plan. Members of Class 6 therefore do not have the right to vote. In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

David A. Mawhinney
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111

**BALLOTS SENT BY FACSIMILE, TELECOPY, ELECTRONIC MAIL OR OTHER FORM OF ELECTRONIC TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery at the address set forth above on or before 5:00 p.m. (Eastern Time) on March 28, 2017. Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in anyway shall be deemed to be cast as follows:

**(a)** Ballots received that do not evidence the amount or evidence an incorrect amount of such creditor's Claim shall be completed or corrected, as the case may be, based upon the Schedules or lists of equity security holders if no proof of Claim has been filed, or based upon timely filed proofs of Claim, and counted as a vote to accept or reject the Plan;

**(b)** Ballots received that do not identify the creditor, whether or not signed by the creditor, shall not be counted as a vote to accept or reject the Plan;

**(c)** Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such creditor's Claim and that are otherwise properly completed shall be completed or corrected, as the case may be, based upon the Schedules or lists of equity security holders if no proof of Claim has been filed, or based upon timely filed proofs of Claim, and counted as a vote to accept or reject the Plan.

**1.4 ACCEPTANCE OF THE PLAN.**

**1.4.1 <u>Creditor and Interest Holder Acceptance</u>.** As a creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds (2/3) in dollar amount of the Claims voting (of each Impaired Class of Claims) must accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Claims pursuant to Bankruptcy Code section 1129(b). In any case, either the Plan must be fully consensual or at least one Impaired Class of creditors excluding the votes of insiders, must actually vote to accept the Plan. To the extent you hold a Claim in Classes 1 (GM Secured Claim) 4 (General Unsecured Claims) or 5 (GM Unsecured Claims), you are urged to complete, date, sign and promptly mail the enclosed Ballot. Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim or Interest and the name of the creditor.

**1.4.2 <u>Cramdown Election</u>.** If all Classes do not accept the Plan, but at least one Impaired Class votes to accept the Plan, excluding the votes of insiders, the Debtors may

attempt to invoke the "cramdown" provisions. Cramdown may be an available remedy, because the Debtors believe that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of Bankruptcy Code section 1129(b)(2) and does not discriminate unfairly.

### 1.5 SOURCES OF INFORMATION.

The information contained in this Disclosure Statement has been obtained from the Debtors' books and records and from pleadings filed by the Debtors and other parties in interest in these Chapter 11 Cases. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof. Any value given as to the assets of the Debtors is based upon an estimation of such value. **You are strongly urged to consult with your financial, legal, and tax advisors to understand fully the Plan and the Disclosure Statement.**

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified. The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits, if any. If any conflicts exist between the Plan and the Disclosure Statement, the terms of the Plan shall control.

### 1.6 ADDITIONAL INFORMATION.

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact one of the following attorneys for the Debtor:

Charles A. Dale III, Esq.
David A. Mawhinney, Esq.
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
(617) 261-3100

## II. THE DEBTORS.

### 2.1 DESCRIPTION OF THE DEBTORS AND THE DEBTORS' BUSINESS.

CCM was founded in 1911 by Walter Clark, William Cutler, and Thomas S. McDermott. CCM's headquarters have remained in Franklin, Massachusetts for over a century. A privately held company, CCM has been owned and operated by members of the Clark, Cutler, and McDermott families since its inception. Throughout the twentieth century, CCM developed innovative products for the automotive acoustical industry including: re-claimed cotton acoustical insulation (1971), polypropylene splash shields and fender insulators (1978), and resin-free moldable acoustical insulators (1986). Historically, the Debtors' customer base was been comprised original equipment manufacturers, parts suppliers, and other suppliers within the

automotive industry. In addition, the Debtors sold their non-woven products to a variety of customers in the transportation, industrial, and textile sectors.

Prior to the Petition Date, the Debtors operated as a Tier I and Tier II manufacturer of molded and flat die-cut acoustic insulation and natural fiber-based interior trim products for the automotive industry. The Debtors manufactured wheelhouse liners, dash insulators, floor insulators, fender and pillar insulators, door trim panel bolsters, package trays and back of cab insulators. In addition, the Debtors engineered fabrics for numerous industrial textile applications. The Debtors' products incorporated new "dissipative" technologies that were lightweight, acoustically superior, and recyclable.

Headquartered in Franklin, Massachusetts, the Debtors operated from a 300,000 square foot manufacturing space, which real estate is currently owned by a corporate affiliate. In 2012, the Debtors established Lafayette, as a wholly-owned indirect subsidiary of CCM, and acquired a 77,000 square-foot manufacturing and warehouse facility in Lafayette, Georgia where Lafayette produced contoured acoustic insulation and interior trim products for the automotive industry. Over the years, the Debtors installed multiple nonwoven production lines in their Franklin and Lafayette facilities, which feature thermo-bonded and needle-punch technologies. Machinery capabilities include fiber opening, blending, carding, needling, as well as forming lines that mold and trim large contoured parts in a fully automated process.

As of the Petition Date, the Debtors' employed approximately two-hundred-thirteen (213) individuals, one-hundred-ninety-one (191) of whom worked at CCM's facilities in Franklin, and twenty-two (22) of whom worked at Lafayette's facilities in Lafayette, Georgia. Fourteen (14) members of the Debtors' workforce were salaried and one-hundred-sixty-one (161) were members of the New England Joint Board Local 31T of UNITE-HERE. In addition, the Debtors used approximately fifty-seven (57) temporary employees, for whom they contracted through agencies.

CCM is a privately-held corporation formed under the laws of Massachusetts. Lafayette is a wholly-owned subsidiary of CCM Automotive LLC ("CCM Automotive"), operating as a limited liability company under the laws of the Commonwealth of Massachusetts. CCM Automotive is a wholly-owned subsidiary of CCM and, therefore, Lafayette is wholly-owned, indirectly, by CCM. In addition, CCM owns 100% of AirLoc LLC ("AirLoc"), Duffy's Park LLC ("Duffy's Park"), and CCMcD Real Estate LLC ("CCMcD Real Estate").

CCM is the sole member and manager of CCM Automotive, AirLoc, Duffy's Park, and CCMcD Real Estate. CCM Automotive is the sole member and manager of Lafayette. CCM Automotive also owns 100% of CCM Automotive Hildebran LLC ("CCM Hildebran") and serves as its sole member and manager. CCMcD Real Estate owns 100% of CCMcD Real Estate Lafayette (Real Estate Lafayette" and, together with CCMcD Real Estate, the "Real Estate Entities"), and serves as its sole member and manager.

While the Debtors directly own the majority of their assets, some important assets are held by wholly-owned non-debtor subsidiaries. Duffy's Park owns ninety-nine percent (99%) and CCM Automotive, the remaining one percent (1%) of CCM Acoustics Holding S.A. de C.V. ("CCM Mexico"). CCM Mexico, in turn, owns a forty-five percent (45%) stake in CCM

Acoustics S.A.P.I. de C.V. ("SAPI"), a joint venture located in Irapuate, Mexico. Duffy's Park also holds twenty percent (20%) of the outstanding shares of a North Carolina based manufacturing company known as Marves Industries, Inc. ("Marves"). CCMcD Real Estate holds title to the various parcels of real estate that comprise the Debtors' manufacturing footprint in Franklin, Massachusetts, namely: 5 Fisher Street, 42 Hayward Street, and, in addition, a personal residence located at 25 Hayward Street (collectively, the "Franklin Property"). CCMcD Lafayette owns the property located at 1465 Shattuck Industrial Boulevard, Lafayette, Georgia, which served as Lafayette's headquarters and manufacturing facilities.

An organizational chart depicting the corporate ownership of each Debtor and their affiliates is set forth on below:




## 2.2 THE DEBTOR'S PREPETITION CAPITAL STRUCTURE.

***Prepetition Secured Debt***

As shall be further described in section 2.3, the Debtors' cash flows became insufficient to sustain their business in early 2016. Beginning in March, 2016, they were forced to rely on continued cash infusions from their then-largest customer, General Motors in the form of secured loans and one-time price adjustment payments to continue operations.

As of the Petition Date, the Debtors had two secured creditors, Wells Fargo Bank, National Association acting through Wells Fargo Business Credit ("Wells Fargo") and GM. The Debtors' financing relationship with Wells Fargo included a $9 million revolving credit facility (the "Revolver") and a $3,181,500 term loan (the "Term Loan" and collectively with the Revolver the "Senior Debt"). As of the Petition Date, the Debtors assert – and GM disputes – that no money was outstanding or owed on the Revolver and approximately $1,486,296.40 was outstanding to Wells Fargo on account of the Term Loan. Obligations under the Revolver and Term Loan are secured by blanket liens against substantially all of the Debtors' assets pursuant to that certain Third Amended and Restated Credit and Security Agreement dated May 23, 2012. Wells Fargo also held mortgages against certain real estate owned by the Real Estate Entities, as security for guarantees given by the Real Estate Entities on the Senior Debt.

The Debtors' financing relationship with GM arose in connection with that certain Interim Accommodation Agreement ("IAA"), as amended, entered into between the parties on April 1, 2016. After the Debtors notified GM of their financial distress, GM agreed to lend them money and provide price adjustment payments to cover the shortfall in their operating budget, thereby enabling the Debtors to continue producing GM component parts. These loans were secured by a blanket lien on substantially all of the Debtors' assets and, additionally, substantially all of the assets of AirLoc, CCM Automotive, CCM Hildebran, and Duffy's Park, pursuant to that certain Amended and Restated Security Agreement dated March 15, 2016. Between March 2016 and the Petition Date, GM made the following loans to the Debtors, which are evidenced by a series of Notes (collectively, the "Junior Notes" or "Junior Debt"):

| **Funding Date** | **Amount** |
|---|---|
| March 14, 2016 | $300,000 |
| March 16, 2016 | $700,000 |
| March 24, 2016 | $950,000 |
| April 25, 2016 | $425,000 |
| May 6, 2016 | $270,000 |
| May 16, 2016 | $185,000 |
| May 24, 2016 | $125,000 |
| May 27, 2016 | $320,000 |
| June 10, 2016 | $175,000 |
| June 20, 2016 | $437,500 |
| June 23, 2016 | $362,500 |
| June 27, 2016 | $262,500 |
| June 30, 2016 | $600,000 |
| July 6, 2016 | $910,000 |
| **Total** | $6,022,500 |

The Junior Notes accrue interest at the rate of 3.94% per annum and are payable on demand, which interest rate would increase to 6.94% subsequent to demand for payment.

Shortly after the Petition Date, GM acquired the Senior Debt from Wells Fargo. On August 8, 2016, the Debtors repaid the Senior Debt pursuant to the Bankruptcy Court's *Second Interim Order (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief* (the "Second Interim Cash Collateral Order") [Docket No. 149]. Accordingly, beyond the $6,022,500 outstanding to GM on the Junior Notes, plus any interest, fees, and expenses related thereto, the Debtors have no other secured debt. It should be noted, however, that under the terms of the Second Interim Cash Collateral Order (a) the security interests securing the Senior Debt remain in place subject to further order of the Bankruptcy Court; and (b) the amount of $535,621.64 has been escrowed in connection with the disputed portion of the Wells Fargo payoff amount (discussed below).

***Unsecured Debt***

As of the Petition Date, the Debtors estimated that their unsecured debt aggregated approximately $5,760,000, consisting primarily of accounts payable to trade vendors.

In addition, CCM is a participant in the Legacy Plan of the National Retirement Fund, a multi-employer defined benefit pension plan (the "Pension Fund"). On August 16, 2016, the Pension Fund filed a proof of claim against the Estates asserting $18,212,404 for "withdrawal liability" pursuant to section 4201 of the Employee Retirement Income Security Act of 1974, 28 U.S.C. §§ 1381 (the "Pension Fund Claim"). The Debtors objected to the Pension Fund Claim on October 13, 2016, arguing that they had not effectuated a total or even partial withdrawal from the Pension Fund and, in the event such withdrawal were to occur, the net present value of the withdrawal liability would be substantially less than the amount asserted in the Pension Fund Claim.

***Equity***

As of the Petition Date, CCM had nineteen (19) Class A voting equity security holders and thirty-seven (37) Class B non-voting equity security holders. CCM had 3,771 voting securities and 34,056 non-voting securities issued and outstanding on the Petition Date.

### 2.3 EVENTS LEADING TO THE BANKRUPTCY FILING.

The Debtors' modern era dates to the 1960s when CCM began producing various acoustic insulation parts and service parts assembled goods (the "Component Parts") for GM. Over the years, the Debtors manufactured millions of Component Parts, which GM integrated into nearly every vehicle that it manufactured in the United States, Canada, and Mexico. In the years leading up to the Petition Date, GM became the Debtors single largest customer, accounting for more than 80% of the company's revenues, and received multiple performance awards from GM for their products and service. The Debtors and their affiliates manufactured Component Parts for GM on a fixed-price requirements basis pursuant to a series of Purchase Order Contracts, supplemented by GM's General Terms and Conditions (collectively, the "GM Contracts"). More specifically, the GM Contracts obligate CCM to produce all of GM's

requirements for each component or part, and the price paid by GM for each part usually decreases annually.

The Debtors began to experience financial difficulty in 2013 a year after opening new manufacturing facilities closer to GM's North American Assembly Plants, by acquiring the manufacturing facility in Lafayette, Georgia and establishing CCM Mexico. For the year ended December 31, 2013, CCM's consolidated net loss totaled $750,270. At year end 2014, its consolidated net loss had increased to $3,676,220. By year end 2015, CCM's consolidated net loss totaled $3,735,568. For the five months of 2016 ended May 31st, CCM suffered consolidated losses totaling $5,227,992, almost doubling its losses for the entire prior year. As of June 2016, CCM was operating at a loss of more than $30,000 per day.[4]

In early 2016, the Debtors engaged a team of consultant from the corporate restructuring group of KPMG LLP ("KPMG"), to assist them in assessing their business. In March 2016, the Debtors informed GM of their financial distress and that without substantial economic and operational support from GM, the Debtors' senior lender, Wells Fargo, would foreclose on the Debtors' business.

On or about April 1, 2016, CCM and GM entered into an Interim Accommodation Agreement, whereby the parties made various mutual commitments for an initial thirty (30) day period during which time they agreed to negotiate in good faith toward new pricing for certain Component Parts. During this thirty day period, GM agreed to provide funding to support CCM's operations. For every dollar advanced by GM, the Interim Accommodation Agreement provided that $0.50 would take the form of a secured loan, and the remaining $0.50 would be treated as a price adjustment in CCM's favor. In other words, CCM incurred additional debt to continue producing parts for GM at a substantial loss. The loans provided by GM under the Interim Accommodation Agreement and a subsequent temporary restraining order (discussed below) consisted the Junior Debt described in section 2.2 above.

The Interim Accommodation Agreement was twice extended to give GM additional time to analyze and negotiate CCM's requests for price increases. During the course of negotiations, CCM engaged an investment banker at GM's request to market the company for sale as a going concern. CCM interviewed several candidates, engaged Conway MacKenzie Capital Advisors LLC ("Conway MacKenzie"), and made plans to begin a marketing process. Following these two extensions, the Interim Accommodation Agreement expired on June 17, 2016, with no agreement on price increases. Believing that there would be no breakthrough in negotiations, on June 16, 2016, CCM's Board of Directors decided to shut down its Franklin and Lafayette factories and to layoff all of its employees. Operations were discontinued at approximately 4:00 p.m. on Friday, June 17, 2016.

On that same day, GM filed suit against CCM and Lafayette in the United States District Court for the Eastern District of Michigan (the "District Court") in Detroit and obtained an emergency temporary restraining order ("TRO") requiring the Debtors to continue producing Component Parts under the GM Contracts. GM represented that it would continue to fund the

[4] None of these financial assertions have been independently verified and reflect only the Debtors' opinion.

Debtors' operations on the same terms as it had previously. Ultimately, the Debtors borrowed $6,022,500 from GM between March 15 and July 7, 2016.

Between the entry of the TRO and July 6, 2016, the Debtors and GM were unable to resolve their differences. At a Board of Directors meeting on July 6, 2016, the Board reviewed the Debtors' efforts to cut costs, improve efficiencies, improve liquidity, and obtain price concessions from GM, and with the assistance of counsel, reviewed all available options. The Board concluded that the Debtors' best option was to file for chapter 11, and a resolution was passed authorizing the commencement of these Chapter 11 Cases.

The Debtors and GM have differing views of the events that occurred between March 1, 2016 and July 7, 2016, and the above-description intentionally reflects a non-adversarial description. Interested parties are directed to the pleadings filed in Adversary Proceeding No. 16-04083 for more detailed descriptions of the competing views and interpretations of these events. Nothing in this Disclosure Statement is intended to modify, limit, or alter the parties' differing views or their respective legal positions with respect to these events.

## 2.4 THE DEBTOR'S BANKRUPTCY PROCEEDINGS.

**2.4.1 The Petition Date.** On July 7, 2016 (the "Petition Date"), the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

**2.4.2 The First Day Operational Orders.** On the Petition Date, the Debtors filed several motions seeking certain operational relief by virtue of so-called first day orders. The first day orders assisted the Debtors in transitioning into operating as debtors in possession by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. The first day orders in the Chapter 11 Cases authorized, among other things (i) use of cash collateral on an interim basis, subject to a budget approved by the Bankruptcy Court, and (ii) payments to employees of accrued prepetition wages, salaries and benefits.

**2.4.3 Rejection of the GM Contracts**. As explained above, the GM Contracts had become burdensome on the Debtors in the years leading up to the Petition Date, with losses totaling more than $12 million since 2013. After several months of analysis, input from third-party advisors, and negotiations with GM, the Debtors concluded that their assets would be more valuable if decoupled from the financial burdens imposed by the GM Contracts. To that end, on the Petition Date, the Debtors filed the *Motion of the Debtors for an Order Authorizing and Approving the Rejection of All GM Contracts Nunc Pro Tunc to the Date of the Motion* [Docket No. 10] (the "Rejection Motion"). In connection with the resolution of the MFR (defined below), GM and the Debtors agreed to the relief sought by the Debtors in the Rejection Motion. On July 13, 2016, the Bankruptcy Court granted the Rejection Motion, finding that rejection of the GM Contracts to be an exercise of sound business judgment and further ordering that rejection would be effective as of the Petition Date. See *Order Authorizing and Approving Debtors' Rejection of Certain GM Contracts* [Docket No. 70].

**2.4.4 The GM Motion for Relief from Stay.** On July 8, 2016, GM filed the *General Motors LLC's Motion for Relief from the Automatic Stay* (the "MFR") [Docket No. 27]. In the MFR, GM sought immediate relief to recover possession of (a) certain tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, owned by GM and used by the Debtors in connection with their manufacture of the GM Component Parts (collectively, the "GM Tooling"); (b) certain machinery and equipment used by the Debtors in connection with their manufacture of the Component Parts (the "Dedicated Equipment"); and (c) certain finished Component Parts inventory manufactured by the Debtors for GM under the GM Contracts. On July 12, 2016, the Debtors filed *The Debtors' Limited Opposition to General Motors LLC's Motion for Relief from the Automatic Stay* [Docket No. 58], in which they opposed relief with respect to the Dedicated Equipment or any other item of estate property. The parties subsequently resolved the MFR and submitted an agreed order, which the Bankruptcy Court entered on July 13, 2016. See *Order on General Motors, LLC's Motion for Relief from the Automatic Stay* ("MFR Order") [Docket No. 71]. Pursuant to the MFR Order, GM was granted access to the GM Tooling and Finished Goods Inventory in exchange for paying the Debtors' Estates $2,930,138.90 for the Finished Goods Inventory and all amounts owed to the Debtors by GM as of the Petition Date for prior shipments of Finished Goods Inventory. GM removed the GM Tooling and Finished Goods Inventory on July 18, 19, and 20, 2016. GM paid the Debtors' labor costs of $16,043 that were incurred in connection with removing the tooling and inventory. GM further paid $159,846.75 for additional Finished Goods Inventory and service parts identified while it was removing the tooling and inventory.

**2.4.5 Schedules and SOFAs.** On August 12, 2016, the Debtors filed their *Schedule of Assets and Liabilities* [Docket No. 170 and Docket No. 15 in the Lafayette proceeding, Case No. 16-41189] and their *Statements of Financial Affairs* [Docket No. 171 and Docket No. 16 in the Lafayette proceeding, Case No. 16-41189] (as amended or modified and together as, the "Schedules"). On August 29, 2016, the Debtors filed amended Schedules A/B and Statements of Financial Affairs, for the purpose of correcting several inadvertent errors related to asset valuations, and to add additional payments made to creditors within ninety (90) days of the Petition Date.

**2.4.6 The Pursuit of a Sale Transaction.** As explained above, the Debtors filed these Chapter 11 Cases to engage in a process to sell substantially all of their assets so that they could maximize the value of their Estates for the benefit of all of their constituents. To that end, on July 12, 2016, the Debtors filed the *Debtors' Motion for (I) Order Establishing Bidding Procedures and Granting Related Relief and (II) Order Approving Sale of Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests and Granting Related Relief* (the "Sale Motion") [Docket No. 50]. As described in the Sale Motion, the Debtors proposed to sell the key equipment constituting their production lines along with the opportunity to lease the manufacturing and warehouse facilities where the equipment was located from their non-debtor affiliates at fair market rates through one or more sales approved by the Bankruptcy Court.

On August 2, 2016, the Bankruptcy Court entered the *Order Establishing Bidding Procedures* (the "Bidding Procedures Order") [Docket No. 141] and the *Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) of the Bankruptcy Code Authorizing the Employment and Retention*

*of Conway MacKenzie Capital Advisors LLC as Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 142], approving the retention of Conway MacKenzie as investment banker. The Bidding Procedures Order approved, among other things, the procedures for the Debtors to solicit and obtain the highest or otherwise best bids for their assets through an auction process.

On August 26, 2016 (the Bid Deadline), the Debtors received twenty-four (24) separate offers from nineteen (19) different parties. The Debtors determined that the best way to maximize the value of these assets was to divide the equipment into several additional lots based on particular interest in specific items. This strategy would optimize the competition among the strategic buyers on particular pieces of equipment, with the goal of extracting value over and above what a liquidator would pay for substantially all of the Debtors' assets in a single lot. In addition, the Debtors created a "Remnant Lot" consisting of assets that did not generate sufficient particularized interest. Following this process, the Debtors divided their assets into fifteen (15) different lots.

On August 31, 2016, the Debtors conducted an auction in connection with the Sales (the "Auction"). After nearly eight (8) hours, the Debtors had identified ten (10) different winning bidders for substantially all of their equipment, with the exception of the equipment line devoted to the production of the so-called "Back of Cab" acoustical insulation part for pickup trucks. Among the purchase agreements that the Debtors entered into within 24 hours following the Auction, was an agreement with Bonded Logic, Inc. ("Bonded Logic") to lease the Lafayette facility and purchase its assets as a turn-key operation.

On September 9, 2016, the Court entered the *Order Approving Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests and Granting Related Relief* (the "Sale Order") [Docket No. 236]. The Sale Order authorized, among other things, the Debtors to consummate the sale transactions with the ten (10) winning bidders (the "Sales") pursuant to those certain Purchase Agreements entered into between the Debtors and the winning bidders on September 1, 2016. In total, the sales generated $4,880,884. The Debtors had closed all of the Sales by September 23, 2016.

The purchasers and purchase price paid for the assets are as follows:

| Buyer | Purchase Price |
|---|---|
| Bonded Logic, Inc. | $850,000 (plus lease of Lafayette facilities) |
| Borgers USA Corp. | $290,000 |
| Formed Fiber Technologies, LLC | $109,500 |
| Hilco Industrial, LLC | $746,000 |
| International Automotive Components North America, Inc. | $200,000 |
| Marves Industries, Inc. | $12,000 |
| Midwest Acoust-A-Fiber, Inc. | $198,301 |
| Milliken Nonwovens, LLC | $2,400,003 |
| Swift Components Corporation | $15,080 |
| UFP Technologies, Inc. | $60,000 |

Through these Sales, the Debtors liquidated substantially all of their machinery and equipment, in addition to enhancing the value of the Lafayette real estate by negotiating a lease with Bonded Logic, which carries a potential eleven-year term. Significant assets remain in the Estates to be liquidated, however, including real estate in Lafayette and Franklin, which CCM owns through its corporate subsidiaries, the 45% stake in SAPI, the 20% stake in Marves, AirLoc, the "Back of Cab" equipment, and remaining items of electrical equipment and machine parts currently stored at the Franklin facility.

**2.4.7 Rejection of Executory Contracts and Unexpired Leases**. Following the conclusion of the Auction, the Debtors filed the *Motion of the Debtors for an Order Authorizing and Approving the Rejection of Certain Executory Contracts and Unexpired Leases Nunc Pro Tunc to the Date of this Motion* (the "Contract Rejection Motion") [Docket No. 207] seeking to reject several contract and leasing arrangements covering real and personal property formerly used in connection with their pre-petition manufacturing operations (the "Contracts"). On September 20, 2016, the Court entered the *Order Authorizing and Approving Debtors' Rejection of Certain Contracts and Leases* [Docket No. 275] approving the rejection of the Contracts.

**2.4.8 Cash Collateral Usage and the Payoff of the Senior Debt**. In the absence of any post-petition financing in these Chapter 11 Cases, the Debtors have relied exclusively on the use of cash collateral to fund their operations. To that end, on the Petition Date, the Debtors filed the *Motion of the Debtors for Interim and Final Orders (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief* (the "Cash Collateral Motion") [Docket No. 12]. On July 13, 2016, the Bankruptcy Court entered the *Interim Order (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief* (the "First Interim Cash Collateral Order") [Docket No. 69]. Pursuant to the First Interim Cash Collateral Order, the Debtors were permitted to use cash collateral on an interim basis through and including August 2, 2016 according to an approved budget. On August 4, 2016, the Bankruptcy Court extended cash collateral usage through and including September 19, 2016. See Second Interim Order [Docket No. 149]. The Bankruptcy Court extended the Second Interim Order first through September 30 and subsequently through October 14, 2016 as the parties attempted to negotiated the further use of cash collateral on consensual terms [Docket Nos. 292 and 311].

In connection with the Second Interim Order, the Debtors proposed, as adequate protection to GM's then-junior lien, to payoff the Senior Debt (which GM had acquired from Wells Fargo) in full. The Second Interim Order set forth a process by which GM provided the Debtors with a payoff amount (the "Payoff Amount") on August 5, 2016, which the Debtors then paid on August 8th. The Debtors took the position that payment of the Payoff Amount would fully and completely satisfy the Senior Debt, and that GM would be obligated to discharge the liens, claims, encumbrances, and mortgages securing such Senior Debt. GM argued, however, that it should have the right, following the above-mentioned Sales, to seek reapplication of the Payoff Amount and a marshalling or other application or sequencing of collateral currently securing to the Senior Debt as appropriate to satisfy the Junior Notes. Accordingly, the Second Interim Order provided that all liens, mortgages, security interests, and other interests securing

the Senior Debt were not discharged or otherwise modified, and such encumbrances should continue and remain in place subject to further order of the Bankruptcy Court.

On August 5, 2016, GM provided the Debtors with the Payoff Amount totaling $1,922,482.31. The Debtors paid this amount to GM on August 8, 2016, although they dispute $535,621.64 in accrued fees, costs, and interest (the "Wells Fargo Disputed Claim"). This latter portion is being held in escrow by GM consistent with the Second Interim Order, and will be retained by GM upon confirmation of the Plan, which incorporates the Global Settlement. In addition, GM subsequently informed the Debtors that it had overstated the initial payoff by $21,614.06, which amount GM returned to the Debtors on October 17, 2016.

On October 19, 2016, the Bankruptcy Court extended cash collateral usage through and including December 23, 2016. See Third Interim Order [Docket No. 349]. The Bankruptcy Court extended the Third Interim Order through January 20, 2017 and subsequently through February 3, 2017 [Docket Nos. 439 and 479]. On February 2, 2017, the Bankruptcy Court extended cash collateral usage through and including March 31, 2017. See Fourth Interim Order [Docket No. 520].

**2.4.9 Settlement with Direct Energy**. In connection with the Cash Collateral Motion, an entity named Direct Energy Business Marketing, LLC ("Direct Energy") asserted a lien on certain pre-petition cash in the Debtors' Wells Fargo account. Prior to the Petition Date, Direct Energy had commenced a civil action in Massachusetts Superior Court styled *Direct Energy Business Marketing, LLC f/k/a Hess Energy Marketing, LLC v. Clark-Cutler-McDermott Co.*, No. 1682CV00518 (the "State Court Action"). As part of the State Court Action, Direct Energy also obtain an attached of funds in the amount of $171,936.93 (the "Attachment"). Because the Attachment occurred within 90 days of the Petition Date, the Debtors argued that it constituted as avoidable preference under section 547(b) of the Bankruptcy Code. The parties agreed to settle the Debtors' preferential transfer claim upon the following conditions: (i) the Debtors agreed to cause $34,387.39 to be paid to Direct Energy from the attached funds currently segregated and held by Wells Fargo; (ii) Direct Energy would release all claims against the Debtors in connection with the State Court Action; (iii) the Debtors would release all claims against Direct Energy in connection with the State Court Action; and (iv) Direct Energy would cause the release of the remainder of the Attachment (i.e., approximately $137,549.54) to the Debtors for the benefit of their Estates. On August 24, 2016, the Debtors filed the *Motion of the Debtors Pursuant to Bankruptcy Rule 9019 and Local Rule 9019-1 for Entry of an Order Approving Settlement Agreement with Direct Energy Business Marketing, LLC* (the "Direct Energy Settlement") [Docket No. 184]. The Bankruptcy Court approved the Direct Energy Settlement on September 21, 2016, see Docket No. 280, and thereafter, counsel for the Debtors worked with counsel for Direct Energy and Wells Fargo to obtain the necessary orders in the State Court Action to release the Attachment. During the week ending October 21, 2017, Wells Fargo transferred $137,549.54 into CCM's debtor-in-possession account.

**2.4.10 The Motion to Convert**. On September 2, 2016, GM filed *General Motors LLC's Motion to Convert Case to Chapter 7 Pursuant to 11 U.S.C. §§ 1112(b)(1) and 1112(b)(4)(a)* (the "Motion to Convert") [Docket No. 217]. In the Motion to Convert, GM observed that the sale process the Debtors ran in August, which generated nearly $4.9 million for the Estates, was effectively a piecemeal liquidation, which could have been accomplished more

efficiently in chapter 7. Given that the Debtors have ceased their manufacturing operations and are in the process of selling all of their assets, GM argued there was "cause" under section 1112(b) of the Bankruptcy Code to convert these Chapter 11 Cases to chapter 7. The Debtors' and the Creditors' Committee opposed the Motion to Convert on September 16, 2016, arguing remaining in chapter 11 is in the best interests of all stakeholders, as it will provide the most efficient, effective, and value-maximizing process of liquidating their remaining assets, which consist mainly of indirectly held real estate and business interests that would be extremely difficult, if not impossible for a chapter 7 trustee to sell. The Motion to Convert will be resolved and moot in connection with the Global Settlement (discussed below).

**2.4.11 <u>The Bar Date Order</u>.** On October 6, 2016, the Bankruptcy Court entered an order establishing the following bar dates for filing proofs of claim against the Estates:

- **General Bar Date**. Each person or entity that asserts a Claim that arose (or is deemed to have arisen) before the Petition Date, including all claims arising under section 503(b)(9) of the Bankruptcy Code must file a proof of claim on or before December 2, 2016.

- **Governmental Bar Date**. All governmental units holding Claims that arose (or are deemed to have arisen) before the Petition Date must file proofs of claim on or before January 6, 2017.

- **Rejection Bar Date**. Any holder of claim arising from the Debtors' rejection of an unexpired lease or executory contract must file a proof of claim by the later of (a) the General Bar Date, (b) the date set forth in an order authorizing the Debtors to reject contracts or leases pursuant to section 365 of the Bankruptcy Code, and (c) 4:00 p.m. prevailing Eastern Time on the date that is twenty-five (25) days from the later of the date the rejection order is entered or notice of rejection is provided.

The Debtors rejected the GM Contracts on July 7, 2016. The Debtors rejected their remaining contracts and leases on September 20, 2016. <u>See</u> Docket No. 275. Accordingly, the Rejection Bar Date in these Chapter 11 Cases was December 2, 2016.

**2.4.12 <u>Pension Fund Claim Objection</u>**. As described in section 2.3 above, the Legacy Plan of the National Retirement Fund (the "<u>Pension Fund</u>") has filed the Pension Fund Claim against CCM's Estate for more than $18 million arising out of purported "withdrawal liability" pursuant to section 4201 of the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>"), 29 U.S.C. §§ 1381 *et seq*. CCM is a contributing employer to the Pension Fund, a multi-employer defined benefits pension plan, which provides retirement income to certain of the Debtors' current and former employees. CCM is obligated to make contributions to the Pension Fund pursuant to that certain collective bargaining agreement between CCM and the New England Joint Board and its Local 31T of UNITE-HERE dated March 19, 2015 (the "<u>CBA</u>").

Among the employees covered under the CBA and the Pension Plan are certain employees of AirLoc, as well as certain remaining employees of the Debtors. These employees have worked continuously since the Petition Date, and the Debtors have made all payments due

and owing to the Pension Fund consistent with their obligations under the CBA. On October 13, 2016, the Debtors objected to the Pension Fund Claim, arguing that CCM has no present withdrawal liability. Moreover, if and when a withdrawal occurs the net present value of the liability will be calculated at an amount significantly less than $18 million. Nevertheless, given the significant layoffs following the Petition Date, and the liquidation of the Debtors' remaining business interests proposed by the Plan, it is likely that the Debtors will trigger withdrawal liability in 2017 or beyond. The Debtors aspire to resolve the Pension Fund Claim by reaching a compromise with the Pension Fund that would allow the Pension Fund Claim at an amount significantly less than $18 million. If no consensual settlement is reached, the Liquidating Trustee will continue to litigate the objection to the Pension Fund Claim after the Effective Date.

**2.4.13** **Settlement with Committee and Substantive Consolidation of the CCM Entities**. On July 20, 2016, the United States Trustee ("U.S. Trustee") filed a *Notice of Appointment of Unsecured Creditors' Committee* [Docket No. 91] appointing a committee consisting of five of the Debtors' unsecured creditors (the "Committee"). Shortly after its appointment, the Committee commenced an investigation into the CCM enterprise, including a review of the integrated operations of CCM and its affiliates. Specifically, the Committee considered the integrated corporate structure of the CCM affiliates, their consolidated financial records and tax reporting, CCM's direct business dealings with the creditors of its affiliates, and CCM's general and pervasive control over and consolidated operation of the CCM affiliates. In addition, the Committee reviewed the transaction in March, 2014, where CCM caused the Franklin Property to be transferred into CCMcD Real Estate for little or no consideration and, thereafter, continued to use the Franklin Property in furtherance of its manufacturing enterprise.

The Committee's investigation culminated in a demand letter to CCM, seeking to substantively consolidate the CCM affiliates into CCM and additionally seeking to avoid and recover the Franklin Property as a fraudulent transfer under section 544 of the Bankruptcy Code and Mass. Gen. Laws ch. 109A. The Debtors disputed the allegations set forth in the Committee's letter and contended that subsidiaries AirLoc and Duffy's Park were sufficiently removed from CCM's manufacturing enterprise to insulate them entirely from the Committee's claims. Ultimately, the parties entered into a settlement (the "Committee Settlement") that provided for the substantive consolidation of CCMcD Real Estate, Real Estate Lafayette, CCM Automotive, co-debtor Lafayette, and CCM Hildebran (collectively, the "CCM Entities") into CCM and for the recovery of the Franklin Property free and clear of all liens, claims, and encumbrances for the benefit of the Estates. GM initially opposed this settlement, but its opposition has been resolved as part of the Global Settlement discussed below.

On February 2, 2017, the Bankruptcy Court entered an order conditionally approving the Committee Settlement, the implementation of which shall occur upon the earlier of: (i) confirmation of a chapter 11 plan that incorporates the terms of the Committee Settlement; (ii) conversion or dismissal of these Chapter 11 Cases; (iii) appointment of a Chapter 11 trustee; or (iv) April 30, 2017. See *Order Granting Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 (A) Approving Settlement Agreement with Committee; (B) Approving Transfer of Property; (C) Substantively Consolidating Non-Debtors into Bankruptcy Estate; and (D) Granting Other Relief* [Docket No. 517]. The Bankruptcy Court's order further provides that the terms of the Committee Settlement may be modified by agreement of the Debtors, the Committee, and GM pursuant to a chapter 11 plan. The Bankruptcy Court's

conditional approval of the Committee Settlement has allowed the Debtors to consolidate the CCM Entities and their assets, including the Franklin and Lafayette Properties pursuant to the Plan and to transfer said assets into the Liquidating Trust, whose Liquidating Trustee will ultimately liquidate and distribute the assets to Liquidating Trust Beneficiaries in accordance with the waterfall outlined in the Global Settlement. In addition, the Bankruptcy Court's order was modified – at GM's request – to preserve any claims that GM may have directly against the assets of the Debtors or the Debtors' affiliates, notwithstanding approval of the Committee Settlement. Any such claims held by GM will be resolved as part of the Global Settlement.

**2.4.14 GM Sanctions Motion**. In addition to its contracts with the Debtors, GM had contracted directly with CCM Mexico for the production of Component Parts at SAPI's facility in Irapuato, Mexico. Specifically, CCM Mexico entered into approximately thirty (30) purchase contracts (collectively, the "Mexican Contracts") with GM subsidiaries, GM de Mexico S. de R.L. de C.V. ("GM Mexico") and GM de Argentina S.r.l. ("GM Argentina," and collectively with GM Mexico, the "GM Affiliates"). After the commencement of these Chapter 11 Cases, GM terminated its contracts with CCM Mexico. Neither the Debtors nor CCM Mexico opposed the termination of those contracts by GM for convenience, although CCM rejected the suggestion that any cause existed for termination. GM thereafter also set off certain amounts owed to CCM Mexico against amounts owed to GM by the Debtors.

On November 21, 2016, the Debtors filed the *Motion of the Debtors for Entry of an Order Pursuant to Bankruptcy Code Sections 105(a) and 362 (I) Enforcing the Automatic Stay Against General Motors LLC, and (II) Assessing Sanctions and Costs* (the "GM Sanctions Motion") [Docket No. 393], pursuant to which the Debtors contend that this set off violated the Bankruptcy Code's automatic stay. GM contends that no stay violation occurred.

In total, the Debtors contend that GM Affiliates owed CCM Mexico $561,094.76 and SAPI, $646,317.96,[5] which remained unpaid on account of GM's purported setoff. The GM Sanctions Motion will be resolved as part of the Global Settlement discussed below. As part of the Global Settlement, GM will retain the amount set off against CCM Mexico.

**2.4.15 Services Agreement with Milliken Nonwovens, LLC.** Among the winning bidders at the August 31, 2016 Auction was Milliken Nonwovens LLC (Milliken"), one of the foremost manufacturers of textile products in the world. Milliken has more than thirty-five (35) manufacturing facilities throughout the Americas, Europe, and Asia. It produces a wide variety of materials for incorporation into many different products across several industries, including tires and airbag fabrics in the automotive industry, specialty apparel for the medical and energy industries (e.g., antimicrobial garments and flame resistant coverings), napery products, and chemical additives for plastics. Among the assets Milliken purchased at the Auction was machinery and equipment comprising four of the Debtors' non-woven product lines: Non-Woven Lines #12, #14, and #16, located at CCM's 5 Fisher Street facility, and Non-Woven Line #7, located at CCM's 29 Hayward Street facility (together, the "Milliken Non-Woven Lines") [Docket No. 213-8]. These manufacturing lines include all of the machinery and

[5] GM disputes that it has setoff amounts owed to SAPI, citing tax issues for its delay in payment. On or about January 10, 2017, GM paid approximately $230,000 on its outstanding invoices to SAPI.

equipment required to convert raw textile inputs into finished textile outputs, such as conveyor belts, stackers, cutters, sorters, and blowers.

Following the purchase of the Milliken Non-Woven Lines, Milliken and the Debtors began to discuss an arrangement whereby CCM would operate the machinery for Milliken under a services agreement and produce Milliken products at its Franklin facilities. This arrangement would be mutually beneficial to each party as Milliken would acquire a manufacturing and distribution hub in the Northeastern United States (which it previously lacked) and the Debtors could put a number of their former employees back to work. The parties' negotiations culminated in a services agreement (the "Milliken Services Agreement"), which the Bankruptcy Court approved on an interim basis through April 12, 2017. See *Order Granting Debtors' Motion Pursuant to 11 U.S.C. § 363 to Approve and Authorize Services Agreement Between CCM and Milliken Nonwovens, LLC* [Docket No. 462]. The parties executed the Services Agreement shortly thereafter and production resumed in Franklin in early January, 2017. Initially, Milliken's requirements have been well below the output capacity of the Milliken Non-Woven Lines and the Services Agreement allows for CCM to use the machinery to produce goods for other customers, remitting a license fee to Milliken. This feature of the agreement allows the Debtors to secure profitable contract manufacturing arrangement with customers other than Milliken.

**2.4.16 Sale of 25 Hayward Street**. On or about February 23, 2004, CCM purchased (through a wholly-owned subsidiary) a three-bedroom, single-family residence that abuts the south-westerly portion of CCM's manufacturing campus known as 25 Hayward Street, Franklin, Massachusetts. CCM initially used this property as temporary housing for foreign technicians who would stay in Franklin for months at a time to assist with the installation and calibration of several production lines that CCM had recently acquired from Europe. The property is currently owned by CCMcD.

Since approximately 2009, CCM's plant manager Oumar Ndoye has occupied 25 Hayward Street as his residence, paying $1,000 per month in rent. As part of their general scheme to liquidate their assets, the Debtors and Mr. Ndoye reached an agreement whereby Mr. Ndoye would purchase 25 Hayward Street for $213,750.00.[6] On February 5, 2017, the Debtors filed the *Motion for an Order Pursuant to Section 363(b) of the Bankruptcy Code Authorizing Debtor to Execute Purchase Agreement and Perform Obligations in Connection with the Sale of Real Property Owned by Non-Debtor Subsidiary* [Docket No. 535]. The parties have signed a Purchase and Sale Agreement that provides for a March 20, 2017 closing, pending approval of the sale by the Bankruptcy Court. Given the minimal transaction costs, the Debtors anticipate that the Estate will receive net proceeds of approximately $210,000, prior to the Effective Date of the Plan.

**2.4.17 Settlements with Gomez, Marves, and Industrias Marves**. Among the remaining unliquidated assets following the August 31, 2016 Auction were CCM's indirectly-held equity interests in the SAPI joint venture and Marves. CCM Mexico currently holds forty-

[6] In December 2016, the Debtors obtained an appraisal estimating the fair market value of 25 Hayward Street to be $225,000. Because the Debtors propose to sell the property without a broker, however, the $213,750 purchase price will net a recovery to the Estate equivalent to the appraised value.

five percent (45%) of the equity interests in SAPI; a company known as Industrias Marves, S.A. de C.V. ("Industrias Marves") owns forty-five percent (45%), and an individual known as Elias Gomez ("Gomez"), owns the remaining ten percent (10%). Gomez is a former officer and board member of CCM, and the principal owner of Marves.[7] As described in section 2.1 above, CCM Mexico is owned by Duffy's Park (99%) and CCM Automotive (1%), both of which are wholly-owned subsidiaries of CCM.[8] Duffy's Park additionally owns 20% of Marves. CCM's interests in CCM Mexico, SAPI, and Marves are depicted in the following chart.




As described above, CCM Mexico was established primarily to enable CCM to produce Component Parts for GM near its production facilities in Central America, thereby reducing inbound transportation costs. After entering into the joint venture, CCM Mexico brought its GM-related work to SAPI. The concept was as follows: GM would place orders with CCM Mexico, which would outsource the production to SAPI; SAPI would manufacture and deliver Component Parts to GM affiliates and invoice CCM Mexico. GM would pay CCM Mexico, and CCM Mexico would pay SAPI. CCM had a similar arrangement with Marves, whereby the former used the latter's North Carolina location to reduce inbound transportation costs for

[7] Marves and Industrias Marves are not to be confused, despite having similar names. Marves is owned by Elias Gomez of North Carolina and Industrias Marves is owned by Alfonso Martinez of Mexico.

[8] In prior pleadings and hearings before the Bankruptcy Court, CCM's attorneys have represented that CCM Automotive owns 99% of CCM Mexico and Duffy's Park owns 1%. On the afternoon of February 2, 2017, CCM's attorneys confirmed upon further review of CCM Mexico's organizational documents, the ownership interests are 99% to Duffy's Park and 1% to CCM Automotive.

customers. Under the terms of the parties' arrangement, Marves would obtain the necessary materials and manufacture goods for CCM at its facilities in Hildebran, North Carolina. Marves would then invoice CCM for its labor and expenses.

CCM's business relationships with Gomez, Marves, and Industrias Marves have been marred in the past year by allegations of contractual and fiduciary breaches and business torts commitment by and among the parties. Gomez (for himself and Marves) has alleged that CCM collected and failed to remit funds earned by Marves as a result of products that it manufactured for CCM customers. Industrias Marves has alleged that CCM owes more than $1 million in accounts payable to SAPI and owes an additional $679,101 to Industrias Marves. Meanwhile, CCM has accused both Gomez and Industrias Marves of taking actions to both dilute CCM Mexico's interest in SAPI and circumvent CCM's business relationships with its customers by soliciting those customers to do business directly with Marves and/or SAPI. CCM maintains that Gomez's alleged conduct breached his fiduciary duties to CCM.

On February 5, 2017, following lengthy and often arduous negotiation between CCM and its joint venture partners, the Debtors filed the following pleadings: the *Motion for Order Pursuant to Federal Rule of Bankruptcy Procedure 9019 Approving Settlement with Elias Gomez and Marves Industries, Inc.* (the "Gomez Settlement") [Docket No. 536] and the *Motion for Order Pursuant to Section 363(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 Approving Settlement with Industrias Marves, S.A. de C.V.* (the "SAPI Settlement") [Docket No. 537]. The Gomez and SAPI Settlements provide for the resolution of all claims between CCM and Gomez, Marves, and Industrias Marves and the divestiture of CCM's interests in SAPI and Marves under terms that will produce a net recovery to the Estate of at least $600,000. The Gomez and SAPI Settlements are mutually dependent upon each other: an express condition precedent of each settlement is the Bankruptcy Court's approval of the other settlement. This settlement structure was necessary given the overlapping interests and rights of the parties.

Pursuant to the Gomez Settlement: (i) Gomez shall pay CCM $400,000.00; (ii) Marves will cancel all outstanding shares of its stock owned by Duffy's Park; (iii) CCM will obtain GM's consent to the Settlement Agreement and a release of its lien on the Marves stock owned by Duffy's Park; and (iv) CCM, Gomez, and Marves shall execute mutual releases whereby each party will discharge and release all claims, defenses, and counterclaims that they may have against each other.

Pursuant to the SAPI Settlement: (i) Industrias Marves shall pay $800,000.00 to CCM Mexico (the "Initial Settlement Payment"); (ii) CCM Mexico shall pay its accounts payable to Industrias Marves and SAPI (the "Accounts Payable");(iii) the Initial Settlement Payment shall be reduced, on a dollar-for-dollar basis, to the extent that CCM Mexico lacks sufficient funds to pay the Accounts Payable in full; (iv) CCM Mexico will transfer its 45% equity interest in SAPI to Industrias Marves and, upon such transfer, CCM Mexico shall relinquish all ownership interests in SAPI; and (v) CCM Mexico and Industrias Marves shall execute mutual releases whereby each party will discharge and release all claims, defenses, and counterclaims that they may have against each other.

The Debtors believe that the Gomez and SAPI Settlements are product of their sound business judgment and meet the criteria articulated by the First Circuit Court of Appeals for approving compromises under Bankruptcy Rule 9019. In light of the (i) limited circumstances in which CCM or CCM Mexico could force a sale of the 45% stake in SAPI, (ii) the complex and unresolved claims and counterclaims between CCM, Gomez, Marves, and Industrias Marves, and (iii) the interrelationship between the SAPI joint venture and the Debtors' business relationship and disputes with Gomez and Marves, the Debtors believe that the Gomez and SAPI Settlements present the best possible return for all creditors.

## 2.5 GLOBAL SETTLEMENT WITH GENERAL MOTORS

**2.5.1 The Investigation of GM and Lawsuit.** Following its appointment, the Committee spearheaded an investigation into the existence and viability of certain claims that the Debtors may hold against GM for, among other things, breach of contract, breach of good faith and fair dealing, fraud, unfair and deceptive practices under M.G.L. c. 93A, breach of fiduciary duty, and equitable subordination (collectively, the "Causes of Action"). During the course of its investigation, the Committee served and conducted Rule 2004 examinations of certain key GM employees, professional advisors, and various potential alternative suppliers. The Committee reviewed thousands of pages of documents that GM and others produced.The Committee's investigation culminated on September 2, 2016 with the filing of a six-count complaint against GM commencing the adversary proceeding styled *The Official Committee of Unsecured Creditors et al. v. General Motors, LLC*, Case No. 16-04083 (Bankr. D. Mass.) (the "GM Lawsuit"). The Committee filed an amended complaint (hereinafter, the "Complaint") on September 19, 2016 to add additional declaratory relief and claims under chapter 5 of the Bankruptcy Code. As set forth in the Complaint, the Debtors and the Committee (together, the "Plaintiffs") allege that GM orchestrated a fraudulent scheme to end its supply relationship with the Debtors, which involved funding their continued operations under the pretense that GM would negotiate in good faith to achieve permanent price increases that would restore the Debtors to viability and/or position the business for sale. The Plaintiffs further allege that GM's true intention during the negotiation period was to line up alternative suppliers and exit their relationship with CCM. The Plaintiffs contend that the Debtors never would have borrowed money from GM had they known that the latter had no intention of offering sustainable permanent price increases. The Plaintiffs argue that GM's lack of good faith precipitated the Debtors' spiral into bankruptcy, and in the process, irreparably harmed the Debtors and their unsecured creditors. The GM Lawsuit seeks to recover damages (including treble damages) from GM on account of breach of contract and fraud, as well as the equitable subordination and disallowance of GM's Claim, among other relief. In addition, the GM Lawsuit seeks recovery of the $535,621 that the Debtors made under the Second Interim Cash Collateral Order constituting the Wells Fargo Disputed Amount.

GM moved to dismiss the GM Lawsuit on October 6, 2016. The Plaintiffs moved for judgment on the pleadings with respect to certain counts in the Complaint on October 13, 2016. Meanwhile, the parties agreed to an accelerated pre-trial schedule, which required discovery to be completed by February 15, 2017 and anticipated holding a hearing on summary judgement on March 30, 2017. See Case Management and Scheduling Order [Adv. Proc. Docket No. 33]. Following the entry of a Joint Discovery Plan in late November, GM propounded extensive discovery requests on CCM.

On December 30, 2016, the Bankruptcy Court entered an order denying both GM's motion to dismiss and the Plaintiffs' motion for judgment on the pleadings.

On January 20, 2017, GM filed its *Answer, Affirmative Defenses, and Counterclaim to Plaintiffs' Amended Complaint and Jury Demand* (the "Counterclaim") [Adv. Proc. Docket No. 73]. In this response, GM vigorously denied all material allegations set forth in the Complaint and brought counterclaims against the Debtors and their affiliates arising out of the same failed negotiations between the former supplier and customer. The Counterclaim added counter-defendants CCM Automotive, AirLoc, Duffy's Park, and CCM Hildebran to the proceeding and alleged that it was CCM, and not GM, who acted in bad faith under the IAA, that CCM wrongfully shut down its operations to leverage GM into accepting unreasonable demands in exchange for continued production of Component Parts, and defrauded GM into providing additional loans to the Debtors in the days immediately preceding the Petition Date, which the Debtors used to fund their chapter 11 filings. The Counterclaim additionally argues that CCM misrepresented the collateral package that would be offered to secure the Junior Debt and seeks to reform GM's security agreement to include mortgages on the Franklin and Lafayette Properties. The Plaintiffs dispute all the allegations in the Counterclaim.

**2.5.2 Settlement**. Notwithstanding each side's view of the facts and the strength of its case, both the Plaintiffs and GM acknowledge that this litigation brings risk and significant costs. The parties are, in essence, fighting over a limited pot of assets, where every week of litigation increases the administrative cost to the Estate. To that end, the parties agreed to a formal mediation of the numerous disputes between the parties. On December 30, 2016, the Bankruptcy Court entered the *Mediation Scheduling Order* [Adv. Proc. Docket No. 64], pursuant to which the parties agreed to a mediation session conducted by the Honorable Joan N. Feeney to resolve (i) the GM Lawsuit, (ii) GM's proofs of claim, (iii) the Motion to Convert, (iv) the Debtors' continued use of cash collateral, (v) the Committee Settlement, and (vi) the GM Sanctions Motion. The parties had two day-long mediation sessions in Boston on January 16 and 23, 2017, during which time they made progress towards a resolution.

A further hearing on the Debtors' use of cash collateral, the Committee Settlement, and the GM Sanctions Motion was scheduled for January 31, 2017. At the parties' request, the Bankruptcy Court continued these hearings to the next day, to allow settlement negotiations to continue. On February 1, 2017, the parties reported that they had reached the principal terms of a global settlement, which would resolve the above-referenced issues and provide the framework for the Plan, which would be supported by both the Committee and GM. The terms of the Global Settlement are attached hereto as **Exhibit C** (the "Term Sheet").

In summary, the Global Settlement proposed the following distribution "waterfall" of $5 million in cash expected to be on had on the Effective Date of the Plan and the proceeds of the the liquidation of additional assets by the Liquidating Trust:[9]

[9] The following summary is provided for information purposes only and in the event of any inconsistency between this summary and the actual Term Sheet, the Term Sheet shall control.

| Tranche | Recipient | Distribution Amount | Terms | Remaining Cash After Distribution |
|---|---|---|---|---|
| First | Allowed Section 503(b)(9) Claims | $600,000 | Any unused amounts will be distributed 50/50 to GM and other unpaid administrative expenses and priority claims. | $4,400,000 |
| Second | Liquidation Trust | $600,000 | Liquidation Trust to be initially funded with $600,000 in cash plus post-Effective Date revenues | $3,800,000 |
| Third | General Unsecured Creditors other than GM | $2,500,000 | | $1,300,000 |
| Fourth | GM and unpaid administrative expenses and priority claims | $3,600,000 | GM to share distributions 50/50 with administrative and priority claimants until those expenses/claims are paid in full, with any remaining balance paid to GM on its secured claim. | $0 |
| Fifth | GM Secured Claim | Up to $3,200,000 | GM to receive distribution of available cash until it receives an aggregate of $5,000,000 (inclusive of distributions under First and Fourth tranches) | |
| Sixth | GM and other General Unsecured Creditors | $1,333,333 | GM to receive 75% of distributions of available cash and other General Unsecured Creditors to receive 25% until GM receives $1,000,000 | |
| Seventh | General Unsecured Creditors | Up to $6,550,000 | General Unsecured Creditors to receive up to $6,550,000; provided that the aggregate net distribution shall not exceed 75% of the Allowed amount of General Unsecured Claims. | |
| Eight | GM and other General Unsecured Creditors | | <u>Scenario A</u>:<br><br>To the extent that less than $6,550,000 is distributed to general unsecured creditors other than GM in the “Seventh” level of the Waterfall to achieve a 75% net distribution to general unsecured creditors through and including the “Seventh” level of the Waterfall, the difference between $6,550,000 and the amount actually distributed under the “Seventh” level of the Waterfall shall be distributed 50% to GM on account of its Unsecured Claim and 50% to general | |

| Tranche | Recipient | Distribution Amount | Terms | Remaining Cash After Distribution |
|---|---|---|---|---|
| | | | unsecured creditors other than GM.<br><br>Scenario B:<br><br>To the extent that $6,550,000 is distributed to general unsecured creditors other than GM in the "Seventh" level of the Waterfall to achieve a 75% net distribution to general unsecured creditors through and including the "Seventh" level of the Waterfall, there shall be no distributions to any creditor at this "Eighth" level of the Waterfall.<br><br>Scenario C:<br><br>To the extent that $6,550,000 is distributed to general unsecured creditors other than GM in the "Seventh" level of the Waterfall but a 75% net distribution to general unsecured creditors through and including the "Seventh" level of the Waterfall is not achieved, the next up to $3,000,000 available for distribution shall be distributed 50% to GM on account of its Unsecured Claim and 50% to general unsecured creditors other than GM; provided that the aggregate net distribution to general unsecured creditors through and including this "Eighth" level of the Waterfall shall not exceed 75% of the allowed amount of general unsecured claims other than GM's Unsecured Claim. | |
| Ninth | GM | Up to $29,250,000 | To GM on its allowed $39,000,000 general unsecured claim; provided that the aggregate net distribution to GM at this "Ninth" level of the Waterfall shall not exceed 75% of the allowed amount of GM's general unsecured claim. | |
| Tenth | GM and other General Unsecured Creditors | | All remaining value/cash shared pro rata among all unsecured creditors, including GM on its allowed $39,000,000 general unsecured claim. | |

The waterfall is predicated upon GM having an Allowed Secured Claim of $7.5 million and an Allowed General Unsecured Claim of $39 million – to which the Debtors and the Committee

have agreed. The waterfall further assumes that the Estate will receive $1 million is cash prior to the Effective Date from the sale of 25 Hayward Street, and the consummation of the Gomez and SAPI Settlements. In addition, GM will retain the Wells Fargo Disputed Claim and its setoff against CCM Mexico in resolution of the GM Sanctions Motion.

**2.5.3 <u>Implementation of Settlement; Liquidating Trust</u>**. The Global Settlement and Waterfall shall be implemented through the Plan. The Plan provides exculpation provisions and mutual releases by and among all parties, including the Debtors, GM, and the Committee (and participating creditors), the Debtors current and former officers and directors and each of the respective subsidiaries, affiliates, successors, and assigns.

GM will consent to and will release its liens to the extent necessary to facilitate the proposed sales of (i) 25 Hayward Street for an amount not less than $200,000, (ii) the Debtors' joint venture interests in CCM Mexico for a gross amount of $800,000, (iii) a settlement of claims against Gomez and Marves for an amount not less than $400,000, and (iv) the sale of AirLoc for an amount not less than $1,500,000; provided, however, all proceeds of such transactions shall remain subject to all rights and claims of GM and other creditors and shall be maintained in the Debtors' debtor-in-possession accounts pending the Effective Date of the Plan; provided, however, that GM shall not consent to and release such liens until the closing of each of the proposed sales.

The Plan provides for the creation of the Liquidating Trust, to which Craig R. Jalbert of Verdolino & Lowey P.C. will serve as Liquidating Trustee. The Liquidating Trust will have an oversight board consisting of five (5) members, three (3) of which will be designees of the Committee, and two (2) of which will be designees of GM. To the extent that the Trust Board is unable to resolve disputes arising in the implementation of the Liquidation Trust, the members of the Trust Board may seek relief from the Bankruptcy Court. The Liquidating Trust Agreement shall provide that any decisions concerning the ultimate disposition of AirLoc LLC, the Debtors' facility in Franklin, Massachusetts, and the Debtors' facility in Lafayette, Georgia shall require the affirmative vote of at least one of the GM designees to the Liquidating Trust Board: provided, however, that no member of the Liquidating Trust Board may withhold its consent for purposes of modifying the Global Settlement or the Plan.

The Committee will recommend that creditors vote in favor of the Plan, and subject to approval of this Disclosure Statement, GM will vote its claims in favor of the Plan.

On February 2, 2017, the Bankruptcy Court entered an order staying all activity in the Adversary Proceeding.

**2.5.4 <u>Consensual Third-Party Releases</u>**. In furtherance of the Global Settlement, on Effective Date, all holders of Claims who do not timely exercise their right to opt-out of such release in their ballot to accept or reject the Plan, shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action and liabilities of any nature whatsoever. **This release is consensual and, for the avoidance of doubt, holders of Claims who do not wish to release the Released Parties and who exercise the opt-out option on their ballot, <u>do not</u> waive any right to receive distributions under the Plan and Liquidating Trust**.

## 2.6 SECURED CLAIMS ENCUMBERING THE DEBTOR'S PROPERTY.

**2.6.1 The GM Secured Claim**. As explained above, prior to the Petition Date, the Debtors borrowed $6,022,500 from GM as evidenced by fifteen (15) separate Junior Notes. The Junior Notes are secured by liens on and security interests in substantially all of the Debtor's assets, including Cash Collateral. Following the Petition Date, GM acquired the Senior Debt from Wells Fargo, including the liens on and security interests in the assets of the Debtors and certain non-Debtor affiliates securing the Senior Debt. Pursuant to the Global Settlement, the GM Secured Claim shall be Allowed in the amount of $7,500,000 and paid in accordance with the Term Sheet.

## 2.7 ADMINISTRATIVE CLAIMS.

**2.7.1 Administrative Claims.** Administrative Claims are Claims that are incurred in the ordinary course of the business during the pendency of the Debtors' case on or before the Effective Date and pre-petition claims allowable under section 503(b)(9) of the Bankruptcy Code. The Debtors estimate such Administrative Claims, excluding Fee Claims, as of the date hereof, to be approximately $600,000.

**2.7.2 Fee Claims.** Fee Claims are Administrative Claims for the compensation of the Debtors' or the Committee's professionals or other entities for professional services rendered or expenses incurred in the Chapter 11 Cases on or before the Effective Date. All payments to Professionals for Fee Claims will be made in accordance with the procedures established in the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of costs.

## 2.8 UNSECURED CLAIMS AGAINST THE DEBTOR.

**2.8.1 Unsecured Priority Claims.** Except for Claims that may be entitled to priority under Bankruptcy Code section 507(a)(2), the Debtors do not believe that any of the Claims asserted against them are otherwise entitled to priority under Bankruptcy Code section 507(a). Without limiting the generality of the foregoing, the Debtors: (a) do not believe that there will be any taxes Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) outstanding on the Effective Date; (b) have paid post-petition real estates taxes in the normal course under applicable Cash Collateral budget and do not anticipate owing any income taxes; and (c) believe that there are no valid Priority Claims outstanding for employee wages and benefits.

**2.8.2 Unsecured Nonpriority Claims.** Based upon amounts reflected in the Debtors' Schedules and certain Claims filed to date, the Debtors unsecured nonpriority Claims to be approximately $9,500,000 – $12,500,000.

**2.8.3 GM Unsecured Claim**. Pursuant to the Global Settlement, the GM Unsecured Claim shall be Allowed in the amount of $39,000,000.

# III. SUMMARY OF THE PLAN OF LIQUIDATION.

## 3.1 IN GENERAL.

The Plan provides for the liquidation and distribution of all of the Debtor's assets pursuant to the terms of the Plan and the Liquidating Trust Agreement. The distributions contemplated under the Plan will be derived from the Debtors' Cash (including proceeds of the Sales) and proceeds of any remaining assets, including Causes of Action.

If the Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Administrative Claim shall be paid in full in Cash, except to the extent that a holder agrees to less favorable treatment. Such Claims shall be paid on the earlier of (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date. Fee Claims shall be paid in accordance with the Global Settlement "waterfall" set forth on Exhibit C.

In addition, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. On and after the Effective Date, the Liquidating Trust shall be responsible for (i) filing post-Confirmation reports and any pre-Confirmation monthly operating reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines and (ii) all applicable U.S. Trustee fees for the Chapter 11 Cases until the entry of a final decree or until the Chapter 11 Cases are closed or dismissed.

All other Allowed Claims will receive distributions as set forth below.

## 3.2 CLASSIFICATION OF CLAIMS AND INTERESTS.

**3.2.1** **<u>Voting Classes</u>**. Classes 1, 4, and 5 are entitled to vote on the Plan (collectively, the "***Voting Creditors***"). Votes to accept or reject the Plan shall be solicited from Voting Creditors, provided that if the Claim of a Voting Creditor is the subject of a Claims objection, the vote of that Voting Creditor shall not be counted (subject to a Resolution Event), although any election to opt out of the Consensual Third-Party Releases shall be valid and recognized.

**3.2.2** **<u>Class 1: GM Secured Claim</u>.** This Class consists of the GM Secured Claim. Class 1 is Impaired by the Plan, and the holder of the GM Secured Claim is entitled to vote to accept or reject the Plan.

**3.2.3** **<u>Class 2: Other Secured Claims</u>.** This Class consists of Other Secured Claims. Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.2.4** **<u>Class 3: Priority Non-Tax Claims</u>.** This Class consists of Priority Non-Tax Claims. Class 3 is Unimpaired by the Plan, and each holder of a Class 4 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.2.5 Class 4: General Unsecured Claims.** This Class consists of General Unsecured Claims against the Debtors. Class 4 is Impaired by the Plan, and each holder of a Class 4 General Unsecured Claim is entitled to vote to accept or reject the Plan.

**3.2.6 Class 5: GM Unsecured Claims.** This Class consists of GM's Unsecured Claims against the Debtors. Class 5 is Impaired by the Plan, and the holder of the Class 5 GM Unsecured Claim is entitled to vote to accept or reject the Plan.

**3.2.7 Class 6: Interests in CCM.** This Class consists of Interests in the Debtors. Class 6 is Impaired by the Plan, and each holder of a Class 6 Interest is conclusively presumed to have rejected the Plan pursuant to section 1126(g).

## 3.3 TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES.

**3.3.1 Administrative Claims.** Except to the extent that a holder agrees to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash. Such Claims (other than Fee Claims) shall be paid on the earlier of (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date. Fee Claims shall be paid in accordance with the Global Settlement waterfall attached hereto as Exhibit C.

The Debtors or the Liquidating Trustee shall provide notice of the Administrative Claims Bar Date to all parties in interest in connection with a notice of the Effective Date. Applications for allowance and payment of Administrative Claims (including Fee Claims) that were not otherwise subject to the Claims Bar Date must be Filed on or before the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the applicable bar date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Liquidating Trust or the Liquidating Trust Assets and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to any Applications for allowance and payment of Administrative Claims (including Fee Claims) must be Filed and served on the Liquidating Trust and the requesting party no later than twenty-one (21) days from the service of such application.

**3.3.2 Priority Tax Claims.** Except to the extent that the holder agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of the Effective Date or the date on which such Priority Tax Claim becomes Allowed; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (iii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon a Final Order.

**3.3.3 Class 2: Other Secured Claims.** Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction, settlement, and release, each holder of an Allowed Other Secured Claim shall receive all collateral securing such holder's Allowed Other Secured Claim on or as soon as reasonably practicable after the later of: (i) the Effective Date; (ii) the date on which such Other Secured Claim becomes Allowed; or (iii) such other date as may be ordered by the Bankruptcy Court.

**3.3.4 Class 3: Priority Non-Tax Claims.** Except to the extent that the holder agrees to a less favorable treatment, in full and final satisfaction, settlement, and release, each holder of an Allowed Priority Non-Tax Claim shall be paid in full in Cash on or soon as reasonably practicable after the later of: (i) the Effective Date; (ii) the date on which such Priority Non-Tax Claim becomes Allowed; or (iii) such other date as may be ordered by the Bankruptcy Court.

## 3.4 TREATMENT OF IMPAIRED CLASSES.

**3.4.1 Class 1: GM Secured Claim**. In full and final satisfaction, settlement, and release of such Secured Claim, the holder of the GM Secured Claim shall receive a beneficial interest in the Liquidating Trust entitling it to periodic Cash distributions under the Global Settlement as set forth in Article IV.B of the Plan.

**3.4.2 Class 4: General Unsecured Claims**. In full and final satisfaction, settlement, and release of each General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive a beneficial interest in the Liquidating Trust entitling it to periodic Cash distributions under the Global Settlement as set forth in Section IV.B of the Plan.

**3.4.3 Class 5: GM General Unsecured Claims.** In full and final satisfaction, settlement, and release of such Unsecured Claim, the holder of the Allowed GM Unsecured Claim shall receive a beneficial interest in the Liquidating Trust entitling it to periodic Cash distributions under the Global Settlement as set forth in Section IV.B of the Plan.

**3.4.4 Class 6: Interests in the Debtors.** On the Effective Date, all Interests in the Debtors shall be cancelled and holders of such Interests shall not receive or retain any distribution or property on account of such Interests.

## 3.5 IMPLEMENTATION OF THE PLAN.

**3.5.1 Liquidating Trust**.

**(a) Creation of Liquidating Trust.** On the Effective Date, the Liquidating Trust shall be created in accordance with the Liquidating Trust Agreement and funded by the Liquidating Trust Assets, which shall be transferred to the Liquidating Trust by CCM as duly authorized representative of the Substantively Consolidated Estate free and clear of Claims, Liens, encumbrances, Interests, and contractually-imposed restrictions except as

otherwise provided herein. The Liquidating Trust shall be a newly-formed trust with no prior assets or liabilities. The Liquidating Trustee shall serve as the trustee of the Liquidating Trust. As will be set forth in the Liquidating Trust Agreement, holders of Allowed Claims entitled to distributions under the Plan shall be deemed to receive uncertificated beneficial interests in the Liquidating Trust on the Effective Date.

**(b) The Liquidating Trustee.** From and after the Effective Date, the Liquidating Trustee shall be the exclusive representative of the Estates subject to the terms of the Liquidating Trust Agreement.

**(c) The Liquidating Trust Board**. The Liquidating Trust Agreement shall provide that the Liquidating Trustee shall be subject to the Liquidating Trust Board, which shall function as a board of directors over the Liquidating Trust and the activities of the Liquidating Trustee. The Liquidating Trust Agreement shall provide that any decisions concerning the ultimate dispositions of AirLoc LLC, the Debtors' facility in Franklin, Massachusetts, and the Debtors' facility in Lafayette, Georgia shall require the affirmative vote of at least one the GM designee to the Liquidating Trust Board; provided, however, that no member of the Liquidating Trust Board may withhold its consent for purposes of modifying the Global Settlement or the Plan. Without limiting the foregoing, in exercising responsibility and duties as members of the Liquidating Trust Board, the designees of GM shall be entitled to consider exclusively the interests of GM. The Liquidating Trustee or any member of the Liquidating Trust Board may petition the Bankruptcy Court to resolve matters concerning the administration of the Liquidating Trust, including in the event of a voting deadlock.

**(d) Responsibilities of the Liquidating Trustee.** The responsibilities of the Liquidating Trustee under the Liquidating Trust Agreement and the Plan shall include those set forth in the Liquidating Trust Agreement, including, without limitation, the following (a) the receipt, management, use, sale, lease, license or other disposition of the Liquidating Trust Assets; (b) the establishment and maintenance of such operating, reserve, and trust account(s) as are necessary and appropriate to carry out the terms of the Liquidating Trust; (c) the investment of Cash; (d) the pursuit of objections to, estimation of and settlements of Claims, regardless of whether such Claim is listed on the Schedules; (e) the prosecution of any Causes of Action not otherwise released under the Plan; (f) unless otherwise provided in the Plan, the calculation and distribution of all distributions to be made under the Plan; (g) the payment of any fees pursuant to 28 U.S.C. § 1930 incurred after the Effective Date until the closing of the Chapter 11 Cases; (h) to respond to reasonable requests for information regarding the administration of the Liquidating Trust made by parties in interest; and (i) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other Final Orders, or as otherwise may be necessary and proper to carry out the provisions of the Plan. The Liquidating Trustee shall be responsible for the filing of all required tax returns and operating reports and the paying of taxes due from the Substantively Consolidated Estate or the Liquidating Trust and all other obligations on behalf of the Liquidating Trust, if any.

**(e) Powers of Liquidating Trustee.** The powers of the Liquidating Trustee, as set forth in the Liquidating Trust Agreement shall include, without limitation and without further Bankruptcy Court approval, each of the following:

(i) To exercise in a manner not inconsistent with the Plan all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any member, officer, director, manager, or shareholder of the Debtors and Non-Debtor CCM Entities with like effect as if authorized, exercised and taken by unanimous action of such officers, directors, member, manager, and shareholders, including, without limitation, the dissolution of the Debtors and the Non-Debtor CCM Entities;

(ii) To hold, manage, maintain, use, sell, lease, license, compromise, or otherwise dispose of any Liquidating Trust Assets.

(iii) To maintain accounts, to make distributions provided for or contemplated by the Plan; and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment, and maintenance of appropriate reserves, in the name of the Liquidating Trustee;

(iv) Except to the extent set forth in the Plan, to object to any Claims regardless of whether such Claim was Disputed on the Effective Date, and to compromise or settle any Claims (prior to or after objection) regardless of whether such Claim was Disputed on the Effective Date, without approval of the Bankruptcy Court, free of any restriction of the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, other than those restrictions expressly imposed by the Plan, the Confirmation Order, or the Liquidating Trust Agreement;

(v) To make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust and the Liquidating Trustee and to pay the fees and charges incurred by the Liquidating Trust on or after the Effective Date for fees and expenses of professionals, disbursements, expenses, or related support services relating to the winding down of the Debtors and the Non-Debtor CCM Entities and implementation of the Plan without application to the Bankruptcy Court;

(vi) To file, if necessary, any and all tax and information returns required with respect to the Liquidating Trust as a grantor trust pursuant to Treas. Reg. 1.671-4(a) or otherwise, (ii) make tax elections by and on behalf of the Liquidating Trust, and (iii) pay taxes, if any, payable by the Liquidating Trust.

(vii) To take all other actions not inconsistent with the provisions of the Plan which the Liquidating Trustee deems reasonably necessary or desirable with respect to administering the Plan;

(viii) To collect any accounts receivable or other Claims of the Debtors, the Non-Debtor CCM Entities, or Substantively Consolidated Estate not otherwise disposed of pursuant to the Plan or the Confirmation Order;

(ix) To implement and/or enforce all provisions of the Plan, including entering into any agreement or executing any document required by or consistent with the Plan, the Confirmation Order, and the Liquidating Trust Agreement;

(x) To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of its choice, any Liquidating Trust Assets if the Liquidating Trustee concludes they are no benefit to the Estate;

(xi) Except as otherwise set forth herein, to prosecute and/or settle Causes of Action for the benefit of holders of Allowed Claims, with or without approval of the Bankruptcy Court, and exercise, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative, or other nonjudicial proceeding and pursue to settlement or judgment such actions;

(xii) To purchase or create and carry all insurance policies and pay all insurance premiums and costs the Liquidating Trustee deems necessary or advisable;

(xiii) To collect and liquidate and/or distribute all Liquidating Trust Assets pursuant to the Plan, the Confirmation Order and the Liquidating Trust Agreement and administer the winding down of the affairs of the Debtors and Non-Debtor CCM Entities;

(xiv) To hold any legal title to any and all of the Liquidating Trust Assets;

(xv) If any of the Liquidating Trust Assets are situated in any state or other jurisdiction in which the Liquidating Trustee is not qualified to act as trustee, to nominate and appoint a Person duly qualified to act as trustee in such state or jurisdiction and require from each such trustee such security as may be designated by the Liquidating Trustee in its discretion; confer upon such trustee all the rights, powers, privileges and duties of the Liquidating Trustee hereunder, subject to the conditions and limitations of the Liquidating Trust Agreement, except as modified or limited by the Liquidating Trustee and except where the conditions and limitations may be modified by the laws of such state or other jurisdiction (in which case, the laws or the state or jurisdiction in which the trustee is action shall prevail to the extent necessary); require such trustee to be answerable to the Liquidating Trustee for all monies, assets and other property that may be received in connection with the administration of all property; and remove such trustee, with or without cause, and appoint a successor trustee at any time by the execution by the Liquidating Trustee of a written instrument declared such trustee removed from office, and specifying the effective date and time of removal;

(xvi) Retain any and all Insurance Policies of the Debtors and Non-Debtor CCM Entities providing coverage with respect to Claims; and

(xvii) Exercise such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other Final Orders, or as may be necessary and proper to carry out the provisions of the Plan.

The Liquidating Trustee shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine, or any other privilege, and the Liquidating Trustee shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

**(f) Unclaimed Property of the Liquidating Trust.** The Liquidating Trustee shall establish the Unclaimed Property Reserve for all Unclaimed Property. Such Unclaimed Property shall be in held in a reserve, for a period of one hundred twenty (120) days, for the recipients of the beneficial interests in the Liquidating Trust entitled thereto under the terms of the Plan and Confirmation Order. Once the distribution becomes Unclaimed Property, the Liquidating Trustee shall, subject to the limitations set forth herein, (a) hold such Unclaimed Property in the Unclaimed Property Reserve solely for the benefit of such holder or holders who have failed to claim such Unclaimed Property and (b) release the Unclaimed Property from the Unclaimed Property Reserve and deliver to the holder entitled thereto upon presentation of proper proof by such holder of its entitlement thereto. After the expiration of one hundred twenty (120) days, the holders theretofore entitled to such Unclaimed Property shall cease to be entitled thereto and shall be entitled to no further distribution under the Plan, and such Claims shall be deemed disallowed and expunged in their entirety and the funds shall be redistributed to the other holders of Allowed Claims in accordance with the terms of the Plan, Confirmation Order, and Liquidating Trust Agreement. Such funds shall not be subject to the escheat laws of any state.

**(g) Compensation of the Liquidating Trustee.** The Liquidating Trustee shall be compensated as agreed upon by the Liquidating Trustee and the Liquidating Trust Board, pursuant to the terms of the Liquidating Trust Agreement. Any professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Liquidating Trustee. The payment of fees and expenses of the Liquidating Trustee and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval. The identity of the initial members of the Liquidating Trust Board and the proposed compensation for the Liquidating Trustee and any known professionals retained by the Liquidating Trustee shall be disclosed in the Plan Supplement.

**(h) Sale Free and Clear of Liens.** The sale or other disposition of any Liquidating Trust Assets by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement shall be free and clear of any and all Liens, Claims, Interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code. To the extent not released prior to the Effective Date, GM shall consent to and release any Liens necessary to facilitate the following transactions:

(i) a sale of the property commonly known as 25 Hayward Street in Franklin, Massachusetts for an amount not less than $200,000;

(ii) a sale of the Debtors' joint venture interests in CCM Acoustics S.A.P.I de C.V. for a gross amount of not less than $800,000;

(iii) a settlement of claims against Elias Gomes and Marves Industries for an amount not less than $400,000; and

(iv) the sale of AirLoc LLC for an amount not less than $1,500,000

provided, however, that GM shall not consent to and release such Liens until the closing of each of the proposed transactions.

**(i)** **Transfer Taxes.** Any transfer of Estate property, property owned by any Non-Debtor Entities, property owned by the Substantively Consolidated Estate or all or any portion of the Liquidating Trust Assets pursuant to the Plan shall constitute a "transfer under a plan" within the purview of section 1146(c) of the Bankruptcy Code and shall not be subject to any stamp tax or similar tax.

**(j)** **Causes of Action.** The Liquidating Trustee shall have the sole right to pursue any existing or potential Cause of Action, except those previously waived or released by the Debtors or Non-Debtor CCM Entities or released pursuant to the Plan, by informal demand and/or commencement of litigation.

**(k)** **Effective Date.** On the Effective Date, CCM as representative of the Substantively Consolidated Estate and the Liquidating Trustee shall have the rights and powers set forth herein in order to carry out and implement the purposes and intent of the Plan.

**(l)** **Records.** On or prior to the Effective Date, the Debtors and the Non-Debtor CCM Entities shall transfer to the Liquidating Trust all originals and/or copies of available documents and business records of the Debtors. The Liquidating Trust shall maintain such records until the earlier of: (a) the entry of a final decree in the Chapter 11 Cases or (b) five years from the filing of final tax returns for the Debtors and the Non-Debtor CCM Entities. Thereafter, said records may be destroyed or otherwise disposed of. If the Liquidating Trustee seeks to destroy or otherwise dispose of any of the records prior to the time periods set forth herein, the Liquidating Trustee shall be entitled to do so upon Final Order after notice and hearing.

**(m)** **Resignation of Officers and Directors.** On the Effective Date, the members of the board of directors, officers, managers, and other similar management personnel of the Debtors and Non-Debtor CCM Entities shall be deemed to have resigned.

**3.5.2** **Global Settlement; Allocation and Distribution of Liquidating Trust Assets**. The Global Settlement represents a compromise of various Claims and disputes and incorporates: (a) the "gifting" of certain distributions which would otherwise be payable to GM on account of its Secured Claim; and (b) the partial subordination of the GM Unsecured Claim to General Unsecured Claims. Liquidating Trust Assets available for distributions under the Plan shall be allocated and distributed by the Liquidating Trustee as follows:[10]

**(a)** on the Effective Date, $600,000 shall be distributed to holders of Allowed Administrative Claims pursuant to section 503(b)(9) of the Bankruptcy Code; provided, however, that to the extent that aggregate Allowed Administrative Claims pursuant to section 503(b)(9) of the Bankruptcy Code are less than $600,000, the difference shall be used to partially fund the allocation set forth inArticle IVB.4 herein;

[10] Notwithstanding the mechanics of this Global Settlement "waterfall," no creditor will receive aggregate distributions greater 100% of its Allowed Claim.

**(b)** on the Effective Date $600,000 shall fund the Trust Seed Fund;

**(c)** on the Effective Date, $2,500,000 shall be distributed to holders of Allowed General Unsecured Claims on a pro rata basis;

**(d)** on the Effective Date, or as soon as the Liquidating Trust has sufficient Cash to make such distributions, $3,600,000 shall be distributed as follows (i) 50% shall be distributed to GM on account of the GM Secured Claim; and (ii) 50% shall be distributed to holders of Allowed Fee Claims on a pro rata basis until Allowed Fee Claims are fully satisfied and, when so satisfied, the remainder of this allocation (up to a total of $3,600,000) shall be distributed to GM on account of the GM Secured Claim;

**(e)** thereafter, Liquidating Trust Assets shall be distributed to GM on account of the GM Secured Claim until it receives aggregate distributions of $5,000,000 on account of the GM Secured Claim;

**(f)** once GM receives aggregate distributions of $5,000,000 on account of its Secured Claim, the next $1,333,333.33 shall be distributed as follows (i) 75% (or $1,000,000) shall be distributed to GM on account of the GM Secured Claim; and (ii) 25% (or $333,333.33) shall be distributed to holders of Allowed General Unsecured Claims on a pro rata basis;

**(g)** further distributable Liquidating Trust Assets, if any, shall be distributed to holders of Allowed General Unsecured Claims on a pro rata basis until such holders receive aggregate distributions representing a 75% recovery on their respective Allowed General Unsecured Claims;

**(h)** if and to the extent that holders of Allowed General Unsecured Claim receive aggregate distributions representing a 75% recovery on their Allowed General Unsecured Claims, further distributable Liquidating Trust Assets, if any, shall be distributed to GM on account of the GM Unsecured Claim, until GM receives an aggregate distribution representing 75% recovery on its GM Unsecured Claim; and

**(i)** if and to the extent that holders of Allowed General Unsecured Claim receive aggregate distributions representing a 75% recovery on their Allowed General Unsecured Claims, further distributable Liquidating Trust Assets, if any, shall be distributed to GM on account of the GM Unsecured Claim.

**3.5.3** **<u>Cancellation of Existing Securities</u>.** Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, the obligations of the Debtors or Non-Debtor CCM Entities pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, certificates or articles of incorporation, or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of a Debtor or a Non-Debtor CCM Entity shall be released and discharged.

**3.5.4 Dismissal of GM Litigation**. On the Effective Date, Adv. Proc. No. 16-04083, *Official Committee of Unsecured Creditors, et al., v. General Motors, LLC,* Adv. Proc. No. 16-04083 shall be dismissed with prejudice and without costs.

**3.5.5 Preservation of Causes of Action.** In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee may pursue the Causes of Action in his discretion, other than those Causes of Action released under the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Liquidating Trust expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to the Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Liquidating Trustee may exclusively enforce any and all Causes of Action that are not released hereunder. Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.

Without limiting the breadth and generality of the foregoing paragraph, any Avoidance Actions against any Entities not released under the Plan expressly preserved for prosecution by the Liquidating Trust for the benefit of holders of Allowed Claims.

**3.5.6 Vesting of Assets.** Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Substantively Consolidated Estate shall vest in the Liquidating Trust to the same extent such property was held by the Estates and the Non-Debtor CCM Entities, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and Interest holders, but subject to the terms of the Plan. As of the Effective Date, the Liquidating Trustee may use, acquire, manage, sell, lease, license, or otherwise dispose of Liquidating Trust Assets and settle and compromise Claims and Causes of Action subject only to the restrictions expressly imposed by the Plan, the Liquidating Trust Agreement, and the Confirmation Order.

**3.6 FUNDING AND DISBURSEMENTS.**

**3.6.1 No Separate Disbursing Agent.** The Liquidating Trustee shall make all distributions under the Plan on account of Allowed Claims against a Debtor pursuant to the terms of the Plan, Confirmation Order, and Liquidating Trust Agreement.

**3.6.2 Reserves.** The Liquidating Trustee shall establish appropriate reserves, which shall be segregated (by book entry or otherwise as the Liquidating Trustee determines) and held by the Liquidating Trustee on and after the Effective Date for the payment of Disputed Claims or Interests to the extent they become Allowed.

**3.6.3 Cash Payments.** Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by the payor and payee, including by check or wire transfer

or, in the absence of an agreement, such commercially reasonable manner as the Liquidating Trustee shall determine in his or her sole discretion.

**3.6.4 Distribution for Allowed Claims and Interests.** Except as otherwise provided in the Confirmation Order, or as otherwise ordered by the Bankruptcy Court, distributions to Allowed Claims shall be made as set forth in the of the Plan. No holder of a Disputed Claim shall have any Claim against the applicable reserved funds, the Liquidating Trustee, the Liquidating Trust, the Debtors, or the Substantively Consolidated Estate with respect to such Disputed Claim until such Disputed Claim or Interest becomes Allowed, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim.

**3.6.5 Compliance with Tax Requirements.** In connection with the Plan, to the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Liquidating Trust shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, including, without limitation, requiring that the holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder or establishing any other mechanisms they believe are reasonable and appropriate. The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, Liens, and encumbrances.

The Liquidating Trust shall not be required to make distributions on any Allowed Claim if the holder thereof has not provided all documentation necessary to determine all tax withholding and reporting requirements for such Allowed Claim. To the extent such documentation is not provided within thirty (30) days of a respective distribution, the distribution on such Allowed Claim shall be deemed Unclaimed Property.

**3.6.6 Allocations.** Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

**3.6.7 Fractional Dollars: *De Minimis* Distributions.** Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding down of such fraction to the nearest whole dollar. In addition, the Liquidating Trustee shall not be required to make any distribution in an amount less than $50.00. To the extent that such a distribution shall be called for as part of any interim distribution, the Liquidating Trustee shall establish a reserve for all distributions in the amount of less than $50.00 and shall, when and if the holder of a Claim is entitled to a distribution of $50.00 or more, make such distribution at such time. The Liquidating Trustee shall not be required to make any Final Distribution to a

particular holder of less than $50.00 and all monies otherwise payable in such amount shall be donated to a charitable organization at the sole discretion of the Liquidating Trustee.

**3.6.8 <u>Delivery of Distributions to Holders of Allowed Claims and Allowed Interests</u>.** Distributions to holders of Allowed Claims shall be made at the addresses set forth in the Schedules unless such addresses are superseded by Proofs of Claim or transfers of Claims filed pursuant to Bankruptcy Rule 3001 or at the last known addresses of such holders if the Liquidating Trustee has been notified in writing of a change of address. If the distribution to any holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or otherwise unclaimed, such Unclaimed Property shall be held in a reserve as set forth in Article IV.A.6. of the Plan.

If there is any residual Unclaimed Property at the time of the dissolution of the Liquidating Trust, such residual Unclaimed Property shall be available for a subsequent distribution or donated to a charitable organization at the sole discretion of the Liquidating Trustee.

**3.6.9 <u>No Penalty Claims</u>.** Unless otherwise specifically provided for in the Plan or the Confirmation Order, no holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

**3.6.10 <u>Setoffs and Recoupment</u>.** The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or Non-Debtor CCM Entities may have against the claimant pursuant to section 558 of the Bankruptcy Code or otherwise, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

**3.6.11 <u>Distributions by the Liquidating Trust</u>.** The Liquidating Trustee shall not be obligated to make a distribution that would impair the ability of the Liquidating Trust to pay the expenses incurred by the Liquidating Trust.

**3.6.12 <u>Claims Paid or Payable by Third Parties</u>.**

**(a) <u>Claims Paid by Third Parties</u>.** The Liquidating Trust shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor. To the extent a holder of such Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such holder shall repay, return, or deliver any distribution to the Liquidating Trust, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The Substantively Consolidated Estate and Liquidating Trust reserve all of rights, remedies, claims, and actions against any such holders who fail to repay or return any such distribution.

**(b) Claims Payable by Third Parties.** No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant the Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c) Applicability of Insurance Policies.** Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.

**3.7 EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**3.7.1 Assumption and Rejection of Executory Contracts and Unexpired Leases.** Except for the Insurance Policies which are dealt with below, on the Effective Date, any and all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) previously expired or terminated pursuant to its own terms; or (iii) is the subject of a motion to assume Filed on or before the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a finding and order that the Debtor has satisfied all of the requirements of section 1113 of the Bankruptcy Code, and that the Collective Bargaining Agreement between CCM and the New England Joint Board, Local 31T of UNITE-HERE is and shall be rejected and terminated as of the Effective Date.

Entry of the Confirmation Order shall constitute a Final Order approving the rejection of such Executory Contracts or Unexpired Leases pursuant to sections 365(a), 1113, and 1123 of the Bankruptcy Code. Unless otherwise indicated, rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date.

**3.7.2 Claims Based on Rejection of Executory Contracts or Unexpired Leases.** Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including, but not limited to, the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will not be considered Allowed and such Person or Entity shall not be treated as a creditor for purposes of distributions under the Plan.** Claims arising from the rejection of Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Class 4 of the Plan.

**3.7.3 Insurance Policies and Proceeds.** Any and all proceeds of the Insurance Policies received by or payable to the Debtors or the Non-Debtor CCM Entities shall be deemed assigned to the Liquidating Trust.

Except to the extent determined by Final Order to be Executory Contracts, the Insurance Policies and any agreements, documents, or instruments relating thereto shall not be treated as or deemed to be Executory Contracts. On the Effective Date, the Liquidating Trust retains all Insurance Policies and nothing in the Plan, including any releases, shall diminish or impair the enforceability of the Insurance Policies that cover claims against a Debtor or any other Entity.

To the extent any Insurance Policies are determined by Final Order to be Executory Contracts subject to assumption pursuant to section 365 of the Bankruptcy Code, such Insurance Policies shall not be assumed unless such relief is sought by the Liquidating Trustee, within 60 days after entry of a Final Order determining that such Insurance Policies constitute Executory Contracts, and is approved by the Court.

**3.8 RESOLUTION OF CLAIMS.**

**3.8.1 Claims Administration Responsibilities.** After the Effective Date, the Liquidating Trust shall have and retain any and all rights and defenses that the Debtors and Non-Debtor CCM Entities had with respect to any Claim immediately before the Effective Date. Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidating Trust shall have the sole authority: (i) to File, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise Disputed Claims or Interests without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to direct the Clerk of the Bankruptcy Court to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. Any objections to Claims filed by the Debtors or Committee that remain pending before the Bankruptcy Court as of the Effective Date shall be deemed assigned to the Liquidating Trustee to litigate, settle or compromise, or withdraw. In addition, any other party in interest, including GM, at such party's sole cost and expense, shall have the authority to File or litigate to judgment objections to Claims, with the exception of any Claims expressly Allowed pursuant to this Plan. Notwithstanding the foregoing, the United States Trustee shall have sole authority to litigate to judgment the *Objection to Proofs of Claim* filed on September 19, 2016 [Docket No. 19], and authority to litigate such objection shall not transfer to the Liquidating Trust.

**3.8.2 Estimation of Claims.** Before or after the Effective Date, the Debtors or Liquidating Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Court for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the claims register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Liquidating

Trust may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

**3.8.3 Adjustment to Claims or Interests Without Objection.** Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan), or any Claim whose treatment has been deemed modified by the Plan, or any Claim whose treatment has been agreed to by the holder of such Claim, may be adjusted or expunged (including on the claims register, to the extent applicable) by the Liquidating Trust, without a Claims objection or any other notice or motion having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**3.8.4 Time to File Objections to Claims.** Any objection to Claims against or Interests in the Debtors shall be Filed on or before the Claims Objection Deadline, as defined in the Plan.

**3.8.5 Disallowance of Claims.** Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date or Administrative Claims Bar Dates, as applicable, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order; provided, however, that nothing in this Article VII.E shall act to automatically disallow an amendment of a timely-filed Proof of Claim.

**3.8.6 Amendments to Claims.** On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trust, unless the proposed amended Claim is for a lesser amount than the original Claim. Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

**3.8.7 Tax Implications for Recipients of Distributions.** Notwithstanding any other provision of the Plan, each Entity receiving a distribution of Cash or other consideration pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any Governmental Unit on account of the distribution, including income, withholding, and other tax obligations.

**3.8.8 Offer of Judgment.** The Liquidating Trust is authorized to serve upon a holder of a Claim an offer to allow judgment to be taken on account of such Claim, and pursuant to Bankruptcy Rule 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the holder of a Claim must pay the costs of Liquidating Trust, after making of such offer, the Liquidating Trust is entitled to setoff such amounts against the amount of any distribution to be paid to such holder.

**3.8.9 Release of Liens Securing Disputed Claims.** If a Secured Claim is a Disputed Claim, the holder of such Claim shall be deemed to have released any Lien on its collateral, if any, pending determination of its Allowed Secured Claim, upon: (i) payment to the

holder of such Disputed Claim the undisputed portion of such Secured Claim; and (ii) the placement of the disputed portion thereof into escrow.

**3.8.10 No Distributions Pending Allowance.** If an objection to a Claim or Interest or portions thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portions thereof unless and until such Disputed Claim or Interest becomes Allowed.

**3.8.11 Distributions After Allowance.** To the extent that a Disputed Claim ultimately becomes Allowed, distributions (if any) shall be made to the holder in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Liquidating Trust shall provide to the holder thereof the distribution (if any) to which such holder is entitled under the Plan, without any interest to be paid on account thereof.

### 3.9 SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS.

**3.9.1 Compromise and Settlement of Claims, Interests and Controversies.** Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights with respect to any Allowed Claim, and all Claims and controversies belonging to the Substantively Consolidated Estate. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement, including the Global Settlement, is in the best interests of the Debtors, their Estates, and holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle (a) Claims against the Substantively Consolidated Estate and (b) the Substantively Consolidated Estate's Causes of Action against any Entities.

**3.9.2 Binding Effect.** The Plan shall be binding upon and inure to the benefit of the Substantively Consolidated Estate, all present and former holders of Claims and Interests, and their respective successors and assigns.

**3.9.3 Release of Liens.** Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against the Liquidating Trust Assets shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Trustee.

**3.9.4 Liabilities to, and Rights of Governmental Units.** Nothing in the Plan or Confirmation Order shall discharge, release, or preclude: (1) any liability to a Governmental

Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Entity other than the Debtors, the Non-Debtor CCM Entities, or Liquidating Trust; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability. Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence. The Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

**3.9.5 Exculpation.** ***None of the Exculpated Persons shall have or incur any liability for any Exculpated Claim, except for actual fraud, willful misconduct, or gross negligence, and in all respects, the Exculpated Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan***.

**3.9.6 *Releases*.**

***(a) Releases by the Substantively Consolidated Estate. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Non-Debtor CCM Entities, and the Liquidating Trustee, and any Person seeking to exercise the rights of the Substantively Consolidated Estate or the Liquidating Trust, shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever, whether direct or derivative, including, without limitation, any of the foregoing in connection with or related to the Debtors, the Non-Debtor CCM Entities, the Chapter 11 Cases, the Sales, Adversary Proceeding No. 16-04083, the Global Settlement, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date; provided, however, that these releases shall not include any rights of setoff that GM has against CCM Mexico or any non-consolidated affiliate of the Debtors.***

**(b) *Consensual Third-Party Releases*. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, all Voting Creditors who do not timely and affirmatively exercise their right to opt-out of such release, shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations suits, judgments, damages, demands, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether direct or derivative, and which relates directly to (i) such holder's business dealings with the Debtors, the Non-Debtor CCM Entities, AirLoc LLC, or (ii) the Chapter 11 Cases, the Sales, the Global Settlement, or the Plan (collectively the "Released Claims"), whether such Released Claims are liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date.**

**Notwithstanding the foregoing, GM shall not be deemed to release any right of setoff against CCM Acoustics Holdings S.A. de C.V.**

**3.9.7 *Injunction. Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, all Entities that have held, hold, or may hold a Claim or other debt or liability against a Debtor or Interest in a Debtor are permanently enjoined from taking any of the following actions against the Debtors, the Released Parties, or the Liquidating Trust or any of their property on account of such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action, or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, or encumbrance; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation including, but not limited to, on account of or in connection with or with respect to any Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (v) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the Plan.***

**3.9.8 Opt-Out of Consensual Third-Party Releases**. Notwithstanding anything to the contrary in the Plan or Disclosure Statement, creditors will be deemed to have consented to the Consensual Third-Party Releases unless they timely and affirmatively opt-out of the Consensual Third-Party Releases.

**3.9.9 Term of Injunctions or Stays.** Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any Final Order, and existent on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall arise and remain in full force and effect from and after the Effective Date.

## 3.10 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

**3.10.1 Conditions Precedent to the Effective Date.** It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived by the unanimous consent of the Debtors, the Committee, and GM: (1) the Confirmation Order, in form and substance acceptable to the Debtors, the Committee, and GM, shall have been duly entered and be a Final Order; (2) the Debtors and the Non-Debtor CCM Entities shall collectively have at least $5 million of Cash; (3) Projected Allowed Administrative Claims pursuant to section 503(b)(9) shall not materially exceed $600,000; (4) GM shall have voted to accept the Plan and shall not have opted-out of the releases contemplated in Article VIII.F.2 of the Plan; (5) there shall be no material breaches of any parties' obligations under the Term Sheet; (6) all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

**3.10.2 <u>Effect of Failure of Conditions</u>.** Unless expressly set forth herein, if the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holder of any Claim or Interests, or any other Entity in any respect.

### 3.11 MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN.

**3.11.1 <u>Modification and Amendments</u>.** Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve the right to revoke or withdraw, to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**3.11.2 <u>Effect of Confirmation on Modifications</u>.** Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**3.11.3 <u>Revocation or Withdrawal of Plan</u>.** The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file a subsequent plan. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (l) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claim or Interest; (b) prejudice in any manner the rights of the Debtors, any holder of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, any holder of a Claim or Interest, or any other Entity.

### 3.12 RETENTION OF JURISDICTION.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142, including jurisdiction to:

**(a)** allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including

the resolution of any request for payment of any Administrative Claim (including Fee Claims) and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

**(b)** resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

**(c)** ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

**(d)** adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications that may be pending on the Effective Date;

**(e)** adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

**(f)** adjudicate, decide, or resolve any and all matters related to the governance, operations, and administration of the Liquidating Trust;

**(g)** enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

**(h)** enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

**(i)** adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

**(j)** issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

**(k)** adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

**(l)** adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

**(m)** enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

**(n)** determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

**(o)** enter an order or final decree concluding or closing of the Chapter 11 Cases;

**(p)** adjudicate, decide, or resolve any and all disputes arising from or relating to distributions under the Plan;

**(q)** consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

**(r)** determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

**(s)** hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

**(t)** hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

**(u)** hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan; and

**(v)** enforce all orders previously entered by the Bankruptcy Court.

The Bankruptcy Court shall retain non-exclusive jurisdiction to hear any other matter not inconsistent with the Bankruptcy Code.

**3.13 MISCELLANEOUS PROVISIONS.**

**3.13.1** **Immediate Binding Effect.** Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trust, any and all holders of Claims or Interests, all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with a Debtor.

**3.13.2** **Additional Documents.** On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary

or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Liquidating Trust, as applicable, and all holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**3.13.3** **Statutory Committee.** On the Effective Date, the Committee shall dissolve and all of its members, Professionals, and agents shall be deemed released of their duties, responsibilities, and obligations, and shall be without further duties, responsibilities, and authority in connection with the Debtors, the Chapter 11 Cases, the Plan, or its implementation, except with respect to applications for Fee Claims.

**3.13.4** **Reservation of Rights.** Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors, with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any of their respective rights with respect to the holders of Claims and Interests or each other before the Effective Date.

**3.13.5** ***Successors and Assigns***. The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, if any, of such Entity.

**3.13.6** ***Notices***. To be effective, all notices, requests and demands, to or upon the Liquidating Trust shall be in writing. Unless otherwise expressly provided herein, notice shall be deemed to have been duly given or made when actually delivered or when received and telephonically confirmed, addressed to the following:

Liquidating Trust:
Verdolino & Lowey, P.C.
Attn: Craig Jalbert
124 Washington Street, Suite 101
Foxboro, MA 02035
Phone: 508-543-1720
Fax: 508-543-4114

**3.13.7** ***Entire Agreement***. Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**3.13.8** ***Exhibits***. All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**3.13.9** **Severability of Plan Provisions**. If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) non-severable and mutually dependent.

**3.13.10Votes Solicited in Good Faith.** Once the Confirmation Order becomes a Final Order, the Debtors and the Committee will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under the Plan (if later determined that any Securities are in fact offered and sold under the Plan) and any previous contemplated plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of any Securities offered and sold under the Plan or any previous contemplated plan.

**3.13.11Closing of Chapter 11 Case.** The Liquidating Trustee shall promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

**3.13.12No Admission Against Interest.** Neither the filing of the Plan, the Disclosure Statement, nor any statement contained therein, is or shall be deemed an admission against interest. In the event that the Plan is not consummated, neither the Plan, the Disclosure Statement, nor any statements contained therein may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or outside the Bankruptcy Court involving the Debtors.

**3.13.13** **No Waiver.** Except as otherwise specifically provide herein, nothing set forth in the Plan or the Disclosure Statement shall be deemed a waiver or release of any claims, rights, or Causes of Action against any Person other than the Debtors.

**3.13.14** **Headings.** The article and section headings used in the Plan are inserted for convenience and reference only and neither constitutes a part of the Plan nor in any manner affects the terms, provisions, or interpretation of the Plan.

**3.13.15** **Governing Law.** Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent otherwise provided in the Plan, the rights and obligations arising under the Plan, shall be governed by, and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, without giving any effect to the principles of conflicts of law or such jurisdiction.

**3.13.16** **Conflicts.** Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control and then the Plan.

## IV. POST-CONFIRMATION ISSUES.

### 4.1 THE DEBTORS' CONTINUED EXISTENCE AFTER CONFIRMATION.

**4.1.1** **Wind-Up of Affairs.** Upon the Effective Date, the Liquidating Trust shall wind-up the affairs of the Debtors, including, without limitation, making distributions pursuant to the Plan and consummating the terms of the Plan. The Debtors shall not exist for the purpose of continuing business except insofar as necessary for the winding up of such company.

**4.1.2** **Role of the Committee.** From and after the Effective Date, as set forth above, the Committee will be disbanded and the appointment of its members will be terminated.

## V. FEASIBILITY.

### 5.1 FINANCIAL FEASIBILITY ANALYSIS.

**5.1.1** **The Bankruptcy Code Standard.** The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization unless contemplated by the Plan.

**5.1.2** **No Need for Further Reorganization of the Debtor.** The Plan provides for the liquidation or distribution of all of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization.

## VI. ALTERNATIVES TO THE PLAN.

### 6.1 CHAPTER 7 LIQUIDATION.

**6.1.1 <u>The Bankruptcy Code Standard</u>.** Notwithstanding acceptance of the Plan by the requisite number of creditors of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the respective Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for: (i) secured creditors (to the extent of the value of their collateral); (ii) administrative and other priority creditors; (iii) unsecured creditors; (iv) debt expressly subordinated by its terms or by order of the Bankruptcy Court; and (v) equity holders.

**6.1.2 <u>The Plan is in the Best Interests of Creditors</u>.** The Debtors believe that the Plan satisfies this standard because the Plan provides for an orderly, consensual liquidation of the Debtors' assets. Specifically, the substantive consolidation under the Plan of the Non-Debtor Entities into the Estate will provide the Liquidating Trust with assets, including valuable real estate that would not be available to creditors, where the Debtors liquidated under chapter 7. Furthermore, the Debtors believe that the Plan also provides creditors with a degree of certainty that would not exist if the Debtor's Assets were subject to liquidation outside of the Plan. In this regard, in the event of liquidation under chapter 7, creditors will not receive as great and as prompt payment of their Allowed Claims and as they would under the Plan and the following is likely to occur: (i) additional administrative expenses, including trustee's commissions, fees for the trustee's accountant, attorneys and other professionals likely to be retained, would be incurred with priority over general unsecured claims under section 507(a)(1) of the Bankruptcy Code and (ii) final distribution of the assets would likely be substantially delayed. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

**6.1.3 <u>Liquidation Analysis</u>.** As noted above, in considering whether the Plan is in the best interests of creditors and equity holders, the Debtors and their professionals created a Liquidation Analysis, a copy of which is attached hereto as **<u>Exhibit B</u>**. The Debtors believe its Liquidation Analysis, and the conclusions set forth herein are fair and accurate, and represent the Debtors' best judgment with regard to the results of a chapter 7 liquidation of the Debtors. The Liquidation Analysis was prepared by the Debtors and is based on the Debtors' books and records and projections.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, which would be available to the Debtors' creditors if they were to be liquidated in a chapter 7 case. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtors' management and professionals, are inherently subject to significant business, economic and competitive uncertainties, and contingencies beyond the control of the Debtors and their

management.

THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND THEY MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

### 6.2 ALTERNATIVE PLAN(S).

If the Plan is not confirmed, the Debtors or other Persons could attempt to formulate and propose a different plan. The Debtors believe that the Plan, as described herein, enables creditors to realize the greatest possible value under the circumstances, and that is compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## VII. TAX CONSEQUENCES OF PLAN.

### 7.1 CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of certain U.S. federal income tax considerations of the Plan to the Debtors and to certain holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury regulations promulgated thereunder, judicial decisions, published administrative interpretations of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS with respect to the statements made and the conclusions reached in this summary, and there can be no assurance that the IRS will agree with such statements and conclusions. In addition, the discussion does not describe any tax consequences arising out of the laws of any state or local or foreign jurisdiction. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not apply to holders of Claims that are not "U.S. persons," except as described below. For purposes of this section under the heading "Certain U.S. Federal Income Tax Considerations," a "U.S. person" means a holder of an Allowed Claim that is a citizen or resident of the United States, a domestic corporation or otherwise subject to U.S. federal income tax on a net income basis in respect of its Claims or Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances. In particular, this discussion does not address all of the tax considerations that

may be relevant to persons in special tax situations, including financial institutions, insurance companies, dealers or traders in securities, regulated investment companies, entities taxed as partnerships and partners therein, trusts, persons subject to the alternative minimum tax, persons who hold Claims on behalf of another person as a nominee, persons who have a "functional currency" other than the U.S. dollar, tax-exempt entities, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, holders of Claims who are themselves in bankruptcy, persons who received their Claims through the exercise of employee stock options or otherwise as compensation, and those holding Claims as part of a "hedge," "straddle," "conversion transaction," "synthetic security," or other integrated transaction. No aspect of state, local, estate, gift, non-U.S. taxation or the Medicare tax on net investment income is addressed. Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim as a capital asset, which generally means as property held for investment. Further, this discussion assumes that the transaction will be completed in accordance with the steps described in this document and in the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**7.1.1 Classification of Liquidating Trust**. On the Effective Date, holders of Allowed Claims will become entitled to receive distributions from the Liquidating Trust and shall be referred to as "Liquidating Trust Beneficiaries" for the purpose of this section. The Liquidating Trust is intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684. In general, a liquidating trust is treated for federal income tax purposes as a "grantor trust." Under U.S. federal income tax laws, a grantor trust is disregarded, and the grantors are treated as if they directly own undivided interests in all of the trust's assets. For federal income tax purposes, the Liquidating Trust will be taxed as a grantor trust under IRC Sections 671-677 (nontaxable passthrough tax entities). The Liquidating Trust Beneficiaries will be deemed to be the grantors and owners of the Liquidating Trust and its respective Liquidating Trust Assets.

The Liquidating Trust has been structured with the intention of complying with Revenue Procedure 94-45. Among other things, the Liquidating Trust Agreement will provide that the sole purpose of the Liquidating Trust is to liquidate the Trust Assets for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trust Agreement will limit the ability of the Liquidating Trust to engage in the conduct of any trade or business activity, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties, including without limitation the Liquidating Trust Beneficiaries, must treat the Liquidating Trust for federal income tax purposes as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors.

All affected parties must treat the initial transfers to the Liquidating Trust as deemed taxable transfers to the Liquidating Trust Beneficiaries as described in more detail in the following section. In turn, no income tax should be imposed on the deemed transfer of Liquidating Trust Assets by a Liquidating Trust Beneficiary. In addition, no income tax should be imposed on the Liquidating Trust (i) on the deemed receipt of Liquidating Trust Assets, or (ii) on subsequent income earned or gain recognized by the Liquidating Trust with respect to Liquidating Trust Assets. Instead, the Liquidating Trust Beneficiaries will be taxed on their respective allocable shares of such net income or gain in each taxable year of the Liquidating Trust, and will be responsible for paying the taxes associated with such income or gain regardless of whether they received any distributions from the Liquidating Trust in that taxable year.

The following discussion assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. No ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status as a grantor trust of the Liquidating Trust. There can be no assurance that the IRS will agree with the tax classification of the Liquidating Trust, or any reserves within the Liquidating Trust, as a grantor trust or part of a grantor trust. A different classification could result in a different income tax treatment of the Liquidating Trust, or a reserve within the Liquidating Trust. Such treatment could include, but is not limited to, treatment as a tax partnership for federal income tax purposes, or the imposition of an entity-level tax on the Liquidating Trust, or a reserve within the Liquidating Trust. Such a tax, if imposed, could result in a material reduction in the amount that would otherwise be available for distribution to the Liquidating Trust Beneficiaries.

**7.1.2** **Treatment of Transfer of Assets to the Liquidating Trust**. For all U.S. federal income tax purposes, all parties with respect to the Liquidating Trust must treat the transfer of assets to the Liquidating Trust as (i) a taxable transfer of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries, followed by (ii) a transfer of the Liquidating Trust Assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, with Liquidating Trust Beneficiaries being treated as grantors and owners of the Liquidating Trust. Each Liquidating Trust Beneficiary will generally recognize gain or loss in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its beneficial interest in the Liquidating Trust and its adjusted tax basis in the beneficial interest. The amount realized should generally equal the fair market value of the Liquidating Trust Assets deemed received for U.S. federal income tax purposes under the Plan in respect of each Liquidating Trust Beneficiary's *pro rata* share of the Liquidating Trust Assets as determined by the amount of each Liquidating Trust Beneficiary's Allowed Claim and the waterfall set forth on the Term Sheet. A Liquidating Trust Beneficiary that is deemed to receive for U.S. federal income tax purposes the Liquidating Trust Assets under the Plan in respect of its beneficial interest should generally then have a tax basis in the Liquidating Trust Assets in an amount equal to the fair market value of the Liquidating Trust Assets on the date of receipt.

Because each Liquidating Trust Beneficiary's share of the Liquidating Trust Assets in the Liquidating Trust may change depending upon the resolution of Disputed Claims, the Liquidating Trust Beneficiaries may be prevented from recognizing for tax purposes all of their losses from the consummation of the Plan until all Disputed Claims have been resolved.

The Liquidating Trust and the Liquidating Trust Beneficiaries, as applicable, must value the Liquidating Trust Assets consistently and use the valuations for all U.S. federal income tax purposes. The Liquidating Trust Agreement will provide for (i) consistent valuation of the Liquidating Trust Assets by the Liquidating Trustee and the beneficiaries of the Liquidating Trust, (ii) the Liquidating Trust to determine the fair market value of the Liquidating Trust Assets, and (iii) the Liquidating Trust to send the fair market value determinations to each Liquidating Trust Beneficiary.

The Liquidating Trust will be required to file federal income tax returns as a grantor trust under IRC Section 671 and Treasury Regulations Section 1.671-4, and report, but not pay tax on, its respective tax items of income gain, loss deductions and credits (the "Tax Items'). Each Liquidating Trust Beneficiary will be required to report that holder's proportionate share of such Tax Items on his, her or its federal income tax return, and pay any resulting federal income tax liability, regardless of whether the Liquidating Trustee distributes sufficient cash to fund the tax.

### 7.2 CONSEQUENCES TO HOLDERS OF CLAIMS

The federal income tax consequences to a Liquidating Trust Beneficiary receiving, or entitled to receive, a payment on account of its Claim may depend on a number of factors, including the nature of the Claim, the Liquidating Trust Beneficiary's method of accounting, the Liquidating Trust Beneficiary's tax jurisdiction, and particular tax situations applicable to the Liquidating Trust Beneficiary. Because each Liquidating Trust Beneficiary's Claim and tax situation differs, Liquidating Trust Beneficiaries should consult their own tax advisors to determine how the Plan affects them for their taxing jurisdictions, based on their particular tax situations.

In general, a holder of an Allowed Secured Claim or Allowed General Unsecured Claim should be treated as exchanging the obligation constituting the surrendered Allowed Secured Claim or the Allowed Unsecured Claim for Cash received under the Plan in respect of the holder's Claim, including to the extent such holder is a Liquidating Trust Beneficiary, the fair market value of each such holder's proportionate share of the assets transferred to the Liquidating Trust on behalf of and for the benefit of such holder in a fully taxable exchange. In general, a holder of an Allowed Secured Claim or Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in the Claim. The holder's amount realized generally will equal the sum of the Cash and the fair market value of the property received or deemed received by the holder under the Plan in respect of the holder's Claim, less the amount, if any, allocable to any Claim for interest.

Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss, or ordinary income or loss, depending upon the nature and origin of the Claim (e.g., whether the Claim arises in an investment transaction, or in the ordinary course of a trade or business, whether the Claim constitutes a capital asset in the hands of the holder, the length of time the holder held the Claim, whether the Claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction. Capital gain or loss will be long-term if the Claim was held by the holder for more than one year, and otherwise will be short-term. Any capital losses realized generally may be used by a corporate

holder only to offset capital gains, and by an individual holder only to the extent of capital gains plus $3,000 of ordinary income ina ny single taxable year.

A holder who receives in respect of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt, and possibly in an earlier or later year, to a bad debt deduction under IRC Section 166(a) or a worthless securities deduction under IRC Section 165(g). The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take either deduction.

**7.2.1 Distribution in Discharge of Accrued but Unpaid Interest.** In general, a holder of an Allowed Claim will recognize ordinary income to the extent that any consideration received pursuant to the Plan is allocable to accrued but unpaid interest not previously included in its taxable income. If the amount of accrued but unpaid interest or previously amortized original issue discount ("OID") previously included in such Claim holder's taxable income exceeds the amount of consideration allocable to the interest, the Claim holder may recognize a deductible loss. Each holder is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest or previously amortized OID.

A holder of an Allowed Claim should also recognize ordinary income on the exchange, but not in excess of the amount of gain recognized, to the extent a holder receives a distribution in exchange for market discount not previously taken into account under the holder's method of accounting.

## 7.3 CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS

Pursuant to the Plan, all Interests in all of the Debtors are being extinguished. A holder of any Interest in the Debtors extinguished under the Plan should generally be allowed a "worthless stock deduction" in an amount equal to the holder's adjusted basis in the holder's Interest. A "worthless stock deduction" is a deduction allowed to a holder of a corporation's stock for the taxable year in which such stock becomes worthless. If the holder held the Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Interest was held by the holder for more than one year and otherwise will be short-term. Any capital losses realized will generally be subject to limitation on the use of such losses.

## 7.4 INFORMATION REPORTING AND BACKUP WITHHOLDING

The Debtors and/or the Liquidating Trust will withhold all amounts required by law to be withheld from payments. The Debtors and/or Liquidating Trust will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of an allowed Claim. Additionally, backup withholding, at a rate of 28%, will generally apply to such payments if a holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax.

Amounts withheld under the backup withholding rules may be credited against a holder of an Allowed Claim's United States federal income tax liability, and a holder of an Allowed Claim may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND DOES NOT CONSTITUTE TAX ADVICE TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST. THIS SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND CONSULTATION WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## VIII. RISK FACTORS.

**Holders of Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before making a judgment with respect to the Plan.**

### 8.1 CERTAIN BANKRUPTCY CONSIDERATIONS

Even if all Impaired voting classes vote to accept the Plan and the requirements for "cramdown" are met; the Court may exercise substantial discretion and may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

Any objection to the Plan by a member of a class of Claims could also prevent confirmation of the Plan or delay such Confirmation for a significant period of time.

If the Plan were not to be confirmed or is confirmed but does not go effective, it is unclear what distribution, if any, holders ultimately would receive with respect to their Claims and Interests. Moreover, if an alternative plan could not be agreed to, it is likely that the Debtors would have no option other than to seek conversion of these Chapter 11 Cases to chapter 7.

Once converted, the chapter 7 fees and expenses would be senior to and, thus, paid prior to the chapter 11 administrative expenses and general unsecured claims. Moreover, without a confirmed Plan, the Global Settlement with GM would be null and void, and a chapter 7 trustee would have to resolve the outstanding Claims between the Debtors and GM. Under such circumstances it is unlikely that a chapter 7 trustee could resolve the GM litigation on terms as favorable as the Global Settlement. As such, it is highly likely that holders of Allowed Claims would receive less than they would have received pursuant to the Plan.

### 8.2 CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION.

There can be no assurance that the estimated amount of Claims set forth herein are correct. The actual Allowed amounts of Claims and Interests may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, including, without limitation, that unanticipated proofs of claim are filed against the Estate prior to the Administrative Claims Bar Date and such Claims are either not subject to a valid objection by the Debtors or such objections are overruled by the Bankruptcy Court.

### 8.3 LIQUIDATION OF ASSETS

On the Effective Date, CCM as representative of the Substantively Consolidated Estate shall transfer the Liquidating Trust Assets into the Liquidating Trust. These Liquidating Trust Assets will consist primarily of Cash, equity interests in AirLoc LLC and real estate in Franklin, Massachusetts and Lafayette, Georgia. The unique nature of these assets makes them difficult to value. The distributable value assumed in the Term Sheet is based on the Debtors' estimates of what the real estate and AirLoc will realize under certain conditions. Accordingly, there can be no assurance when such value will be realize or whether it will be realized in an amount less than the assumptions made on the Term Sheet. Many factors can change the ultimate sale price of these assets, including the state of the domestic and global economy, interest rates, changes in state and local land use, zoning and environmental laws and regulations. Timing and liquidity are also factors that will contribute to the ultimate sale price achieved for the Liquidating Trust Assets.

## IX. CONCLUSION.

It is important that you exercise your right to vote on the Plan. It is the Debtors' belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against and Interests in the Debtors.